UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN THE MATTER OF THE          )
EXTRADITION OF CRISTIAN       )          DOCKET NO.  17-mj-04218-DHH
STARLING AGUASVIVAS           )

## MOTION TO DISMISS EXTRADITION COMPLAINT

On September 13, 2017, the government filed a Complaint in this District seeking to extradite Mr. Aguasvivas to the Dominican Republic. Mr. Aguasvivas moves to dismiss the Complaint and accompanying extradition request because the request fails to comply with the terms of the extradition treaty signed between the Dominican Republic and United States. Specifically, the Dominican government fails to (1) provide a valid arrest warrant, (2) show pending charges, or (3) provide a "reasonable basis" to believe Mr. Aguasvivas committed these offenses under the language of the Treaty. In addition, the government has failed to present competent or sufficient evidence of probable cause that Mr. Aguasvivas has in fact committed the offenses alleged in violation of the extradition statute, 18 U.S.C. § 3184.

### RELEVANT FACTUAL BACKGROUND

I.     Documents Submitted by the Dominican Government

The Complaint is accompanied by two Diplomatic Notes submitted by the State Department.[1] Attached to these Notes are four documents submitted by the Dominican authorities in support of the extradition request:[2]

_____

[1]  Defendant attaches the entire submission provided by the government in support of the extradition request at Exhibit A. All references in this Motion to Dismiss are to the Bates numbering on the government's submission in Exhibit A unless otherwise noted.

[2]  In this section, Mr. Aguasvivas recounts the facts as alleged in the documents submitted by the Government in support of the Complaint. By citing these facts he does not adopt the factual scenarios recounted within; in fact, Mr. Aguasvivas denies the allegations made by the Dominican government and intends to vigorously contest the proffered evidence at the extradition hearing.

1) An Arrest Warrant, issued December 6, 2013, by Acting Judge Leonardo Antonio Garcia Cruz, at Bates 62-66 ("Warrant");[3]

2) An Autopsy report, issued by Dr. Ana Vicenta Sanchez Romero of the National Institute of Forensic Science of the Attorney General of the Republic, dated December 6, 2013, at Bates 67-71 ("Autopsy"), and Medical Certificates, issued by Dr. Walter Lopez Pimental, dated December 20, 2013, at Bates 72-73;[4]

3) An "Affidavit justificatory of the extradition request" written by Feliz Sanchez Arias, "Prosecutor of Judicial District of Peravia," dated December 12, 2016, at Bates 53-61; and

4) An "Additional Affidavit of Support" of the Extradition Request by Feliz Sanchez Arias, dated March 29, 2017, at Bates 81-82 (replicated at Bates 88-89).

The documents assert various factual scenarios surrounding the shooting of three agents of the DNCD, the Dominican drug police, on December 5, 2013. All emphasis is added.

- The 12/6/13 Warrant, at Bates 62-63, asserts that:

**[O]n December 05, 2013, at mid-day, on 5th street,** Pueblo Nuevo, Bani, … at the moment when the agents [] Felipe [Jimenez Garcia], Jose Marino [] and Lorenzo Ubri Montero were making an anti-drug operation and were preparing to arrest of **Estarling Aguasvivas aka Momon**, *this person disarmed and fired three shots to the agent Lorenzo Ubri Montero causing his dead [sic].* Estarling Aguasvivas also seriously injured with firearm [unintelligible] agent [unintelligible] the [DNCD] Felipe de Jesus Jimenez Garcia [and] Jose Marino Henriquez Rodriguez. The accused fled and with [unintelligible] Fran Aguasvivas aka El Cojo. *The brothers Aguasvivas also disarmed [unintelligible] agents of the [DNCD]*

---

[3] Mr. Aguasvivas notes that the Dominican government has submitted a copy of the original documents in Spanish and also a translation in English, as required by the Treaty. *See* Art. 9 of the Treaty between the two countries ("All documents submitted under this Treaty by the Requesting Party [country requesting the extradition] shall be accompanied by an official translation into the language of the Requested Party [country to whom the extradition request is directed], unless otherwise agreed in exceptional circumstances."). All references will be to the English versions of the documents unless otherwise noted.

[4] The National Institute of Forensic Sciences appears to be affiliated with – if not a subdivision of – the prosecutor's office. *See* Bates 67 ("Attorney General of the Republic" is on the stationary header).

*who were participating [unintelligible] the anti-drug operation*, in violation of [various laws….]"

- The 12/6/13 Autopsy, at Bates 69, states that:

    Lorenzo Ubri Montero was seriously injured when he and the other agents of the [DNCD] were performing an anti-drug operation in Pueblo Nuevo, Bani, the deceased with other three agents tried to arrest and introduce into a vehicle to a presumed drug dealer, but **they were injured by someone else, who tried to stop the arrest**, in the shooting two more agents were wounded and one left unharmed…"

- The 12/12/16 Affidavit in Support of the Extradition Request, at Bates 56-57, states that:

    **On December 6, 2013, "in the address calle [street] Francisca la Francisquera, Sector** Pueblo Nuevo, Bani … it was being performed an anti-drug operation by the agent of the National Directorate for Drug Control Lorenzo Ubri Montero, the Captain of the National Police Felipe de Jesus Jimenez Garcia, and the Agent of the National Directorate for Drug Control Jose Marino Hernandez Rodriguez. In the course of the anti-drug operation, **Cristian Estaling Aguasvivas [sic] aka Momon [sic]** *was arrested and handcuffed; in this moment a brother of him named Frank Aguasvivas aka El Cojo was present at the place and he questioned to the agents about the reasons for the arrest of his brother and protested by [sic] the arrest. Cristian Estaling Aguasvivas aka Momon took advantage of the distraction of the agents at the time of the intervention of his brother and, in a surprising way, attacked to the agent the National Directorate for Drug Control Lorenzo Ubri Montero, to whom disarmed and killed, opening fire on all the agents of the National Directorate for Drug Control that were present.*[5] By his action Lorenzo Ubri Montero died; the Captain of the National Police Felipe de Jesus Jimenez Garcia and the Agent of the [DNCD] Jose Marino Hernandez Rodriguez were seriously injured. Cristian [Aguasvivas] [illegible] from the place along with his brother helped by other and carrying [illegible]…."

