UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In the Matter of the Extradition of | ) | Misc. No. 17-MJ-4218-DHH |
| Cristian Starling Aguasvivas | ) | |
|  | ) | |
|  | ) | |
|  | ) | |

## MEMORANDUM OF EXTRADITION LAW AND RESPONSE TO FUGITIVE'S MOTION TO DISMISS

### I.    Background

On September 13, 2017, this Court issued an arrest warrant for Cristian Starling Aguasvivas ("the fugitive") pursuant to a request for his arrest from the Government of the Dominican Republic, under the authority of the Extradition Treaty between the Government of the United States of America and the Government of the Dominican Republic, Jan. 12, 2015, T.I.A.S. 16-1215 (referenced hereinafter as "the Treaty") and 18 U.S.C. §§ 3184 *et seq.*[1]  On September 14, 2017, U.S. law enforcement arrested the fugitive in this district.  He made an initial court appearance on September 15, 2017, at which time this Court ordered him detained.

At the time that the United States filed its complaint seeking an arrest warrant, it also lodged the Dominican Republic's formal request to the United States Department of State for the fugitive's extradition, which is supported by the documents required by the Treaty.  Pursuant to that complaint, the United States seeks the fugitive's extradition in accordance with its Treaty obligations to the Dominican Republic.

---

[1]   The Treaty is attached to the Declaration of Tom Heinemann, Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser for the Department of State, which is part of the government's request for extradition.  It is reprinted in Exhibit A of the Motion to Dismiss Extradition Complaint ("Ex. A") at Bates Stamp 000020-30.

By statute, the judicial officer handling the extradition is required to hold a hearing to consider the evidence of criminality presented by the Dominican Republic and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. The United States respectfully submits this memorandum to set forth the procedural and factual background of the case, and to explain the legal standards and protocols that govern extradition proceedings under Section 3184. As detailed herein, the evidence submitted by the Dominican Republic fulfils the relevant Treaty requirements. The Court should therefore "certify the same" to the Secretary of State, who will decide whether to surrender the fugitive "according to the treaty." *Id.*[2] As further detailed herein, the Court should deny the fugitive's Motion to Dismiss (R. Doc. 23), as the claims in support are without merit.

## II. Statement of Facts

According to the evidence submitted by the Dominican Republic, on or about December 6, 2013, Dominican Republic anti-drug agents executed an operation in the city of Bani. *See* Affidavit of Feliz Sanchez Arias ("Arias Affidavit"), (Ex. A at 000056-57). During the operation, the agents were arresting the fugitive, a/k/a "Momon," a suspected illegal drug dealer, when they were approached by his brother, Frank Aguasvivas ("Frank"). *Id.* Frank began to question the agents about, and protest, his brothers' arrest. *Id.*

The fugitive took advantage of this distraction and attacked Agent Lorenzo Ubri Montero ("Agent Ubri"). *Id.* The fugitive managed to disarm Agent Ubri and then shot him three times. *Id.*; *see also* Arrest Warrant for Cristian Starling Aguasvivas a/k/a "Momon" (agents "were making

---

[2] After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not." *Id.*

[sic] an anti-drug operation and were preparing to arrest [] Estarling Aguasvivas aka Momon, [when] this person disarmed and fired three shots [at] the agent Lorenzo Ubri Montero causing his dead [sic]"), Ex. A at 000062-63.  Next, the fugitive opened fire on the other agents, hitting and seriously wounding Captain Felipe de Jesus Jimenez Garcia ("Captain Jimenez") and Agent Jose Marino Henriquez Rodriguez ("Agent Henriquez").[3]  Ex. A at 000055-57.

Agent Ubri suffered a fatal bullet wound to the chest and died.  A subsequent autopsy established that his cause of death was by gunshot wounds.  *See* Autopsy of Lorenzo Ubri Montero ("Autopsy"), Ex. A at 000069-71.  Captain Jimenez survived but suffered bullet wounds to the neck, abdomen, arm, and thorax.  *See* Medical Certificate of Felipe De Jesus Jimenez Garcia, Ex. A at 000072.  Agent Henriquez also survived but suffered bullet wounds to his abdomen and liver. *See* Medical Certificate of Jose Marino Henriquez Rodriguez, Ex. A at 000073.  Both Captain Jimenez and Agent Henriquez identified the fugitive, by reference to his photograph, as the man who shot them and who disarmed, shot, and killed Agent Ubri.  *See* Additional Affidavit of Feliz Sanchez Arias ("Additional Arias Affidavit"), Ex. A at 000082.

On the same day, December 6, 2013, a Dominican Republic judge issued a warrant for the fugitive's arrest.  Ex. A. at 000062-66.   He is wanted by the Dominican Republic on charges of (1) conspiracy, in violation of Articles 265 and 266 of the Dominican Criminal Code ("DCC"); (2) murder, in violation of Articles 295 and 304 of the DCC; (3) robbery, in violation of Article 379 and 383 of the DCC; and (4) illegal possession of firearms, in violation of Article 39 of Law 36 of the Dominican Trade and Possession of Firearms.  Ex. A at 000004, 000031, 000054.

## III.    Discussion

---

[3] The extradition request, in places, refers to Agent Henriquez as "Jose Marino Hernandez Rodriguez," although both references are clearly to the same agent who survived being shot by Cristian Aguasvivas. The United States is using the name Henriquez in accordance with the references in the Dominican Republic's arrest warrant for the fugitive and the medical records for the wounded agent.

Through the hearing prescribed by 18 U.S.C. § 3184, the Court must determine whether to certify to the Secretary of State that the evidence submitted by the Dominican Republic is "sufficient to sustain" these charges against the fugitive.  If any evidence is offered by the fugitive, the Court should rule on its admissibility.  Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought.  *See Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973).  If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender.  18 U.S.C. § 3184; *see Martin,* 993 F.2d at 828-29.  The Secretary will then decide whether to surrender the fugitive to the Dominican Republic.

As discussed below, the Dominican Republic's evidence satisfies the requirements of the Treaty and supports a finding that the fugitive is extraditable for conspiracy, murder, robbery, and weapons-related offenses.  Accordingly, this Court should certify to the Secretary that he is extraditable to the Dominican Republic to stand trial on the charges for which his extradition is sought.

A.    **The Documentary Evidence Submitted by the Dominican Republic Supports Certification; the Fugitive in Extradition Proceedings May Submit Explanatory Evidence Only**

An extradition hearing is not a criminal proceeding and "unique rules of wide latitude govern reception of evidence."  *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (citation and internal quotation marks omitted).  Among these rules are the following:

1.   The Dominican Republic's Written Submissions Are Sufficient and Admissible

Extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty."  *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).  Thus, hearsay evidence is admissible at extradition hearings and may properly support a finding of extraditability.  *See id.* (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *see also, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 626–27 (9th Cir. 1984) (unsworn written statements may properly form the basis for extradition); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same); *In re Stern*, No. 07-21704-MC, 2007 WL 3171362, at *3 (S.D. Fla. Oct. 25, 2007) (same).

Accordingly, a finding of extraditability may be, and typically is, based entirely on the four corners of the authenticated documentary evidence and information provided by the requesting government.  *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1162-63 & 1166 (11th Cir. 2005) (upholding probable cause determination based on unsworn 106-page bill of indictment prepared by a foreign investigator describing witness statements and other hearsay evidence); *Manta v. Chertoff*, 518 F.3d 1134, 1139-40, 1145-47 (9th Cir. 2008) (upholding probable cause determination based on investigation report written by prosecutor); *Bovio v. United States*, 989 F.2d 255, 259-61 (7th Cir. 1993) (Swedish investigator's statement sufficient to establish probable cause); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994).