- The 3/29/2017 Additional Affidavit in Support of the Extradition Request, at Bates 82, states that:

    "The same photograph attached to the Request for Extradition…, it has also been seen and recognized as corresponding to Cristian Starling Aguasvivas a/k/a Momon

---

[5] Mr. Aguasvivas submits that the translations here are difficult to understand and to follow and that more should be required in order to give sufficient notice to the accused of the factual allegations. *Cf*. Article 9, Treaty, Bates 25.

> by the Captain Felipe de Jesus Jimenez Garcia and the officer of the order Jose Marino Hernandez Rodriguez, who are two surviving victims of the shootout attack on the anti-narcotics patrol carried out by Cristian Starling Aguasvivas a/k/a Momon…; *they are also eyewitnesses because they saw to Cristian Starling Aguasvivias a/k/a Momon to disarm, shoot and kill to the officer of the order Lorenzo Ubri Montero*, other of the members of the aforementioned anti-narcotics patrol."

These documents are riddled with factual inconsistencies as to when the offense occurred, where it occurred, how it occurred, and who committed the offense.

II.     Prior Proceedings Related to the Incident in United States Immigration Court

Eight months after the incident occurred, Mr. Aguasvivas fled to the United States illegally. He left because he was in fear of the Dominican police in the wake of the incident. In order to stay in the United States, Mr. Aguasvivas sought asylum, withholding of removal, and relief under the Convention Against Torture ("CAT") in immigration court. The Immigration Judge ("IJ") held nine hearings in his case, four of which involved taking testimony on the events at issue in the present case, the country conditions in the Dominican Republic, and Mr. Aguasvivas's claims that his relatives had been tortured by the DNCD in the wake of the incident in order to ascertain his whereabouts.

Numerous witnesses testified on Mr. Aguasvivas's behalf.[6] Several were character witnesses who testified that Mr. Aguasvivas had never been in trouble before and had always worked full-time, since the age of 11, for a cabinet-maker, his boss. Three people testified, from the Dominican Republic, that they had been tortured by the DNCD in the wake of the shooting, while the DNCD was looking for Mr. Aguasvivas. In the words of the Immigration Judge, these witnesses

---

[6] Mr. Aguasvivas attaches the written opinions issued by the Immigration Judge and Board of Immigration Appeals in this matter, but – due to their size – not the transcripts from the hearings held by the Immigration Judge in this matter. Undersigned counsel can produce these materials to the Court upon request.

4

> consistently stated that officers took them from their houses to another location and physically abused them while inquiring about the Respondent's whereabouts. Specifically, they described being handcuffed, beaten with sticks, and kicked in the stomach. Each also stated that officers put an onion in the individual's mouth and, simultaneously, put a black bag over the individual's head. This made the witnesses feel as if they could not breathe and were suffocating. . . The officers threatened that they would kill the witnesses (and, in some cases, that they would kill the witnesses' family members, including their young children) if they did not divulge the Respondent's whereabouts.

*See* Immigration Court Decision (February 23, 2016), at Exhibit B, at 16. The Immigration Judge nonetheless denied all relief. *See id.*

The Board of Immigration Appeals ("BIA") reversed and granted withholding of removal under the Convention Against Torture. The BIA found:

> The record contains evidence of human rights conditions in the Dominican Republic, including evidence revealing that despite efforts to curb abuses, there have been persistent reports of arbitrary arrests, extrajudicial killings, impunity, and corruption involving police and security forces, and that the police were involved in incidents that resulted in maiming or severe injury to unarmed civilians. Indeed, although the law prohibits torture, beatings, and physical abuse of detainees and prisoners, there were instances in which members of the security forces, primarily police, reportedly carried out such practices.

> [T]he Immigration Judge found that the respondent's witnesses testified credibly that DNCD officers tortured them in an effort to uncover the respondent's whereabouts. The Immigration Judge stated that '[t]heir testimony describes ... having [ ] black bags placed over their heads and onions placed in their mouths,' and that 'the black bag/onion tactic, intended to simulate/cause suffocation, is identified in two articles as a torture method practiced by the Dominican police….'

> …. In view of the country conditions evidence in the record and the credible and detailed testimony of the respondent's witnesses, we conclude…that the respondent has met his burden of demonstrating on this record **that it is more likely than not that [Mr. Aguasvivas] will be tortured** at the instigation of or with the consent or acquiescence of public official[s] in the Dominican Republic.

*See* Board of Immigration Appeals Decision (August 17, 2016), at Exhibit C, at 2 (emphasis added) (most internal quotation marks, brackets, and citations omitted).

After several years in immigration detention, Mr. Aguasvivas was released. Approximately six months later, he was arrested on the present Extradition Complaint, notwithstanding the BIA's finding that he is protected under the Convention Against Torture from being returned or extradited

to the Dominican Republic. *See* Convention against Torture and Other Cruel, Inhuman or

Degrading Treatment or Punishment, Article 1 ("No State Party shall expel, return ('refouler') or

extradite a person to another State where there are substantial grounds for believing that he would

be in danger of being subjected to torture.").[7]

### LEGAL STANDARD GOVERNING EXTRADITION PROCEEDINGS

I.   <u>Statutory Framework</u>

International extradition proceedings are governed by the applicable treaty and 18 U.S.C.

§§ 3181-96. *See United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997); *Valenzuela v. United

States*, 286 F.3d 1223, 1226 n.3 (11th Cir. 2002). The statute establishes a "two-step procedure

which divides responsibility for extradition between a judicial officer and the Secretary of State."

*Kin-Hong*, 110 F.3d at 109. The judicial officer is responsible for making the following findings in

order to certify the extradition:

1. That an extradition treaty is in force between the requesting country and the United States, and the government's extradition request complies with the terms of this treaty;
2. The treaty covers the offenses for which extradition was requested;
3. The defendant is the person whose extradition is sought by the Dominican Republic; and
4. Competent legal evidence demonstrates probable cause to believe that the defendant committed the offenses for which extradition is sought.

*See* 18 U.S.C. § 3184. *Cf. In re Necolaiciuc*, No. 2:09-MC-21-FTM-DNF, 2011 WL 798144, at *12

(M.D. Fla. Mar. 1, 2011) (formulating seven-part test); *Barapind v. Enomoto*, 360 F.3d 1061, 1068

(9th Cir. 2004), *on reh'g en banc,* 400 F.3d 744 (9th Cir. 2005); *Yapp v. Reno*, 26 F.3d 1562, 1564

(11th Cir. 1994); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1360 (S.D. Fla. 1999).