The Treaty governs proper certification of documents in this case. Article 7 of the Treaty lists the documents the Government of the Dominican Republic is required to submit when making a request for the extradition of a fugitive charged with a crime. Article 8 of the Treaty establishes that the documents "*shall be received and admitted as evidence* in extradition proceedings if: (a) they bear the certificate or seal of the Department of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting party[.]" (Emphasis added.) [4] The documents filed in this case are accompanied by such a certificate or seal. *See* Ex. A at 000003, Declaration of Tom Heinemann, ("The Dominican Republic, in submitting documents in the instant case, has complied with the Treaty with respect to authentication."). Accordingly, the documents are properly authenticated and thereby admissible in this proceeding.

### 2.  The Fugitive's Right to Introduce Evidence Is Limited

The fugitive's opportunity to challenge the evidence introduced against him is heavily circumscribed. "The accused is not entitled to introduce evidence which merely goes to his defense but he may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal." *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962); *see also Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) ("[T]he extraditing court properly may exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity. . . . Because of the limited function of an extradition proceeding and the limited participation

---

[4] *Cf.* 18 U.S.C. § 3190 (submitted documents also admissible if properly certified by the principal diplomatic or consular officer of the United States resident in the requesting country, if the documents would be received for similar purposes by the tribunals of the requesting country). The Requesting state may use either the Treaty or statutory method of admissibility when submitting the extradition request. *See Emami v. U.S. Dist. Court for N. Dist. of California*, 834 F.2d 1444, 1451 (9th Cir. 1987); *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406 (9th Cir. 1988).

permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case."); *see also In re Stern,* 2007 WL 3171362 at *3 ("Defendant's right to introduce evidence is limited to testimony that explains (rather than contradicts) the demanding country's evidence.").

The fact that "explanatory evidence" is permitted but "contradictory evidence" is prohibited flows from the rule that an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986), *cert. denied*, 479 U.S. 882 (1986). "Testimony that merely gives the opposite version of the facts does not destroy the probability of guilt" and thus is inadmissible. *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1361 (S.D. Fla. 1999). Similarly, evidence (or argument) regarding the credibility of the requesting country's witnesses must be disregarded. *See, e.g.*, *Bovio*, 989 F.2d at 259 (rejecting evidence that major witness lied during the investigation because "issues of credibility are to be determined at trial"); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *8 (S.D. Fla. May 28, 2015) ("Defendant has consistently attempted to contradict the case brought against him in [the requesting country]. . . . This the Defendant cannot do."); *In re Extradition of Cervantes Valles*, 268 F. Supp. 2d 758, 772 (S.D. Tex. 2003) ("Explanatory evidence, then, is taken to mean evidence that provides an innocent explanation for the matters which the government contends point toward guilt.").

In concert with this limited nature of "explanatory" evidence, an extradition magistrate is bound to view submissions of the requesting country as true. *See*, *e.g.*, *In re Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005) ("Because [the fugitive's] argument does not accept Mexico's evidence as true, it is contradictory rather than explanatory within the meaning of extradition law."); *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d. 1277, 1294 (S.D. Fla. 2011)

(fugitive's claim that his shooting was accidental contradicted the requesting country's autopsy report, and therefore, could not "be thought to merely 'explain' the Government's evidence"); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997); *Marzook*, 924 F. Supp. at 592; *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991); *Matter of Extradition of Atta*, 706 F. Supp. 1032, 1050–52 (E.D.N.Y. 1989).  Therefore, if the fugitive intends to offer the testimony of live witnesses to contradict the evidence contained in the extradition request, then this Court should prohibit him from doing so.

Extradition treaties do not require or even anticipate the testimony of live witnesses at the hearing because to do so "would defeat the whole object of the treaty."  *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *see also Bingham*, 241 U.S. at 517.   A contrary rule would compel the "demanding government to produce all its evidence . . . both directing and rebutting, in order to meet the defense thus gathered from every quarter."  *Collins v. Loisel*, 259 U.S. 309, 316 (1922) (quoting *In re Wadge*, 15 F. 864, 866 (S.D.N.Y.), *aff'd,* 16 F. 332 (C.C.S.D.N.Y. 1883)).  Hearsay evidence is admissible at extradition hearings and fully supports a court's findings leading to a certification under Section 3184.  *Collins*, 259 U.S at 317.  Nothing more is required, and typically nothing more is provided.  *See, e.g.*, *Bovio*, 989 F.2d at 259; *Zanazanian*, 729 F.2d at 627-28.

### B.    The Requirements for Certification Are Satisfied

The Court must certify a fugitive as extraditable where: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of

probable cause as to each charge for which extradition is sought. *See, e.g.*, *Shaw*, 2015 WL 3442022, at *5 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *see also In re Stern*, 2007 WL 3171362 at *3 (articulating similar six-part standard). Each of these elements has been met in this case.

### 1.  This Court Has Authority Over the Proceeding

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," *Matter of Requested Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1996), *as amended* (Feb. 27, 1997), but is rather acting in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993). It is well settled that both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993), *cert. denied*, 510 U.S. 1165 (1994). This Court is therefore authorized to conduct the hearing in this case. *See id.*; *see also* Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, Rule 1(e) ("Each Magistrate Judge appointed by this court is authorized to . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. Section 3184[.]").

### 2.  This Court Has Jurisdiction Over the Fugitive

It is also well settled that the Court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue [its] warrant for the apprehension of

the person so charged."); *Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *Grin v. Shine*, 187 U.S. 181, 185-86 (1902).  The fugitive was arrested in this district on September 14, 2017; accordingly, this Court has jurisdiction over him.

3.      The Relevant Treaty Is in Full Force and Effect

Section 3184 provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States.  *See id.*  In this case, Tom Heinemann, Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser for the Department of State, has provided a declaration attesting that the Treaty is in full force and effect between the Dominican Republic and the United States.  Ex. A 000001-03.  The Court must defer to the Department of State's determination in these regards.  *See, e.g.*, *Kastnerova v. United States*, 365 F.3d 980, 985-87 (11th Cir. 2004) ("[E]very other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination."); *cf. United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir. 2002) ("[T]he State Department's interpretation of a treaty is entitled to great deference.").

4.      The Charged Crimes Are Covered by the Treaty

The extradition treaty between the United States and the Dominican Republic is what is known as a "dual criminality" treaty.  All early United States extradition treaties were "list" treaties, in which the treaty listed all the extraditable crimes.  Most modern treaties, including the current Treaty with the Dominican Republic, are "dual criminality" treaties, which state that for an act to be extraditable, it need only be punishable under the laws of both countries by imprisonment for a period of more than a year.  Article 1 of the Treaty provides for the return of fugitives "sought for prosecution" of an "extraditable offense," as that term is defined under the Treaty.  Article 2 of the Treaty makes offenses "extraditable" if "under the laws of both Parties,

the maximum applicable penalty is deprivation of liberty for more than one year or a more severe penalty." Ex. A at 000021.

Here, the charged offenses are covered by the Treaty and are therefore extraditable. The laws in both the United States and the Dominican Republic make the fugitive's offenses punishable by more than a year of imprisonment. In determining whether an offense is punishable under the laws of both countries, extradition magistrates properly look to the underlying acts to determine whether, if they had been committed in the United States, they would violate United States federal law, the law of the state in which the hearing is held, or the law of the preponderance of the states. *See Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981); *Matter of Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989); *see also Collins*, 259 U.S. at 312 ("The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions."). Both U.S. federal law and Massachusetts law would be so violated had the fugitive committed his crimes in the United States. The following are examples of such federal and state offenses.

First, the fugitive could be charged with either first or second degree murder for the killing of Agent Ubri, pursuant to Massachusetts law, which would subject him to well in excess of one year's imprisonment. *See* Mass. Gen. Laws ch. 265, §§ 1, 2; *see also* 18 U.S.C. §§ 1111, 1114 (murder of a federal official punishable by death or imprisonment for life).[5]

---

[5] *Cf.* Arias Affidavit, Ex. A at 000055-59. Dominican Criminal Code Article 295: "Whoever voluntarily kills another, is guilty of murder;" Article 304: "Murder is punished with thirty years of imprisonment, when its commission precedes, accompanies, or follows another crime." Here, robbery is the other crime that "preced[ed], accompany[ed], or follow[ed]" the murder.