The government bears the burden of proof on each requirement of the extradition statute and

treaty. *See In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1038 (C.D. Cal. 2006) ("[i]n

extradition proceedings, the government bears the burden of establishing extraditability"). If the

---

[7] *Available at*: http://www.ohchr.org/EN/ProfessionalInterest/Pages/CAT.aspx

judicial officer finds each of these criteria met, "he certifies that a warrant may issue." *Id.* (quoting 18 U.S.C. § 3184).

II.   Extradition Treaty Between the Dominican Republic and United States

This extradition is governed by the 2015 Treaty between the United States and the Dominican Republic. *See* Bates 7-30. Any request must comply with its procedures. *See* Treaty, Art. 1, Bates 21 ("the parties undertake the obligation to extradite to each other, pursuant the provisions of this Treaty…."); *In re Extradition of Howard*, 996 F.2d 1320, 1329 (1st Cir. 1993) ("A sovereign's right to obtain the extradition of an accused is created by treaty….[;] no branch of government has authority to surrender an accused to a foreign country except in pursuance of a statute or treaty" (citation omitted)); *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003) (the court must determine whether the evidence provided by the requesting party is "sufficient to sustain the charge under the provisions of the proper treaty.").

Article 7 of the Treaty, entitled "Extradition Procedures and Required Documents," provides a list of documents which "shall" support any extradition request made pursuant to the Treaty. *See* Bates 24. These include, *inter alia*: "documents, statements, or other types of information that describe the identity. . . of the person sought," § 7(2)(a); "a copy of the warrant or order of arrest or detention issued by a judge or other competent authority," § 7(3)(a); "a copy of the document setting forth the charges against the person sought," § 7(3)(b); and "such information as would provide a reasonable basis to believe that the person sought committed the offense or offenses for which extradition is required," § 7(3)(c).

When a requesting party fails to provide the required documentation or otherwise fails to comply with the treaty's requirements, an extradition complaint should be dismissed. *See In re Extradition of Ferriolo*, 126 F. Supp. 3d 1297, 1299 (M.D. Fla. 2015) (granting relator's motion to dismiss because of lack of required documentation and lack of probable cause); *In re Extradition of*

*Chapman*, No. CIV07-00365SOM/BMK, 2007 WL 3254880, at *2 (D. Haw. Nov. 5, 2007)

(granting relators' motions to dismiss because "the government has failed to meet its burden of

showing the existence of any pending criminal action against the Chapmans in Mexico" under the

applicable treaty); *see also Salazar v. Venables*, No. 10 CV 1566 MMA AJB, 2010 WL 3516660, at

*2 (S.D. Cal. Sept. 3, 2010) (granting habeas corpus petition and dismissing complaint after arrest

warrant, which was required under treaty with Mexico, was quashed in Mexico); *In re Gambino*,

421 F. Supp. 2d 283, 314-15 (D. Mass. 2006) (discussing documentation required to accompany

extradition request).

## ARGUMENT

I.    **THE EXTRADITION REQUEST SHOULD BE DISMISSED BECAUSE IT FAILS TO COMPLY WITH THE REQUIREMENTS OF THE TREATY**

The extradition request in this case does not comply with the terms of the Treaty because the

Dominican government fails to provide a valid arrest warrant, *see* Art. 7 § 3(a), fails to show

pending charges, *see* Art. 7 § 3(b), and fails generally to provide a "reasonable basis" to believe Mr.

Aguasvivas committed the alleged offenses under Art. 7 § 3(c).

### A.  The government fails to provide a valid arrest warrant under Art. 7 § 3(a)

The Dominican government must provide a "copy of the warrant or order of arrest or

detention issued by a judge or other competent authority." Art. 7 § 3(a). Implicit in this requirement

is that the arrest warrant be valid. *See Salazar*, 2010 WL 3516660, at *2 (dismissing Mexican

extradition request because there was no valid arrest warrant, required under the treaty[8]); *see also*

---

[8] The instant Treaty is functionally equivalent, for these purposes, to the treaty with Mexico at issue
in *Salazar*. *Compare* Extradition Treaty Between the United States of America and the United
Mexican States, arts. 1&10, May 4, 1978, 31 U.S.T. 5059 (stating in Article 1 that the two countries
agree to extradite "persons who the competent authorities of the requesting Party have charged with
an offense," and requiring in Article 10 that the request be accompanied by "[a] certified copy of
the warrant of arrest issued by a judge or other judicial officer of the requesting party"), *with* Treaty
Between the United States of America and the Dominican Republic, Art, 7 §§ 3(a) & 3(b), Jan. 12,

*United States v. Kin-Hong*, 110 F.3d 103, 114 (1st Cir. 1997) (arrest warrant is a mechanism for verifying pending charges in the requesting country).

The warrant submitted by the government in support of the Complaint is defective in several respects. First and foremost, the warrant fails to authorize the arrest of Mr. Aguasvivas. Instead, the warrant authorizes the arrest of "Estarling Aguasvivas, AKA 'M*a*mon.'" Bates 48-50 (containing a copy of the original warrant, in Spanish). Mr. Aguasvivas's full name is Cristian Starling Aguasvivas. In other documents provided in support of the Complaint, the Dominican government alleges that Mr. Aguasvivas's alias is "M*o*mon" - not "M*a*mon." This is not an inconsequential mistake. No agency or court in the United States would think that a domestic warrant authorizing the arrest of "John Smith" could properly be used to arrest a man who is in fact named "Charles Jack Smith," or some variant thereon. Defendant also notes that the official English "translation" provided by the Dominican Government actually corrects this fundamental defect in the warrant: while the original warrant requests "Estarling Aguasvivas, AKA 'M*a*mon," Bates 48-50, the English translation of the warrant calls for the arrest of "Cristian Starling Aguasvivas, aka Momon,'" Bates 62-63. An interpreter cannot properly attempt to cure a defective warrant in this way. The translation is incompetent. *See* Art. 9 (requesting government must provide translation), Bates 25.[9]

In addition, the warrant only requests extradition of "Estarling Aguasvivas" on five out of the seven charges contained in the government's extradition request. *Compare* Bates 63 (warrant for arrest on violation of articles 265, 266, 295, 304, and 309), *with* Bates 57 (Affidavit in Support of

---

2015, T.I.A.S. 16-1215 (requiring in § 3(b) "a copy of the document setting forth the charges against the person sought" and in § 3(a) "a copy of the warrant or order of arrest or detention issued by a judge or other competent authority").