Second, the fugitive could be charged, pursuant to Massachusetts law, with larceny for stealing Agent Ubri's firearm, which he then is alleged to have used to murder Agent Ubri and wound two of the other agents. *See* Mass. Gen. Laws ch. 266, § 30 (larceny) & ch. 140, § 121 (definition of "firearm" includes "a pistol, revolver, or other weapon of any description"). The Massachusetts larceny statute provides that the crime of stealing a firearm subjects the offender to a maximum punishment of five years in state prison. *See* Mass. Gen. Laws ch. 266, § 30. Moreover, the fugitive also could be charged with armed robbery, pursuant to Massachusetts law, for the theft of the weapons of Captain Jimenez and Agent Henriquez, which can only be reasonably inferred to have occurred after he had disarmed Agent Ubri (thereby arming himself) and opened fire on the agents. *See* Arrest Warrant for Cristian Starling Aguasvivas a/k/a "Momon" and Fran[k] Aguasvivas a/k/a "El Cojo" ("The brothers Aguasvivas also disarmed to all [sic] the agents of the National Directorate for Drug Control who were participating in the anti-drug operation[.]"), Ex. A 000063. This would be in violation of Mass. Gen. Laws ch. 265, § 17 (armed robbery), which would carry a maximum punishment of imprisonment for life.[6]

Third, the fugitive could be charged, pursuant to Massachusetts law, with the substantive offense of conspiracy for conspiring with his brother Frank to perpetrate the armed robbery of Captain Jimenez and Agent Henriquez by stealing their weapons, following the fugitive's disarming and shooting of Agent Ubri. *See* Mass. Crim. Model Jury Instructions § 4.160 (2017) (elements of conspiracy are "*First*: That the defendant joined in an agreement or plan with one or more other persons; *Second*: That the purpose of the agreement was to do something unlawful . . .

---

[6] *Cf.* Arias Affidavit, Ex. A at 000058, Dominican Criminal Code Article 379: "[W]ho by fraud subtracts a thing that does not belong to him, is guilty of robbery."; Article 383: "Robbery committed on public roads . . . shall be punished with the maximum penalty of imprisonment . . . In all other cases, guilty parties will be sentenced to three to ten years in prison."

and *Third*:  That the defendant joined the conspiracy knowing of the unlawful plan and intending to help carry it out."); *see also* 18 U.S.C. § 372 (conspiracy to impede or injure a federal officer, including by "injur[ing] his property so as to . . . impede him in the discharge of his official duties" carries a maximum punishment of six years' imprisonment).[7]

Fourth, the fugitive could be charged with a firearms offense relating to his use of Agent Ubri's weapon to murder Agent Ubri, which would subject him to an additional penalty of not less than five years.  *See* Mass. Gen. Laws ch. 265, § 18B (use of firearms while committing a felony).[8]

Article 2.5 of the Treaty permits extradition for any offenses punishable by one year or less imprisonment, if other offenses specified in the request qualify as extraditable offenses under Article 2.1 & 2.2.  Therefore, pursuant to the Treaty, even if the substantive conspiracy offense or the weapons offense is punishable by one year or less confinement in the Dominican Republic, because there are clearly multiple other offenses in the same request that are punishable by more than one year, the conspiracy and firearms-related offenses are also extraditable offenses.

5.   The Dominican Republic's Evidence Establishes Probable Cause that the Fugitive Committed the Charged Offenses

The standard of proof to find the evidence "sufficient to sustain the charge ..." pursuant to Section 3184 is the familiar U.S. domestic requirement of probable cause.  The Court must

---

[7] *Cf.* Arias Affidavit, Ex. A at 000058, Dominican Criminal Code Article 265:  "Any association formed, regardless of its duration or number of members, any agreement established, for the purpose of preparing or committing crimes against persons or properties, constitutes a crime against public peace."; Article 266: "It shall be punished with imprisonment the person who has affiliated to an association or who has participated in an agreement established for the purposes specified in the previous article."

[8] *Cf.* Arias Affidavit, Ex. A at 000057-58, Dominican Law 36 on Trade and Possession of Firearms:  "Any person who manufactures, receives, purchases in any way, has in his possession or custody, sells, uses or carries any firearms or airguns, its parts or spare parts and the ammunitions for them, at violation of the provisions of this Act, he shall be punished in the manner indicated below:  Paragraph III.  If it comes [sic] to gun or revolver, this is, those firearms for which it is possible to obtain a special license . . . it shall be punished with imprisonment[.]"

conclude that there is probable cause to believe that the crimes charged by the Dominican Republic

was committed and the person before the Court committed it.  *Hoxha v. Levi*, 465 F.3d 554, 561

(3d Cir. 2006).  The evidence is sufficient, and probable cause is established, if a person of ordinary

prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the

accused.  *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  The Supreme Court stated in *Benson*, 127

U.S. at 463:

> the proceeding before the commissioner is not to be regarded as in the nature of a
> final trial by which the prisoner could be convicted or acquitted of the crime charged
> against him, but rather of the character of those preliminary examinations which take
> place every day in this country before an examining or committing magistrate for the
> purpose of determining whether a case is made out which will justify the holding of
> the accused, either by imprisonment or under bail, to ultimately answer to an
> indictment, or other proceeding, in which he shall be finally tried upon the charge
> made against him.

*See also Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine

whether there is competent evidence to justify holding the accused to await trial, and not to

determine whether the evidence is sufficient to justify a conviction."); *Fernandez*, 268 U.S.

at 312 ("Competent evidence to establish reasonable grounds is not necessarily evidence

competent to convict."); *accord Afanasjev*, 418 F.3d at 1165 n.11; *Barapind v. Enomoto*, 400

F.3d 744, 752 (9th Cir. 2005); *Sidali v. INS*, 107 F.3d 191, 199 (3d Cir. 1997).

The facts summarized above and set forth in the extradition request submitted by the

Dominican Republic establish probable cause.   The Dominican Republic's evidence is

straightforward:  two law enforcement agents, Captain Jimenez and Agent Henriquez, who both

witnessed the fugitive murder Agent Ubri, and who both suffered grievous wounds when the

fugitive shot each of them in the same incident, identified the fugitive as their shooter and one of

the culprits in the December 6, 2013, incident.  *See* Additional Arias Affidavit, Ex. A at 000082.

("The same photograph attached to the Request for Extradition . . . has also been seen and

recognized as corresponding to [the fugitive] . . . by [Captain Jimenez] and . . . [Agent Henriquez] . . . they are also eyewitnesses because they saw [the fugitive] to [sic] disarm, shoot and kill to the [sic] officer of the order [Agent Ubri.].").

This is classic extradition evidence "sufficient to sustain the charge." Even in cases in which the facts have not been so well sourced, or in which the requesting country has relied on multiple levels of hearsay, probable cause has been found. *Bovio* is highly instructive. There, the extradition magistrate found that probable cause existed based solely upon the affidavit of a Swedish investigator. 989 F.2d at 258. The fugitive contested that finding in the Seventh Circuit arguing that:

> (1) [the investigator's] statements do not indicate how he obtained the information on which the statements are based, whether witnesses were under oath, and whether there are any original notes or recordings of witness interviews; (2) all the evidence implicating Bovio is hearsay; (3) there is no physical evidence implicating Bovio; and (4) the major witness relied upon by the Swedish government, Perttunen, has admitted lying during the investigation, and there is otherwise no corroboration of her account.