[9] It is disturbing that the "official translation" provided in accordance with Treaty requirements seeks to cure a significant error in the original judicial warrant issued by the courts of the Dominican Republic. This calls into question the impartiality and professionalism of the translator.

Extradition under articles 265, 266, 295, 304, *379 and 383*). The charges under articles 379 and 383 appeared for the first time in this case when the government decided to request extradition, three years after the alleged crime occurred and the warrant issued. It does not appear from the government's submission that there have been any judicial proceedings in the interim authorizing this addition by the prosecutor's office.

Third, the language of the warrant is overbroad, as it permits a provisional arrest for investigative purposes. Specifically, the warrant states:

> the Judge to request [sic] of the Public Prosecutor can ordain the arrest of a person when: 1-his presence is necessary and there is evidence to reasonably maintain that he is the perpetrator or accomplice of an offense, that he can hide, leave or escape from the place and when the person after being summoned to appear he does not do that, and his presence is necessary during the investigation or knowledge of an infringement.

Bates 64. It further states that "the arrest is [unintelligible] in a provisional deprivation of liberty of the person *in the event of* being subjected to a criminal procedure, *and it is characterized by its provisionality*…." *Id.* (emphasis added).[10] The italicized language indicates that "being subjected to a criminal procedure" is a *possibility*, not an actuality, for the arrestee – a person may be arrested *in case* they are later subject to criminal process. In the plain language of the warrant, it authorizes a "provisional[]" arrest, an arrest for investigative purposes.[11]

The requirement of an arrest warrant functions to ensure that there has been some measure of judicial oversight of the accusatory process. *See Kin-Hong*, 110 F.3d at 114 ("the warrant requirement . . . help[s] the judicial officer in the requested country to confirm that there are in fact charges properly pending against the relator in the requested country."). Were that judicial oversight

---

[10] If the Court finds that the language, as translated, is incomprehensible, it should order the government to provide functional translations. *See* Article 9 (requiring the Dominican government to provide official translations).

[11] Nor are such arrests for investigative purposes a rarity. *See* U.S. State Dept., Dominican Republic 2016 Human Rights Report, at 6 ("Police sometimes detained suspects for investigation or interrogation longer than 48 hours. Police often *detained all suspects and witnesses to a crime*" (emphasis added)), *found at* https://www.state.gov/documents/organization/265794.pdf.

not required, individuals could be extradited on nothing more than suspicion, rumor, or unsupported accusation.

### B.   The government fails to show pending charges as required by Art. 7 § 3(b)

The requesting country must provide "a copy of the document setting forth the charges against the person sought." Art. 7 § 3(b) (emphasis added), at Bates 24. The phrase "charges against the person" should be read in accordance with its plain meaning. *See Greci v. Birknes*, 527 F.2d 956, 960 (1st Cir. 1976) (abiding by the plain language of the treaty even though the government and State Department supported a different construction). Black's Law Dictionary defines "criminal charges" as "[a]n accusation of crime, formulated in a written complaint, information, or indictment, and taking shape in a prosecution;" "charged" is defined as an "[a]ccusation of crime by complaint, indictment, or information." Black's Law Dict., 5th Ed. (1983).

In *In re Extradition of Chapman*, the District of Hawaii granted a motion to dismiss the extradition complaint because the government failed to show that there were criminal charges pending against the accused in the requesting country. No. CIV07-00365SOM/BMK, 2007 WL 3254880, at *1 (D. Haw. Nov. 5, 2007) (unpub.). The extradition treaty in force in that case, between the United States and Mexico, stated that it applied to "persons who the competent authorities of the requesting Party have charged with an offense." *Id.* at *1. While charges had been brought against the defendant in Mexico, those charges had been dismissed (even though the dismissal was being appealed in the Mexican courts). The district court held that, under Mexican law, "the ruling [dismissing the charges] has not been stayed, and [therefore] the government has failed to meet its burden of showing the existence of any pending criminal action against the Chapmans in Mexico." *Chapman*, 2007 WL 3254880, at *2. The *Chapman* court also stated more broadly that "[a] person may not be extradited where there are no pending criminal charges against that person." *Chapman*, 2007 WL 3254880, at *2 (citing *United States v. Peterka*, 307 F. Supp. 2d

1344, 1349 (M.D. Fla. 2003) (requiring proof of "criminal charges pending in another state" in Czech extradition case without indicating basis of that requirement, whether treaty or statute)).

The language of the treaty in *Chapman* is not functionally different from the language here, which requires that the government provide a "copy of the document setting forth the charges against the person" – implying that there in fact be formal charges pending against the accused. Art. 7 § 3(b).  *See also United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1360 (S.D. Fla. 1999) (requiring proof of "criminal charges pending in another state," in Bolivian extradition case, and appearing to ground that requirement in the extradition statute, § 3184); *United States v. Barr*, 619 F. Supp. 1068, 1070 (E.D. Pa. 1985) (same, in Irish extradition case[12]); *In re Extradition of Moreno-Vazquez*, No. CIV. 3:06CV761-CSC, 2008 WL 3926427 at *2, *3 (M.D. Ala. Aug. 22, 2008) (same, in Mexican extradition case).