*Id.* at 259. The Seventh Circuit rejected all of these arguments, noting that a fugitive has "no right to attack the credibility" of witnesses in an extradition hearing, as "issues of credibility are to be determined at trial," and that "hearsay testimony is often used in extradition hearings." *Id.* at 259-60.[9]

### C.   Claims Regarding the Fugitive's Treatment Upon Return to the Dominican Republic Are Reserved for the Secretary of State's Consideration

---

[9]  The person arrested in this case has not specifically contested identity; namely, that he is, in fact, the fugitive, whom the two agents identified as their shooter and Agent Ubri's, and who is wanted in the Dominican Republic. Moreover, the person who has appeared before this court strongly resembles the person in the photographs of the fugitive provided by the Dominican Republic. Accordingly, there is probable cause to believe that the person before the Court is the same person alleged to have committed murder, robbery, conspiracy, and weapons-related offenses in the Dominican Republic.

To the extent that the fugitive intends to raise claims that he will face mistreatment in the Dominican Republic following his extradition, this Court must defer to the Secretary of State's determination on this issue.[10]  The Supreme Court reaffirmed this principle of "non-inquiry" in *Munaf v. Geren*, 553 U.S. 674, 700-01 (2008) ("Even with respect to claims that detainees would be denied constitutional rights if transferred, we have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments.").

In reaching this conclusion, the Court reasoned that, in contrast to the Judiciary, "the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is." *Id*. at 702.  Further, "[t]he Judiciary is not suited to second-guess" the Executive Branch's evaluation of a petitioner's torture claims as that "would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." *Id*.[11]

*Munaf* is only one in a long line of cases faithfully applying the rule of non-inquiry for well more than a century.  *See*, *e.g.*, *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *United States v. Kin-Hong*, 110 F.3d 103, 111 (1st Cir. 1997); *Martin*, 993 F.2d at 829-30; *Ahmad v. Wigen*, 910 F.2d

---

[10]  Based on the government's understanding of the fugitive's motion to dismiss, he has thus far raised no such claims.  His motion to dismiss contains a section pertaining to his prior immigration proceedings and attaches related documents as Exhibit B to the motion.  (R. Doc. 23-2)  However, it appears that the fugitive does not actually attempt to raise any substantive defenses to extradition based on those proceedings.  Nor could he.  *See In re Extradition of Mironescu*, 296 F. Supp. 2d 632, 638 n.6 (M.D.N.C. 2003) ("The granting of asylum does not preclude extradition.  Defendant's assertion that the Immigration and Naturalization Act (8 U.S.C. § 1158(c)) protects one who has been granted asylum from extradition fails to acknowledge the distinction between the asylum and the extradition process.").

[11] The habeas petitioners in *Munaf* were U.S. citizens detained in Iraq and set to be transferred, not extradited, to Iraqi authorities for criminal prosecution.  *Id*. at 679.  However, the Court relied on extradition cases in its analysis and its holding applies with equal force in extradition cases.  *See also Omar v. McHugh*, 646 F.3d 13, 19 (D.C. Cir. 2011) ("because [the habeas petitioner] is facing transfer to the custody of another sovereign that has convicted him of a crime, his situation is analogous to that of an extradition transferee").

1063, 1067 (2d Cir. 1990); *Quinn*, 783 F.2d at 789–90; *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980).  The rule of non-inquiry, "like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers."  *Kin-Hong*, 110 F.3d at 110.  The rule respects the unique province of the Executive Branch to evaluate claims of possible future mistreatment at the hands of a foreign state, its ability to obtain assurance of proper treatment (if warranted), and its capacity to provide for appropriate monitoring overseas of a fugitive's treatment.  *See* 22 C.F.R. § 95.3(b) ("[T]he Secretary [of State] may decide to surrender the fugitive to the requesting State, to deny surrender of the fugitive, or to surrender the fugitive subject to conditions."); 22 C.F.R § 95.4 ("Decisions of the Secretary [of State] concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review.").

Moreover, any claims the fugitive may raise about immigration status or immigration proceedings are inapposite, as they are fundamentally "separate and independent" from this extradition process.  *See Barapind v. Reno*, 225 F.3d 1100, 1104-05 (9th Cir. 2000); *see also Matter of McMullen*, 17 I & N. Dec. 542, 548 (extradition and immigration proceedings are "distinct and separate"); *Matter of Perez-Jimenez*, 10 I. & N. Dec. 309, 314 (BIA 1963) (extradition process takes precedence over separate immigration proceedings, which should be deferred while extradition is pending).  The extradition process is governed by (1) treaties between the United States and the state requesting extradition; (2) the extradition statute contained in 18 U.S.C. 3181, 3184, 3188-3195; and (3) the case law developed thereunder.

Conversely, immigration-related claims are governed by (1) the Immigration and Nationality Act; (2) the regulations promulgated under that statute; and (3) the case law interpreting those laws.  *Cf.* 22 C.F.R. § 95.4 ("[R]eview of a final order of removal pursuant to

section 242 of the Immigration and Nationality Act . . . is not applicable to extradition proceedings."). Extradition proceedings concern the return of fugitives to face trial for serious crimes charged by a separate sovereign state; immigration proceedings involve removal of aliens even when not accused of a crime by a foreign country. Furthermore, findings in immigration proceedings have no preclusive effect, and are not binding, on extradition proceedings. *See, e.g.*, *Barapind v. Reno*, 225 F.3d at 1114. Therefore, any claims regarding immigration proceedings or immigration status should play no part in this extradition matter.

### D.    The Court Should Deny the Fugitive's Motion to Dismiss

In his motion to dismiss, the fugitive argues for dismissal of his complaint, alleging that the Dominican government failed to comply with the terms of the Treaty. Specifically, he claims that the Dominican government failed: to provide a valid arrest warrant; to show pending charges; to provide a reasonable basis to believe he committed the offenses for which his extradition is sought; and to provide competent or sufficient evidence to establish probable cause. In a supplemental briefing, the fugitive adds a more specific argument that the complaint should be dismissed because it contains insufficient evidence to show probable cause on the elements of his conspiracy and homicide charges, pursuant to Dominican law. These claims are without merit.

### 1.    The Extradition Request Complies with Article 7.3(a) & (b) of the Treaty

Pursuant to Article 7.3 of the Treaty:

> [A] request for extradition of a person who is sought for prosecution shall also be supported by: (a) a copy of the warrant or order of arrest or detention issued by a judge or other competent authority; (b) a copy of the document setting forth the charges against the person sought; and (c) such information as would provide a reasonable basis to believe that the person sought committed the offenses or offenses for which extradition is requested. Ex. A at 000024.

Taken together, these requirements are intended to oblige the requesting country to demonstrate through documentary evidence, in cases where fugitives are "sought for prosecution," (1) "that the fugitive is currently charged with an offense recognized by the treaty . . . in other words, [to] show that the fugitive is in fact 'prosecutable' upon extradition to the demanding country," *Skaftouros v. United States*, 667 F.3d 144, 160 (2d Cir. 2011), and (2) that the person before the court is the person accused in the extradition request, and further that there is sufficient evidence that the same person committed the offenses for which extradition is sought, *see Manta*, 518 F.3d at 1143.  The first requirement is generally known in extradition law as the "warrant requirement."  *See Skaftouros*, 667 F.3d at 160; *Sacirbey v. Guccione*, 589 F.3d 52, 67 (2d Cir. 2009).  The second requirement is subsumed by the extradition magistrate's probable cause analysis, which is required by the language in 18 U.S.C. § 3184 instructing magistrates to find evidence "sufficient to sustain the charge" before certifying a case for extradition.  *See Quinn*, 783 F.2d at 787.

Article 7.3 of the Treaty contains no directive that the requesting country must submit separate documents in order to satisfy the warrant and probable cause requirements.  Indeed, the same document could satisfy each and every component of Article 7.3.  Here, despite the fugitive's attempts to read technical requirements into the Treaty that do not exist, the documents submitted by the Dominican Republic in the extradition request both satisfy the warrant requirement and establish probable cause.