The courts that have declined to require pending charges have done so on the basis of treaty language distinguishable from ours. In *Emami v. U.S. Dist. Court for N. Dist. of California*, 834 F.2d 1444, 1448 (9th Cir. 1987), the extradition treaty with Germany applied to persons "who have been charg*ed*." Adopting the reasoning of *In re Assarsson*, 635 F.2d 1237, 1242-43 (7th Cir.1980)), which construed similar language, the Ninth Circuit reasoned that given the context of the word "charged," it was "used only in contrast to 'convicted' so as to define the two classes of extraditees that the treaty covered." *Emami*, 834 F.2d at 1448. The word was "used as a verb in the generic sense only to indicate "accused." *Id*. The verb "charg*ed*" "could not be transmuted into a requirement that "charg*es*," a noun, be filed" *Id*. (emphasis added). The court further reasoned, as

---

[12] The quoted provision of the treaty states: "Extradition shall be granted only if the evidence be found sufficient according to the law of the requested Party either to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party or to prove that he is the identical person convicted by the courts of the requested Party." *Barr*, 619 F. Supp. at 1070 (quoting the United States and United Kingdom of Great Britain and Northern Ireland Extradition Treaty, Article IX(1), TIAS 8468).

had the court in *Assarsson*, that a "copy of formal charges was absent from the list of [] documents" the requesting party was required to provide. *Id*. The parties "had not intended to require such a document because the parties could have specifically included such a requirement but had not." *Id*. at 1448 & n.3 (citing *Assarsson*, 635 F.2d at 1243).

Here, by contrast, the Treaty does require that the Dominican Republic produce a copy of "the document setting forth the charg*es* against the person sought." Art. 7 § 3(b) (emphasis added). The reasoning of *Assarsson* and *Emami* thus does not apply. The plain language of the treaty requires that charg<u>es</u> have been filed in the requesting country, and that the charging document be produced in support of the extradition request.

No such charging document has been provided here. To the contrary, the prosecutor's Affidavit makes clear that Mr. Aguasvivas has *not* been formally charged with any crimes. He specifically notes that he requests extradition so that he can "decide[] *whether or not to bring charges*," depending on "the merits of the evidence available." Bates 55 (emphasis added). The prosecutor states that he asks for a warrant, if the "accused has escaped," and as "soon as the suspect is arrested, the prosecutor in charge of prosecuting the case, will interview him in the presence of his defense counsel…. Within 48 hours, the accused is presented by the prosecutor to the investigating judge, in order that he decides on the measure of coercion that must be applied to the accused." [13] Bates 55. The prosecutor then "*decides whether or not to bring charges according to the merits of the evidence available*." *Id*. (emphasis added).

This case, therefore, is still in the investigatory stages. Although not completely analogous, this would be similar to the United States requesting extradition on the basis of a prosecution memorandum listing prospective allegations, rather than any formal charging document. The Treaty

---

[13] Undersigned counsel assumes this means that the defendant will be presented within 48 hours to a judicial officer to determine the appropriate charges, but the language of the translation is unclear.

requires more: "a copy of the document setting forth *the charges*" against the person. 7(3)(b)(emphasis added). Accordingly, the Complaint should be dismissed.

### C.   Internal errors and inconsistencies, in the aggregate, violate Art. 7 § 3(c)

The documents provided in support of the Complaint are also rife with internal errors and inconsistencies. On the whole, these errors serve to defeat the principle that the government has met its burden to provide the documents required by Article 7 in support of the complaint. Even "trifling" errors, viewed in the aggregate, may combine to undermine the reliability of the government's records. *In re Mazur,* No. 06M295, 2007 WL 2122401, at *20 (N.D. Ill. July 20, 2007) (noting that a series of errors, although individually easily explained, in the aggregate "do tend to shake the Court's confidence in the reliability of the records"). Here, the documentation is internally inconsistent and riddled with errors – which points to an investigation that was conducted under "circumstances which seriously call into question its legitimacy." *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1365 (S.D. Fla. 1999).

Here are some:

- Inconsistencies as to where the event occurred. The arrest warrant states that the shooting took place on 5th Street in Bani, Bates 62, while the prosecutor's affidavit states that it took place on Francisca la Francisquera Street. Bates 56.

- Inconsistencies as to when the event occurred. The arrest warrant states that the shooting occurred on December 5, 2013, Bates 62, while the prosecutor's affidavit states that it occurred on December 6. Bates 56.[14] The prosecutor's affidavit which supplements the extradition request for Ramon Aguasvivas, Mr. Aguasvivas's uncle, who is alleged to have

---

[14]   Defendant notes that in the prosecutor's supplemental affidavit, he notes that his original affidavit listed the date as "December 6, 2016," and corrects this to refer to "December 6, 2013." This still leaves open the question as to whether the incident occurred on December 5 or December 6, 2013.

been involved in the same incident, states that the shooting occurred on December 9, 2013. *See In the Matter of the Extradition of Ramon Emilio Aguasvivas Mejia*, Docket No. 17-mj-01250-DLC, D.E. 1-1 at 80.

- Inconsistencies as to the name of the perpetrator. The original arrest warrant, in Spanish, seeks the arrest of "*Estarling* Aguasvivas (A) M*a*mon," Bates 48 (emphasis added). That document is transformed, in translation, into an arrest warrant for "*Cristian Starling* Aguasvivas aka M*o*mon." Bates 62 (emphasis added). "Mamon" and "Momon" are two different words. In addition, the prosecutor's affidavit itself uses two names:  it requests the extradition of "Cristian Starling Aguasvivas aka Momon." Bates 54, 55, and later uses the name "Cristian *Estaling*[sic] Aguasvivas aka Momon" Bates 56 (emphasis added). The affidavit in the extradition of Ramon Emilio Aguasvivas refers to this relator as "Estaling [sic] Aguasvivas." *See* Docket No. 17-mj-01250-DLC, D.E. 1-1 at 83.

- Inconsistencies as to which Treaty applies. The Dominican government appears to request the extradition under the 2015 Treaty, *see* Dominican Embassy EDW-0481-17, Bates 6, yet the Affidavit in Support of the Extradition request references crimes under the 1909 Treaty. Bates 60.

- Inconsistencies as to the articles intended to be charged. The Warrant, which was issued on December 6, 2013, the day after the incident occurred, authorizes arrest of "Estarling Aguasvivas" for violations of articles 265, 266, 295, 304, and 309. Bates 63. The Affidavit in Support of the Extradition Request, dated December 12, 2016, adds charges, seeking extradition on charges of violating articles 265, 266, 295, 304*, 379 and 383*. Bates 57.