> a.   The extradition request is supported by "a copy of the warrant or order of arrest issued by a judge or other competent authority"

As observed by the First Circuit, "the warrant requirement appears to do nothing more than to help the judicial officer in the requested country to confirm that there are in fact charges properly pending against the relator in the requested country and that the relator is actually the person

sought." *Kin-Hong*, 110 F.3d at 114.  A foreign arrest warrant satisfies this requirement as long as it "is one that is 'duly authenticated' as required by § 3190 and the applicable treaty" and shows that the fugitive is "currently charged and prosecutable."[12]  *Skaftouros*, 667 F.3d at 160; *cf. Sacirbey*, 589 F.3d at 67 (foreign warrant did not satisfy the treaty where issued "by a court ousted of jurisdiction and no longer able to enforce it").

The extradition request in this case contains an arrest warrant for the fugitive signed on December 6, 2013, by Leonardo Antonio Garcia Cruz, Acting Judge of the Judicial Office of Services of Permanent Assistance, Judicial District of Peravia, City of Bani, in the Dominican Republic. Ex. A at 000062-66 (translation); 000050 (signature page of warrant in Spanish).  Judge Garcia Cruz's arrest warrant is properly authenticated pursuant to the treaty, *see* note 8 *supra*, and clearly demonstrates that the fugitive is currently charged with several extraditable offenses.  The fugitive asserts no claim that the warrant is fraudulent, forged, unauthorized, or unenforceable.

Instead, the fugitive raises the types of claims that "savor of technicality" which are "peculiarly inappropriate in dealing with a foreign nation."  *Skaftouros*, 667 F.3d at 160; *see also Factor v. Laubenheimer*, 290 U.S. 276, 294 (1933) (holding that "a narrow and restricted construction [of an extradition treaty] is to be avoided" and that "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred").  He complains (1) of a variation in the spelling of his name between the Spanish version and the English translation of his arrest warrant, (2) that the arrest warrant lists only five of the seven charges for which his extradition is sought, and (3) that the arrest warrant seeks his arrest for "investigative" purposes instead of for prosecution.  (R. 23 at 9-11)  These hyper-technical claims are wholly without merit.

---

[12] See n.4, *supra*, regarding valid forms of authentication under the Treaty.

*First*, the Dominican warrant for the fugitive's arrest, issued shortly after December 6, 2013, shooting incident, lists the arrestees' names as "Estarling Aguasvivas (A) Mamon" as well as "su hermano [his brother] Fran Aguasvivas (A) El Cojo."  Ex. A at 000048.  Both the Spanish version and the English translation of the warrant list the three victims in the case, the date of the offense, the time, the place, and the circumstances surrounding the incident.  Ex. A at 000048, 000062-000066.

There is no dispute about which incident is described in the warrant, or about whether the fugitive, brother of Frank Aguasvivas a/k/a El Cojo, is the person actually identified therein (and the person further identified by the two surviving victims as their shooter - Ex. A at 000082).  To the extent that the Spanish version of the arrest warrant refers to the fugitive as "Estarling Aguasvivas, (A) Mamon" and the English translation of the warrant refers to the fugitive as "Cristian Starling Aguasvias aka Momon" and "Estarling Aguasvivas," any variation is inconsequential.  There is no dispute that the documents reference the same person, the fugitive, who is "prosecutable upon extradition to the demanding country" for the offenses identified in the request.  *Skaftouros*, 667 F.3d at 160.

*Second*, the Treaty is silent as to what, if anything, a foreign arrest warrant must state on its face regarding the extraditable offenses.  Certainly, the Treaty does not require that a foreign warrant must list any or all of the offenses on its face; instead Article 7.3(a) simply requires the requesting state to provide "a copy of the warrant or order of arrest or detention issued by a judge."  *See Hill v. United States*, 737 F.2d 950, 950 (11th Cir. 1984) (*per curiam*) (stating in dicta that the U.S.-Canadian extradition treaty contained no "implicit requirement of a warrant containing all the extraditable charges"; instead, "[t]he warrant may specify all the charges if the requesting country so chooses, but it need refer to only one"); *cf. Matter of Extradition of Ricardo Alberto*

*Martinelli Berrocal*, No. 17-22197-Civ-Torres, 2017 WL 3776953, at *25 (S.D. Fla. Aug. 31, 2017) (Panamanian arrest warrant satisfied extradition treaty requirement even though it did not expressly refer to any one extraditable offense, given that "the associated evidence" made "clear that there are four charges pending against Pres. Martinelli").

Here, the extradition request as a whole references four sets of charges: conspiracy (Articles 265 and 266 of the DCC), murder (Articles 295 and 304 of the DCC), robbery (Articles 379 and 383 of the DCC), and illegal firearm possession (Law 36 on Trade and Possession of Firearms, Article 39).  See Ex. A at 000057-59.  And the arrest warrant specifically lists the charges under Articles 265 and 266 (conspiracy), 295 and 304 (murder), Article 39 of Law 36 (firearms), and "309."  Ex. A at 000048, 000063.  The final charge listed in the arrest warrant as "309" is likely a typographical error intended to read "379," which, as explained in the Arias Affidavit, relates to the alleged robbery of the agents' firearms.  The fugitive's emphasis on arguments pertaining to any technical defect concerning the robbery charge is unavailing.  *See*, *e.g.*, *In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 221 (N.D.N.Y. 2013) (finding that "the combination" of a court authorizing the issuance of an international warrant for the fugitive's arrest, the resulting Interpol diffusion notice, and a court decision authorizing his detention satisfied the warrant requirement of U.S.-Bosnia extradition treaty) (internal quotation marks omitted); *In re Extradition of Azra Basic*, No. 5:11-MJ-5002-REW, 2012 WL 3067466 at *19 (E.D. Ky. July 27, 2012) (finding that separate documents which "collective[ly] . . . show a decision to prosecute, a decision to detain, and extant orders currently implementing both" satisfied the warrant requirement of U.S.-Bosnia extradition treaty), *denial of petition for habeas corpus affirmed in Basic*, 819 F.3d at 900-01 (holding that "the documents in the record constitute 'a duly authenticated copy of the warrant of arrest,' as required by the Treaty").

*Third*, the fugitive's claim that the warrant is defective because it authorizes his provisional arrest for investigative purposes in the Dominican Republic is baseless.  Again, the Treaty requires only that the Extradition Request be "supported by a copy of the warrant or order of arrest or detention issued by a judge" and does not further specify the type of warrant required. Furthermore, the fugitive's arrest warrant was, in fact, issued by Judge Garcia Cruz, based on a request by the prosecution, ordering the arrest of the fugitive after reaching a considered decision. Ex. A 000062-000066.  As explained in the Arias Affidavit, this procedure is how criminal proceedings may be initiated under the law of the Dominican Republic.  Ex. A 000054-000055. The fugitive does not contend otherwise.

Indeed, the fugitive admits that the point of the warrant requirement is to ensure that there has been some measure of judicial oversight in the requesting country.  (R. Doc. 23 at 10-11)  But there can be no dispute that such judicial oversight was exercised in this case, and U.S. extradition courts have routinely approved extradition requests in similar circumstances notwithstanding the claim that the fugitives were wanted for investigative purposes.  *Emami*, 834 F.2d at 1448; *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 986 (D. Or. 2011) (extradition to Bosnia-Herzgovenia, rejecting argument that fugitive was wanted only for investigation); *In re Lam*, No. 1:08-MJ-247GSA, 2009 WL 1313242, at *3 (E.D. Cal. May 12, 2009); *see also Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 129-30 (E.D.N.Y. 2001) (rejecting fugitive's argument that Swiss extradition request did not sufficiently reference formal criminal charges where intent to prosecute was established through issuance of arrest warrants and the extradition request containing detailed account of alleged crimes); *id.* ("American courts cannot become enmeshed in the technicalities of foreign criminal processes."); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 83-84 (S.D.N.Y. 2003) (rejecting fugitive's argument that no charge had been filed against him where

Bosnian court orders issuing an arrest warrant, together with the extradition request describing "good reason" fugitive is suspected of having done the criminal act, sufficiently demonstrated an intent to prosecute fugitive) (*reversed in part on other grounds by Sacirbey*, 589 F.3d at 52).