- Inconsistencies as to who was actually responsible for the shooting.
  - The arrest warrant, executed December 6, 2013, states that "Estarling Aguasvivas" – who was allegedly being arrested during an anti-drug operation – shot the decedent

three times.  Separately, and seemingly inconsistently, the warrant also states that the

"brothers Aguasvivas" shot the agents. Bates 62-63.

o   The Autopsy, also executed on December 6, 2013, states that "the deceased with

other three agents tried to arrest and introduce into a vehicle to a presumed drug

dealer, but they were injured by **someone else**, who tried to stop the arrest." Bates 69

(emphasis added). It is unclear who this "someone else" could be. The Autopsy

further finds that the three wounds to the decedent were "distant wound[s] by short-

barreled firearm projectile," which is at odds with the government's theory that Mr.

Aguasvivas disarmed and shot the officer *after he had been arrested and while he*

*was handcuffed*. Bates 56, 69-70.

o   A request for the extradition of Mr. Aguasvivas's uncle, Ramon Emilio Aguasvivas,

states that Ramon Aguasvivas was present in a car, and that he got out, "collected the

firearms of the agents," and "fired several shots." *See* Docket No. 17-mj-01250-

DLC, D.E. 1-1 at 84. Ramon Aguasvivas is charged with the same offenses as Mr.

Aguasvivas, including premeditated murder under Article 304, notwithstanding the

factual allegations. *See id*. at 89. Documentation in Ramon Aguasvivas's case asserts

confirms that the decedent died of "remote wounding," *id*. at 80, again inconsistent

with the version of facts that Mr. Agusavivas shot the officer while under arrest and

in handcuffs. *See* Bates 56.

Even if these errors and inconsistencies can be explained individually, they combine to

undermine confidence in the reliability of the documents and the legitimacy of the investigation. *See*

*Mazur*; *Ferriolo*, 126 F. Supp 3d at 1304 ("unexplained inconsistency" drew government's version

of events into doubt); *Fernandez-Morris*, 99 F. Supp. 2d at 1365 (questioning legitimacy of prior

proceeding). Ultimately, the documents lack sufficient competence to demonstrate "a reasonable

basis to believe that the person sought committed the offenses for which extradition is requested."
Art. 7 § 3(c); *see also* section II.C, below (discussing inconsistencies).

## II.   THE EXTRADITION COMPLAINT SHOULD BE DISMISSED BECAUSE THE EVIDENCE PROVIDED IN SUPPORT OF THE REQUEST IS LEGALLY INCOMPETENT TO SHOW PROBABLE CAUSE

### A.   Probable Cause Standard

The extradition statute states that the Magistrate may only certify an extradition if "he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. Article 7(3)(c) of the Treaty requires that the government produce "such information as would provide a reasonable basis to believe that the person sought *committed the offense or offenses for which extradition is requested*." (emphasis added). The preamble to the Treaty noted that "this language mirrors the probable cause standard applied in U.S. criminal law." Bates 14. *See also Eain v. Wilkes*, 641 F.2d at 507-08; *Greci v. Birknes*, 527 F.2d 956, 959 (1st Cir. 1976); Fed. R. Crim. P. 5.1. Accordingly, the Court must determine "if there is evidence sufficient to show reasonable ground to believe the accused guilty." *Kastnerova v. United States,* 365 F.3d 980, 987 (11th Cir. 2004) (internal quotations omitted). As the Supreme Court has stated:

> [t]he commissioner must judge for himself the persuasiveness of the *facts* relied upon by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusions that the person whose arrest is sought has committed a crime.

*Giordenello v. United States*, 357 U.S. 480, 486 (1958) (emphasis added) (discussing probable cause standard generally).

The government must present "competent and adequate" evidence to establish probable cause. *Bingham v. Bradley,* 241 U.S. 511, 517 (1916).

> Inherent in the probable cause standard is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant the conclusion. The probable cause standard does not even require that the government make its showing by a

preponderance of the evidence. But neither is it toothless. All evidence does not have the same importance even if it is authentic and admissible. For example, a confession obtained by duress is inherently unreliable and would be given little weight even if the confession were authenticated. The reliability of the evidence is a factor for the reviewing court to consider as well, and potentially unreliable evidence may be accorded reduced weight by the court.

*Kin-Hong*, 110 F.3d at 120–21 (internal citations omitted); *see also Valenzuela*, 286 F.3d at 1229 ("the judiciary must ensure that the constitutional rights of individuals subject to extradition are observed.").

The government bears the burden of "establishing extraditability, so the government must show, among other things, that there is competent evidence establishing probable cause to believe that the person named in the extradition request committed the charged offense." *Matter of Extradition of Santos*, 228 F. Supp. 3d 1034, 1036 (C.D. Cal. 2017) (citations omitted); *see also In re Necolaiciuc*, No. 2:09-MC-21-FTM-DNF, 2011 WL 798144, at *16 (M.D. Fla. Mar. 1, 2011) (the Court determines both the competency and sufficiency of the evidence). This independent review allows a magistrate to perform a "'neutral and detached' function and not serve merely as a rubber stamp...." *Aguilar v. Texas*, 378 U.S. 108, 111 (1964). *See also Illinois v. Gates*, 462 U.S. 213, 239 (1983) ("[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his actions cannot be a mere ratification of the bare conclusions of others"). The Court is empowered to dismiss an extradition Complaint upon motion, without a hearing, when the evidence supporting the request fails as a matter of law. *See*, *e.g*., *Ferriolo*, 126 F. Supp. 3d at 1299 (court granting relator's motion to dismiss on the grounds that the extradition request lacked the required documentation and failed to show probable cause).[15]

---

[15] In other cases, courts have found insufficient evidence of probable cause and dismissed the Complaint after a hearing. *See, e.g., In re Extradition of Khochinsky,* 116 F. Supp. 3d 412, 414 (S.D.N.Y. 2015) (Rakoff, J.) (deferring ruling on motion to dismiss until after hearing and then dismissing extradition complaint); *United States v. Nolan*, 651 F. Supp. 2d 784, 799-815 (N.D. Ill. 2009) (discussed below); *United States v. Peterka*, 307 F. Supp. 2d at 1349  (denying extradition because prosecutor's conclusory statements were insufficient to show probable cause); *Fernandez-*

18

**B.**     **The government's conclusory allegations are insufficient to establish probable cause.**

The Supreme Court has specifically addressed the situation in which the requesting government fails to "set forth the sources of information or the grounds of [the] affiant's belief." *Rice v. Ames*, 180 U.S. 371, 374 (1901). In *Rice*, the Court explained that a complaint was

> obviously insufficient, *[when] the charges were made solely upon information and belief, and no attempt was made even to set forth the sources of information or the grounds of affiant's belief. This is bad, even in extradition proceedings*, which are entitled to [] liberality of construction …. Nor is it saved by the fact that Greer [the affiant] described himself as government detective for the province of Ontario and duly authorized by the Attorney General to act as the agent of the government to prosecute extradition proceedings.