The fugitive cites (R. Doc. at 8) *Salazar v. Venables*, No. 10CV15566MMA(AJB), 09MJ2545BLM, 2010 WL 3516660, at *1-2 (S.D.C.A. Sept. 3, 2010), but that case actually underscores the government's argument regarding the warrant requirement and its application in this case.  In *Salazar*, with the government's agreement, the fugitive's extradition request was withdrawn because the foreign arrest warrant had been invalidated pursuant to legal proceedings in the requesting country.  The instant case is completely different.  Here, there is a properly authenticated warrant, which has not been challenged in the requesting country, demonstrating the pendency of current charges against the fugitive in the Dominican Republic, where he would be "prosecutable" upon extradition.  *Skaftouros*, 667 F.3d at 160-61; *see also* Ex. A at 000004 (requesting extradition of the fugitive "to respond to the charges against him . . . ."); *id.* at 000006 (referring to the initial diplomatic note requesting the extradition of the fugitive "to respond to the charges against him . . . . ."); *id.* at 000053 (requesting extradition "with the purpose" that the fugitive "may face charges against him"); *id.* at 000054 (prosecutor describing being in charge "of the criminal case that accuses" the fugitive "as author" of the crimes for which extradition is sought); *id.* at 000055 ("there is a criminal process against" the fugitive); *id.* ("In virtue of these facts [the fugitive] must respond for the violations…."); *id.* at 000057 (listing the criminal provisions the fugitive is accused of violating); *id.* at 000061 (affirming the prosecutor's belief that if the fugitive is extradited, the fugitive "shall be sentenced in criminal trial [for] the crimes he is charged [with]"); *id.* at 000064 (describing the authority of a Dominican judge to issue an

arrest warrant as to an individual for which "there is evidence to reasonably maintain that he is the perpetrator or accomplice of an offense. . . .").

        b.        <u>The extradition request is supported by "a copy of the document setting forth the charges against the person sought"</u>

As noted above, the Treaty contains no command that the requesting country provide separate documents to satisfy Article 7.3's requirements. Nor does the Treaty express any condition that some level of formality, such as that which would accompany an U.S.-style indictment, must attend the foreign charges beyond that which is reflected in the foreign arrest warrant. Especially when reviewing extradition treaties that the United States has entered into with countries rooted in civil law traditions, courts have repeatedly held that foreign arrest warrants may also serve as a "charging documents" for purposes of extradition, particularly if they explain the factual and legal basis upon which the requesting country seeks the fugitive for prosecution.[13] *See*, *e.g.*, *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1186 n.2 (W.D. Okla. 2015) (in response to fugitive's claims that an arrest warrant alone could not provide sufficient evidence that the fugitive was "charged with" an extraditable offense, extradition court found that a Mexican judge's "arrest warrant 'is a charging document' in the sense that 'it identifies the offense in the criminal code, sets out the essential facts of the alleged crime, and details the evidentiary basis for the charge.'") (internal brackets omitted) (citing *Martinez v. United States*, 793 F.3d 533, 543-44 (6th Cir. 2015), *reversed on other grounds by Martinez v. United States*, 828 F.3d 451, 456 (6th Cir. 2016) (*en banc*) (also holding that "a Mexican arrest warrant is the equivalent of a United

---

[13] If a less fulsome arrest warrant did not "set[] forth" the charges against the fugitive, *see, e.g.*, *Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, 2017 WL 3776953, at *25 (Panamanian arrest warrant included in extradition request for multiple offenses referred only to detaining the fugitive for contempt), then another document explaining the charges might be needed in order to meet the treaty requirement in Article 7.3(b). In this case, however, the Dominican arrest warrant in this case satisfies both Article 7.3(a) & (b).

States indictment" for purposes of tolling the statute of limitations in an extradition proceeding); *see also Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("We agree that for the purpose of a civil proceeding such as an extradition, a Mexican arrest warrant is the equivalent of a United States indictment."); *United States v. Nolan*, 651 F. Supp. 2d 784, 796 (N.D. Ill. 2009) (arrest warrant constituted an appropriate charging document under Costa Rican law); *Borodin*, 136 F. Supp. 2d at 130 ("the 'charge' requirement is satisfied by a requesting nation's intent to prosecute as evidenced by the record" and was satisfied by the foreign warrant and facts represented in the extradition request) *Matter of Extradition of Rovelli*, 977 F. Supp. 566, 568 (D. Conn. 1997) ("arrest warrant issued by the Italian authorities constitutes a charging document under Italian law").

Here, the extradition request is supported by the Dominican arrest warrant, which "set[s] forth" the charges of conspiracy, murder, robbery, and illegal firearm possession, and further explains the factual and legal basis upon which the Dominican Republic is prepared to prosecute the fugitive. Ex. A at 000062-66. No more is required.[14]

Even if there were any ambiguity as to what Article 7.3(b) requires pursuant to the Treaty, the fugitive cannot prevail. This is because the Court is bound by the general canon of extradition law requiring that, to the extent that there is any ambiguity, extradition treaties must be construed liberally in favor of extradition. *Factor*, 290 U.S. at 293-94; *Kin-Hong*, 110 F.3d 103, 110 ("extradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement"; *Howard*, 996 F.2d at 1330-31 (same); *In re Gambino*, 421 F. Supp. 2d 283, 309-10

---

[14] At the extradition hearing, the government intends to submit before this Court a declaration from Department of State personnel in support of this treaty interpretation, which would be entitled to "great weight." *Abbott v. Abbott*, 560 U.S. 1, 15 (2010); *see also, e.g.*, *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

(D. Mass. 2006) (same).  In this case, the rule of liberal construction requires the Court to interpret the treaty to permit the foreign arrest warrant to satisfy both Article 7.3(a) & (b), as long as it actually "set[s] forth" the charges against the fugitive, which it does.[15]

The fugitive's arguments to the contrary are meritless.  *In re Extradition of Chapman*, No. CIV07-00365SOM/BMK, 2007 WL 3254880 (D. Haw. Nov. 5, 2007) reflects another case, similar to *Salazar*, in which proceedings in the requesting country resulted in the dismissal of foreign charges and served to nullify the foreign arrest warrant that was included in the extradition request.  2007 WL 3254880, at * 2.  In no way does *Chapman* stand for the proposition that something other and more formal than a foreign arrest warrant is required in an extradition request to "set[] forth" the charges against a fugitive.[16]  *Emami* and *Matter of Assarsson*, 635 F.2d 1237 (7th Cir. 1980) are no more helpful to the fugitive.  In both cases, the courts rejected the fugitives' argument that extradition for purposes of investigation was improper.  *Emani*, 834 F.2d at 1448; *Assarsson*, 635 F.2d at 1239-40.  Further, the courts declined to interpret the Swedish and German

---

[15] The fugitive can point to no prohibition in the Treaty against a single document, such as an arrest warrant, satisfying multiple requirements.  Another provision of the Treaty illustrates how, in the reciprocal context, a single document would satisfy multiple requirements if the United States were the requesting party.  Article 7.4 identifies the requirements for an extradition request seeking a fugitive to serve an already-imposed sentence.  These requirements include both: (1) "a copy of the judgment of conviction," and (2) "a copy of the sentence imposed."  *See* Treaty, Article 7.4(a) & (c).  In cases where the United States is the requesting party, these two requirements would be satisfied by a single federal court document: a Judgment in a Criminal Case (Form AO 245B, http://www.uscourts.gov/sites/default/files/ao245b.pdf).  In the same manner, here, where the Dominican Republic is the party requesting extradition of a fugitive for prosecution, the Dominican arrest warrant properly constitutes both the "copy of the warrant" and the "copy of the document setting forth the charges" under Article 7.3 of the Treaty.  "Controlling precedent requires that, where possible, we interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories."  *Howard*, 996 F.2d at 1330.