*Id.* (emphasis added) (citations omitted). The Supreme Court specifically contemplated that where an affiant has no personal knowledge, s/he will ground the allegations in the supporting information, identifying its source: "If the officer of the foreign government has no personal knowledge of the facts, he may with entire propriety make the complaint upon information and belief, *stating the sources of his information and the grounds of his belief.*" *Id.* at 375-76 (emphasis added).

Accordingly, courts have routinely refused extradition requests that were based solely on factual summaries without direct citations to primary evidence. In *In re Gambino*, this district considered Italy's request for the extradition of Giovanni Gambino, of the Gambino crime family. 421 F. Supp. 2d 283, 316 (D. Mass. 2006) (Bowler, J.). The court found insufficient evidence of

---

*Morris*, 99 F. Supp. 2d at 1369 (denying extradition where the government's allegations were "unsupported by the evidence"); *In re Lehming*, 951 F.Supp. 505, 517 (D. Del. 1996) (accusations in warrant and affidavit did not contain "sufficient factual information" to support a criminal fraud charge, when the Court "[could] not identify the subject matter of the contracts, the parties who negotiated or authorized the agreements, the injury which [the victim] suffered as a result of the contracts, or [the relator's] personal involvement therein" and could not "identify the source for [the affiant's] conclusion [that relator had committed the crime]").

probable cause on one of two charges, a conspiracy to commit drug trafficking charge under Italian article 75. *Id.* Although the Italian warrant provided a 16-page summary of the allegations, the court found that the summary fell short where it failed to identify "the source of the information tying the relator to the criminal association," beyond general references to "'inquiries carried out by the bodies of American police' or 'thanks to this proceeding.'" *Id.* (citation omitted). Information about "[t]he presence [and functioning] of the criminal association… stem from inquiries by the Italian police and undisclosed statements made by 'co-defendant Allegro Salvatore.'" *Id.* While "accomplice statements … which incriminate the speaker provide reliability, the extradition papers fail[ed] to contain any summary or otherwise identify the nature of the statements made by Allegro Salvatore and connect those statements to the relator." *Id.* The court contrasted this silence as to the source of the information with other cases finding evidence and witness statements sufficient to show probable cause. *See id.* at 316-317 (collecting cases). The court held that the government could, under the treaty, supplement its request. *Id.* at 317.

Similarly, in *United States v. Nolan*, 651 F. Supp. 2d 784, 810, 814-15 (N.D. Ill. 2009), the court dismissed an extradition complaint for lack of probable cause. There, the relator was charged with aggravated kidnapping and aggravated homicide for having ordered the torture and killing of a kidnapping victim in Costa Rica. Costa Rica's theory was that the victim owed $7 million to a Florida businessman, who hired Nolan to torture the victim to get him to pay. *Id.* at 799. Nolan then either hired or worked with a bellboy, who was later convicted of the crimes. The government produced multiple witness statements, police and medical reports, flight records, telephone records, emails, hotel receipts, and tickets in an attempt to show that Nolan and the bellboy forced the victim into Nolan's car on March 6, took him to a different location, tortured him and killed him. *See id.* at 799-810 (detailing the government's evidence over 11 pages). The court found there was credible evidence that Nolan was with Cohen on the morning of March 6, in the hotel where the bellboy

worked and that Nolan was engaged in "asset-recovery" from Cohen for the businessman to whom Cohen owed $7 million. *Id*. at 813. However, the court found no evidence that that work involved killing or torturing Cohen. "Costa Rica did not submit any physical evidence, witness statement or other evidence demonstrating that Nolan – as opposed to Mejia [the bellboy] – used violence against Cohen or took any action that deprived Cohen of his freedom." *Id*. at 813. "In fact," the government's evidence "show[ed] someone other than Nolan was responsible" for the kidnapping – namely, the bellboy and the businessman, who Cohen had implicated in a call to his daughter during the time he was missing. *Id*. In sum, "[a]side from [the prosecutor's] unsupported allegation, there [wa]s no indication that Nolan ordered 'cruel treatment,' [] that Nolan was even aware of Cohen's captivity, …. [or] of a plan between Mejia and Nolan to end Cohen's life." *Id*. at 814.

Here, the government's "evidence" is comprised entirely of narrative accusation. The Dominican government provides four documents with various recitations of what occurred during the incident: the Warrant, the Autopsy and Medical Certificates, and the two supporting affidavits by the prosecutor. None is authored by an eyewitness to the incident. None directly references any statements, testimony, or reports made by an eyewitness to the incident.

As in many extradition cases rejecting the government's showing of probable cause, the government's "unsupported conclusory statements are insufficient to satisfy probable cause." *Matter of Extradition of Lehming*, 951 F. Supp. 505, 517 (D. Del. 1996). *See also Nolan,* 651 F.Supp.2d at 814 (denying extradition where government "relies on unsupported narrative statements that do not contain sufficient information to allow this Court to independently determine probable cause"); *In re Ribaudo*, No. 00 CRIM.MISC.1PG. (KN, 2004 WL 213021, at *6 (S.D.N.Y. Feb. 3, 2004) (unpub.) (denying extradition after conviction in absentia, "since the underlying evidence has not been made available, [and] the Court cannot make an independent determination concerning whether there is probable cause"); *In re Extradition of Ernst*, 1998 WL 395267, at *10

(same); *U.S. ex rel. Karadzole v. Artukovic*, 170 F. Supp. 383, 390 (S.D. Cal. 1959) (rejecting complaint containing hearsay statements of witnesses because it was unclear how the information was obtained and "the testimony of the witness [wa]s not furnished."). The government's documentation here is even more conclusory and even more devoid of any actual evidence than that rejected in *Gambino, Nolan, Ribaudo, Ernst, Lehming*, and *Karadzole*. The Court should reject it as legally incompetent. *See also Rice v. Ames*, 180 U.S. at 374.