[16] The fugitive's citations to *United Sates v. Fernandez-Morris*, 99 F. Supp. 2d 1358 (S.D. Fla. 1999), *United States v. Barr*, 619 F. Supp. 1068 (E.D. Pa. 1985), and *In re Extradition of Moreno-Vazquez*, No. CIV. 3:06CV761-CSC, 2008 WL 3926427 (M.D. Ala. Aug. 22, 2008), are inapposite.  These cases merely recite the standard that charges must be pending in a foreign country, not that something other and more formal than a foreign arrest warrant must reflect those charges.

extradition treaties to "condition[] extradition upon the filing of formal charges," *Emani*, 834 F.2d at 1448, because the treaties imposed no requirement that formal charges be filed and did not list as a treaty requirement "that a formal document called a 'charge' be produced." *Assarsson*, 635 F.2d at 1243.

The instant case is no different than *Emami* and *Assarsson*.  Here, both Article 1 and Article 7.3 of the Treaty use the phrase "sought for prosecution" to distinguish those fugitives who have yet to be convicted from those who have been convicted.  That phrase is functionally similar to the phrase used in the treaties at issue *Emami* and *Assarsson* that referred to fugitives who "have been charged," *i.e.*, accused of certain offenses, to distinguish them from fugitives who have already been convicted.  *See Assarsson*, 635 F.2d at 1242.  As with the treaties analyzed by *Emami* and *Assarsson*, the Treaty does not require the filing of a "formal" or "public" charge similar to a U.S.-style indictment.  It merely requires that the extradition request include a copy of the document such as the Dominican arrest warrant in this case, which "set[s] forth" and explains the charges that are pending against the fugitive.[17]  Therefore, the copy of the arrest warrant provided in the extradition request, which identifies and explains the charges pending in the Dominican Republic, satisfies the Treaty.

2.   <u>The Extradition Request Complies with Article 7.3(c) of the Treaty and the Probable Cause Standard by Providing "Such Information as Would Provide a Reasonable Basis to Believe that the Person Sought Committed the Offense or Offenses for which Extradition Is Requested"</u>

The fugitive contends that factual inconsistencies and other alleged deficiencies in the documents provided in the extradition requests violate the proof requirement contained in Article 7.3(c), which for extradition requests to the United States reflects the probable cause standard.  *See*

---

[17] Both the diplomatic note and the Arias affidavit repeatedly refers to the fact that the fugitive has been "charged" under Dominican law.  *See* Ex. A. 000004, 000006, 000031, 000053.

Section III(b)(5), *supra*. However, the fugitive fails to acknowledge that the extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn*, 783 F.2d at 791 (internal quotation marks omitted).

Accordingly, probable cause in an extradition proceeding is not defeated when a fugitive alleges that the evidence submitted by the requesting country contains inconsistencies. *See*, *e.g.*, *Shaw*, 2015 WL 3442022I, at * 7-11 (finding probable cause despite fugitive's argument that the evidence against him was "unreliable, contradictory, inconsistent, unbelievable, and inadmissible"); *In re Extradition of Figueroa*, No. 12-M-269, 2013 WL 3243096, at *8 (N.D. Ill. June 26, 2013) ("In sum, although we agree with [the fugitive] that the evidence that Mexico has provided is by no means perfect, the issue before us is not whether [he] should be convicted of the crime. . . . Although there may be some inconsistencies in the record, we do not believe that these are so compelling as to negate a finding of probable cause."). "Providing an air-tight narrative of the events surrounding a crime is not a precondition for granting extradition," and issues regarding alleged inconsistencies in the evidence "are all properly reserved for the eventual trial in [the requesting country]." *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 893 (N.D. Ill. 2006).

This principle accords with the fact that an extradition hearing is only preliminary in nature and is not a determination of guilty; therefore, the resolution of any inconsistencies in the record, as well as the weighing of inculpatory with exculpatory evidence, are tasks that are properly left to the courts in the requesting country. *See*, *e.g.*, *Collins*, 259 U.S. at 316; *Neely*, 180 U.S. at 123. Moreover, here, the inconsistencies and other deficiencies alleged by the fugitive about the

evidence in the extradition request are particularly minor when compared with the critical facts of the case and the evidence that supports those critical facts.

*First*, the fugitive alleges an inconsistency between the arrest warrant, which states that the shooting occurred on 5th Street, and the Arias Affidavit, which states that the shooting occurred on Francisca las Francisquera Street – both streets being in Bani.  (R. Doc. 23 at 14)  *Compare* Ex. A at 000056 *with* Ex. A at 000062.  However, Google Maps shows these streets are less than 100 yards apart.  Moreover, the arrest warrant states that the fugitive fired the shots from 5th Street, while the Arias Affidavit states that an anti-drug operation was being performed on Francisca las Francisquera Street.  In short, the Arias Affidavit and the arrest warrant are not necessarily, and probably are not actually, inconsistent as to the location of the crimes.

*Second*, the fugitive complains that the arrest warrant states the shooting occurred on December 5, 2013, whereas the Arias Affidavit (and the Autopsy) states that it occurred on December 6, 2013.  (R. Doc. 23 at 14) *Compare* Ex. A at 000056 *with* Ex. A at 000062.  The discrepancy of a single day is immaterial for extradition purposes, as it is generally even under heightened U.S. standards of criminal law.  *See*, *e.g.*, *United States v. Morris*, 700 F.2d 427, 429 (1st Cir. 1983) (strict chronological specificity or accuracy of crime charged is not required and variance between what is alleged and what proved is not grounds for relief.).

*Third*, the fugitive again cites to variance in the spellings of his name in the Spanish version and English translation in an attempt to undermine the extradition request.  (R. Doc. at 15)  Any variance is immaterial as it is evident that the person referred to in the arrest warrant and the Arias Affidavit, and the person whose image (Ex. A. at 000077-78) was identified as the fugitive by his two surviving victims (Ex. A at 000082), are the same person.  The fugitive does not contend otherwise.

*Fourth*, the fugitive's complaint of inconsistencies in the extradition request regarding references to the applicable Treaty is immaterial.  (R. Doc. at 15)  The applicable Treaty is the 2015 Treaty, as referenced in the diplomatic note from the Dominican Republic.  *See* Ex. A at 000001, 000004.

*Fifth*, the fugitive's allegation that the addition of charges in the extradition request to those listed in the arrest warrant is somehow improper is inaccurate.  (R. Doc. at 15)  This is not a deficiency in the request, but a valid practice in extradition cases.  *See* Section III(D)(1)(a), *supra*.