### C.   The government's version of the offense is internally inconsistent.

Moreover, the government's evidence has so many internal errors and inconsistencies that it is unreliable to the point of being incompetent. Throughout the various documents submitted, the Dominican government has changed the name of the accused, the date of the incident, and the location where the incident took place. *See* section I.C, above. As noted above, the prosecutor's affidavit alleges that Mr. Aguasvivas grabbed a gun from an officer and shot him while he was handcuffed, after being arrested, *see* Bates 56. The autopsy, however, asserts that that "someone else" shot the officers, *see* Bates 69. In the case of Ramon Aguasvivas, the documents submitted state that *Ramon Aguasvivas* drove up in a car, grabbed the guns, and started shooting the officers as well. *See* Docket No. 17-mj-01250-DLC, D.E. 1-1 at 83. Yet there were only three bullet wounds to the decedent. *See* Bates 69-70. As many courts before this Court have found, patently unreliable evidence cannot support a finding of probable cause. *See Mazur*, No. 06M295, 2007 WL 2122401, at \*27 (the government's evidence, "though seemingly damning on its face, on close scrutiny, turned out to be so internally inconsistent, so patently unreliable, that it obliterated, all on its own, any semblance of probable cause."); *Ferriolo*, 126 F. Supp 3d at 1304 ("unexplained inconsistency" in government's versions of events "dr[ew] both versions into doubt"); *United States v. Nolan*, 651 F. Supp. 2d 784, 795, 808 (N.D. Ill. 2009) (the "conflicts and inconsistencies" within certain records rendered them of "no evidentiary value"); *In re Extradition of Singh,* 124 F.R.D. 571, 577

22

(D.N.J.1987) ("when a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude…that there are insufficient *indicia* of reliability or credibility to establish probable cause").

In addition, defendant notes that the Immigration Judge who heard testimony regarding Mr. Aguasvivas's immigration claims found that the DNCD used torture *in the investigation of this case*. This is a factor the Court can consider in evaluating the reliability of the government's documents. *See Santos v. Thomas*, 830 F.3d 987, 1006 (9th Cir. 2016) (en banc) (evidence that inculpatory statements were obtained through torture was admissible in extradition proceeding because "the manner in which evidence used to support probable cause was obtained is relevant in determining whether the probable cause standard has indeed been satisfied"). The allegations of torture here "seriously call into question [the] legitimacy" of the investigation. *Fernandez-Morris*, 99 F. Supp. 2d at 1365. "Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause. Were that the case, the judiciary's role in the extradition process would be meaningless." *Santos*, 830 F.3d at 1006.

### D.  The fact that Mr. Aguasvivas was present at the scene is insufficient to show probable cause.

This Court should decline to find probable cause in this matter where the proffered facts support a conclusion that Mr. Aguasvivas was present, but fail to show he took any actions to participate in the crime. In *Barr*, the Eastern District of Pennsylvania found probable cause lacking in an alleged attempted murder by a group of Northern Irish on a British military officer. 619 F. Supp. 1068. The relator conceded that the crime occurred but contended that he did not commit it. Id. at 1071. The only evidence linking the relator to the attempted murder was the written statement of a co-defendant that, while they were getting ready to attack the Brit, "'Jim Barr … arrived in his car which was a Renault 5 green color. I told him we were going to have a go at the Brits. I also told him to scout around the top end of Clonard Street for any other foot patrols.'" *Id*. at 1070. The court

found fatal the lack of evidence that the relator intended the shooting on the officers or accepted the scouting assignment. It held that the government had "shown only that Mr. Barr was present in the vicinity of the attack and nothing more." *Id*. at 1071. Probable cause, by contrast, "means more than opportunity to commit crime or presence in a particular place. It must be more than surmise or suspicion. There must be some tangible fact or incident which will support a judicial act, something which invokes discrimination of judicial discretion." *Id*. (internal quotation marks and citation omitted). Because Barr did not request a hearing, the court denied the extradition request on the papers. *Id*. at 1069. Here too, mere "opportunity to commit" a crime or presence in a particular place is insufficient. *Id*. at 1071. The government has produced no more than "surmise or suspicion." *Id*.

### E.  Hearsay is permitted, but this information is not even hearsay.

At least one level of hearsay has been found competent for extradition purposes. *See Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984); Fed. R. Crim. P. 5.1(a) (a "finding of probable cause may be based upon hearsay in whole or in part"), *quoted in Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (en banc). In *Zanazanian*, the court found a police report competent, where it described the recorded statements/confessions of accomplices and included a statement that each suspect approved the tape or had listened to a reading of the officer's notes and approved. *Id*. at 627. The court acknowledged "that the extra hearsay step [beyond one level] might in certain cases result in decreased reliability," but found that the reports in the case at bar were "sufficiently reliable to be deemed competent." *Id*.

Here, however, what the government presents is not even hearsay, of *any* number of levels. There is no declarant. Such evidence should be found per se incompetent. *Cf. U. S. ex rel. Karadzole v. Artukovic*, 170 F. Supp. 383, 390 (S.D. Cal. 1959) ("Hearsay evidence, under

24

decisions of the higher courts, may be admissible in extradition cases but the weight to be given the evidence is for the committing magistrate").

## CONCLUSION

The government fails to provide the documentation required by the Treaty and fails to produce any actual evidence that Mr. Aguasvivas committed these crimes. The government's conclusory accusations are unsupported, unreliable, and legally incompetent to sustain a finding of probable cause. "This Court is not permitted 'to simply hand over a [person] on the word of a prosecutor, coupled with conclusory allegations and unsubstantiated, unreliable evidence.'" *Nolan*, 651 F. Supp. 2d at 815 (quoting *Mazur*, 2007 WL 2122401 at *27). The Court should dismiss the extradition Complaint.

Respectfully submitted,

CRISTIAN STARLING AGUASVIVAS,
by his attorneys,

*/s/ Jennifer C. Pucci*
Jennifer C. Pucci
B.B.O. #669823
Amy Barsky
Cal. Bar 270846
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061

Certificate of Service

I, Jennifer C. Pucci, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

Date:   February 27, 2018                    */s/ Jennifer C. Pucci*
                                             Jennifer C. Pucci