*Sixth*, contrary to the fugitive's claims (R. Doc. at 15-16, 23-24) the extradition request provides more than sufficient evidence to satisfy the probable cause standard that the fugitive shot all three anti-drug agents, killing Agent Ubri and seriously wounding Captain Jimenez and Agent Henriquez.  The Arias Affidavit alleges that the fugitive was arrested and handcuffed by drug agents when his brother Frank questioned and protested the arrest.  The fugitive took advantage of the distraction and disarmed, shot, and killed Agent Ubri, and then opened fire on other agents. The fugitive and Frank then escaped with the firearm.  The Arias Additional Affidavit relates that the other victims, the two drug agents injured in the shooting, observed the fugitive shoot and kill the agent.  See Ex. A at 000056-57, 000082.[18]

The Autopsy in the extradition request is ambiguous (*see* Ex. A at 000069) as to the identity of the shooter – stating that "the deceased with three other agents tried to arrest and introduce into a vehicle to a [sic] presumed drug dealer; but they were injured by someone else, who tried to stop the arrest; in the shooting two more agents were wounded[.]"  However, the Autopsy was performed the night of the shooting by a doctor who was not an eyewitness.  It is unclear how and

---

[18] Contrary to the fugitive's claim, the government's theory is simply not that the probable cause standard is met because he was merely "present at the scene."  (R. 23 at 23).  The government's theory is that probable cause is met because two police officers have positively identified him as the man who shot them and their fellow officer.

from whom the doctor received any factual information about the shooting.  By referencing "someone else" the doctor could simply be stating that someone other than the agents opened fire and killed the deceased agent.  Furthermore, the material purpose of the Autopsy to the extradition request is to show the death of Agent Ubri, and its weight on matters relating to the facts of the shooting incident is far offset by the Arias Affidavit and Additional Arias Affidavit, which explain that the eyewitnesses to and victims of the shooting positively identified the fugitive as their shooter.

Ramon Aguasvivas is the fugitive's uncle and is the subject of a separate extradition request relating to the same shooting incident.  *See* Docket No. 17-mj-01250-DLC.  However, the government's theory of liability in Ramon Aguasvivas's case, as reflected by the evidence in his separate extradition request, is principled on the fact that he spurred the fugitive away from the scene of the crime after helping him steal the agents' firearms.  Therefore, Ramon Aguasvivas is liable as an accomplice to the murder under Dominican law.  In both extradition cases, the government posits that the fugitive shot and killed Agent Ubri and wounded the other agents.  The government's position is further that any shooting done by Ramon Aguasvivas was a part of his effort to secure safe haven for the fugitive following the incident.

*Seventh*, the fugitive wrongly claims that the extradition request in this case relies on conclusory allegations, and further wrongly implies that documents supporting extradition requests are invalid unless "authored" by an eyewitness or other person with personal knowledge. (R. Doc. 19-22)  The source of the evidence in the extradition request is clear:  the two "surviving victims of the shootout attack on the anti-narcotics patrol carried out by Crisitan Starling Aguasvivas a/k/a Momon" identified the fugitive as the person who "disarm[ed], [shot] and

kill[ed] to the officer of the order Lorenzo Ubri Montero."  There can be no doubt that these facts derive from statements made by Captain Jimenez and Agent Henriquez.

Additionally, extradition courts have repeatedly relied upon multiple levels of hearsay in making probable cause findings and have rejected fugitives' challenges to the reliability of such evidence.  *See, e.g.*, *Afanasjevt*, 418 F.3d at 1165 & 1166 n.13  (upholding a probable cause finding based entirely on hearsay; and discussing *Zanazanian*, 729 F.2d at 625-27, where the Ninth Circuit rejected a fugitive's argument that "multiple hearsay does not constitute competent evidence"); *Escobedo*, 623 F.2d at 1102 n.10 & 1103 (upholding extradition magistrate's finding of probable cause, and rejecting fugitive's argument that evidence submitted by the requesting state "constitutes compound hearsay and is untrustworthy"); *In re the Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996) (finding probable cause that fugitive committed crimes in Israel despite his argument that the extradition complaint was based "purely upon multiple hearsay"); *In re Extradition of Chan Hon-Ming*, No. 06-M-296(RLM), 2006 WL 3518239, at *8 (E.D.N.Y. Dec. 6, 2006) (noting that "[i]t is well established that hearsay evidence, including multiple hearsay and the unsworn statements of absent witnesses, is admissible at extradition hearings and may support a finding of extraditability"); *In re Extradition of Jarsosz*, 800 F. Supp. 2d 935, 947 n.4 (N.D. Ill. 2011) ("In extradition cases, the hearsay exists on at least two levels.  First, is the statement of the absent declarant who prepared and submits the witness summaries.  The second level is comprised of the hearsay statements of the witnesses to the prosecutor or police officer.  There can even be three or more levels of hearsay.  For example, a witness may recount statements made by another witness, which are then recounted to the declarant who prepares the summaries used in the extradition hearing.").  Indeed, even in U.S. criminal proceedings, there is no rule that multiple

hearsay is "per se unreliable."  *See, e.g.*, *United States v. Crawford*, 734 F.3d 339, 342 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1528 (2014).[19]

*Eighth*, in his supplemental briefing, the fugitive argues that the evidence fails to demonstrate probable cause for elements relevant to his conspiracy and murder charges.  (R. Doc. 24)  In support of his claims, he offers the affidavit of a Dominican attorney who represents that under Dominican law "[a] conspiracy cannot be formed at the moment" and that murder charges such as those for which the fugitive's extradition is sought require "a premeditated intent to kill." (R. Doc. 24-1 at 1-2)  Even assuming that the fugitive's Dominican attorney is correct in his interpretation of Dominican law, the extradition request still satisfies probable cause on both the conspiracy charge and the murder charge.

Article 295 of the DCC simply provides: "Whoever voluntarily kills another, is guilty of murder."  Ex. A at 000058.  The evidence adduced in the extradition request demonstrates that the fugitive voluntarily, willfully, and intentionally shot Agent Ubri three times, and shot both Captain Jimenez and Agent Henriquez, after taking Agent Ubri's firearm.  Ex. A 000062-63.  Even if the murder charge requires premeditation, a term that is not used in the Dominican statute, premeditation generally requires no particular length of time to form.  *See*, *e.g.*, *Walker v. Russo*, 506 F.3d 19, 22 (1st Cir. 2007) ("Under Massachusetts law, 'no particular length of time is required in order to show deliberate premeditation.  It may be a matter of days, hours, or even seconds.  It is not so much a matter of time as of logical sequence.'") (quoting *Com. v. Coren*, 437 Mass. 723, 774 (2002)).  Here, where the logical sequence of facts as alleged in the extradition request

---

[19] The fugitive's reliance on the cases cited by him for the proposition that extradition courts have "routinely refused extradition requests that were based solely on factual summaries without direct citation to factual evidence" is misplaced.  (R. Doc. 19-23)  Those cases presented far more complex fact patterns, and were missing critical facts, whereas in this case the critical facts are straightforward and expressly supported by eyewitness-victims.

establish that the fugitive fired multiple shots at the anti-drug patrol, striking Agent Ubri three times in the process, there is ample evidence demonstrating probable cause that at some point along this timeline he formed the premeditated intent to kill.

Furthermore, Article 265 of the DCC provides that "[a]ny association formed . . . for the purpose of preparing or committing crimes against persons or properties, constitutes a crime against public peace."  Although the fugitive's Dominican attorney states that "[a] conspiracy cannot be formed at the moment," it is unclear what he means by "at that moment" or whether "a preconceived conspiracy" requires more than the "tacit agreement" sufficient under U.S. law.  *See United States v. Martin*, 228 F.3d 1, 11 (1st Cir. 2000).  The arrest warrant explains that the "brothers Aguasvivas," allegedly acting in concert, "also disarmed . . . the agents . . . who were participating in the anti-drug operation."  Ex. A at 000063.  Together, they "escaped from the place . . . carrying the gun."  Ex. A at 000057.  That "tacit agreement" manifested by joint action establishes probable cause that the fugitive and his brother Frank formed an unspoken agreement to steal the agents' firearms in the course of their escape from the scene – a "crime[] against persons or properties" that logically constitutes a violation of Article 265.

## IV.    Conclusion

WHEREFORE, the United States requests that the Court certify to the Secretary of State that Cristian Aguasvivas is extraditable to the Dominican Republic on each of the charges for which his extradition is requested.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney
District of Massachusetts

By:

*/s/ Theodore B. Heinrich*
Theodore B. Heinrich

Assistant United States Attorney
District of Massachusetts

Dated: March 20, 2018