UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE ) | |
| EXTRADITION OF CRISTIAN ) | DOCKET NO.  17-mj-04218-DHH |
| STARLING AGUASVIVAS ) | |

### RELATOR'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO DISMISS EXTRADITION COMPLAINT

Relator Cristian Aguasvivas filed a motion to dismiss the extradition complaint on February 27, 2018. *See* D.E. 23 ("Mot."). On March 1, 2018, he filed a supplement to that motion adding claims under Dominican law, supported by the affidavit of a Dominican law expert. *See* D.E. 24; 24-1. The government filed its opposition ("Govt. Resp.") to the combined motion on March 20, 2018. *See* D.E. 28. Relator now replies to certain of the government's arguments, assuming familiarity with the case.

1. **Deficiencies regarding warrant and pending charges, Treaty Article 7.3(a) & (b)**
   *(Reply to Govt. Resp. at 19-28)*

In defending the adequacy of the warrant, the government cites cases that confirm the need for formally lodged charges. The First Circuit, for instance, has already assumed that "charges properly pending against the relator in the requested country" are required. *Kin-Hong,* 110 F.3d at 114, *quoted at* Govt. Resp. 19-20. The government next cites *Skaftouros v. United States*, 667 F.3d 144, 160 (2d Cir. 2011). Govt. Resp. at 20. Yet *Skaftouros reinforces* the idea that "most extradition treaties" require that the relator be "currently charged with an offense." *Id.* at 160. In defending a loose interpretation of what constitutes a valid arrest warrant, the Second Circuit made exactly the point Mr. Aguasvivas makes here: the warrant must be "sufficient to show that the fugitive is *currently charged* with an offense recognized by the treaty." *Id.* (emphasis in original). The court also uses the phrase "prosecutable upon extradition." *See id.* "Prosecutable" cannot mean that the person could, at some point, be prosecuted. It must mean "currently charged." *Id.* The instant request fails under either standard: Mr. Aguasvivas is not "currently charged," and he is not prosecutable, unless and until prosecutor Arias "decides *whether or*

1

*not to bring* charges." Arias Aff. in Support of Extradition Request, Bates 55 (emphasis added); *see* Mot. at 13. Here, there is no pending criminal case, no "live, pending prosecution." *In re Extradition of Azra Basic*, No. 5:11-MJ-5002-REW, 2012 WL 3067466, at *19 (E.D. Ky. July 27, 2012), *cited in* Govt. Resp. at 22.

The government cites a number of cases for the proposition that extradition for investigative purposes is proper. *See* Govt. Resp. at 23. This ignores the fact that Mr. Aguasvivas raises a treaty-based claim. The government cites a host of cases addressing different treaties that use different language. The seminal decision in *Emami* interpreted a treaty that attached to persons "charg*ed*" with an offense. The court in *Emami* found that "the word 'charged,' used as a verb in the generic sense only to indicate 'accused,' could not be transmuted into a requirement that *'charges'*, a noun, be filed." *Emami v. U.S. Dist. Court for N. Dist. of California*, 834 F.2d 1444, 1448 (9th Cir. 1987) (quoting *Assarsson*, 635 F.2d at 1242-43); *see In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 987 (D. Or. 2011) (Bosnia-Herzegovina ("BiH") treaty using word "charged"); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 82 (S.D.N.Y. 2003) (same BiH treaty); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 129 (E.D.N.Y. 2001) (Swiss treaty requiring extraditees be "charged with" an extraditable offense).[1] The intimation in *Emami* is that the noun, "charg*es*," *would* connote a requirement of formal pending charges. The present Treaty uses

---

[1] The government's cases cited at pages 25-26 of the response likewise do not govern the construction of the instant treaty. The language in the U.S. treaty with Mexico, at issue in *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1187 n.2 (W.D. Okla. 2015), *Martinez v. United States*, 793 F.3d 533, 543 (6th Cir. 2015), & *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009), does not require a "document setting for the charges against the person," as the present treaty does. *See Sarellano*, 142 F. Supp. at 1187 n.2; *cf. United States v. Nolan*, 651 F. Supp. 2d 784, 796 (N.D. Ill. 2009) (treaty required the requesting country to submit a "'charging document, or any equivalent document issued by a judge or judicial authority'"). *Martinez v. United States*, cited in Govt. Resp. at 25, considered the entirely different question of whether an arrest warrant tolled the statute of limitations – and found that the arrest warrant was a charging document for statute of limitations purposes. *See* 793 F.3d 533, 543 (6th Cir. 2015). What those courts did not do, and this Court must do, is determine what the Treaty between the U.S. and the D.R. requires and whether the government has provided it.

exactly that language – it requires a document setting forth the "charges against the person." Art. 7.3(b).[2]

Finally, the government argues that ambiguity should be resolved in favor of extradition and that the State Department's construction of the treaty is owed deference. Govt. Resp. at 26-27 & n. 14. The First Circuit has held that the plain language of the treaty governs over the State Department's construction. *See Greci v. Birknes*, 527 F.2d 956, 960 (1st Cir. 1976) (abiding by the plain language of the treaty even though the government and State Department supported a different construction).

**2. Inconsistencies and contradictions in government's paperwork**
*(Reply to Govt. Resp. at 28-31)*

Mr. Aguasvivas has argued that the Dominican government's paperwork is so rife with inconsistencies – large and small – as to render it incredible. It is internally inconsistent with regard to the date of the incident, the place where the incident occurred, and indeed the name of the suspect. It is also inconsistent with regard to the question of *who* committed the shooting. The government brushes aside the assertion in the autopsy that "someone else" committed the shooting on the ground that the pathologist "was not an eyewitness." Govt. Resp. at 31. *Nor was the prosecutor who wrote the two affidavits.* There is no reason to believe that the pathologist's factual statement represents any more levels of hearsay, or any greater inaccuracy, than the prosecutor's statement. Indeed, the pathologist received the information on same day as the shooting, presumably from whoever brought in the victims. The prosecutor's document, by contrast, is dated four years later and there is no indication of whether or when the prosecutor had any direct contact with any percipient witness. *See* § 5, below.

---

[2] The Treaty calls for a copy of the "document setting forth the charges against the person sought." Art. 7 § 3(b). The word "sought" modifies the immediately preceding noun, the "person." *See Lockhart v. United States,* 136 S. Ct. 958, 962-63 (2016) (discussing the rule of the last antecedent, whereby "'[Q]ualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing'")). This interpretation is reinforced by the repeated usage of the phrase "person sought" in the Treaty, including in the very next provision, clearly referring to the relator. *See* Art. 7 § 3(c).

Mr. Aguasvivas does not suggest that minor inconsistencies in a requesting country's paperwork, without more, defeats probable cause. *Cf.* Govt. Resp. at 29. Rather, he asserts that when viewed as a whole, the Dominican government's submission is so faulty, so riddled with internal inconsistencies, so thin, and so untrustworthy that it is cannot support a finding of probable cause. Mr. Aguasvivas cites cases in which inconsistencies and errors in the requesting government's paperwork were a factor in the determination that probable cause was lacking. *See* D.E. 24 at 14, 16; *In re Mazur*, No. 06M295, 2007 WL 2122401, at *27 (N.D. Ill. July 20, 2007) ("though seemingly damning on its face, on close scrutiny, [the government's evidence] turned out to be so internally inconsistent, so patently unreliable, that it obliterated, all on its own, any semblance of probable cause"); *United States v. Nolan*, 651 F. Supp. 2d 784, 795, 808 (N.D. Ill. 2009) ("conflicts and inconsistencies" nullified evidentiary value); *In re Extradition of Ferriolo*, 126 F. Supp. 3d 1297, 1304 (M.D. Fla. 2015) (unexplained contradiction between two versions of events in government's paperwork drew "both versions into doubt"); *In re Extradition of Singh,* 124 F.R.D. 571, 577 (D.N.J. 1987) (extradition court may conclude, "on a review of the affidavits submitted, that there are insufficient *indicia* of reliability or credibility to establish probable cause"); *In re Mazur*, No. 06M295, 2007 WL 2122401, at *20 (N.D. Ill. July 20, 2007) (number of "trifling" errors shook "the Court's confidence in the reliability of the records"). Mr. Aguasvivas submits that the paperwork here is deficient under any of these cases.

Finally, the government argues that the insertion of additional charges in the extradition request is permissible. *See* Govt. Resp. at 21-22. Yet extradition is a charge-based exercise. Under the "doctrine of specialty," trial in the requesting country is limited to those charges for which extradition was authorized. *See United States v. Anderson*, 472 F.3d 662, 671 (9th Cir. 2006); *United States v. Levy*, 947 F.2d 1032, 1034 (2d Cir. 1991). It cannot stand to reason that the Court should authorize extradition on charges for which there is no valid arrest warrant and no pending charges; *ie*, no judicial authorization or oversight in the requesting country. The government skirts the requirements of the Treaty.

**3.    Dual criminality/ Probable cause on the elements under Dominican law**
*(Reply to Govt. Resp. at 11-13 & 34-35)*

Mr. Aguasvivas submitted a supplement to his motion providing an affidavit from a Dominican legal expert addressing the elements of the listed offenses under Dominican law. *See* D.E. 24; *Petition of France for Extradition of Sauvage*, 819 F.Supp. 896, 901 (S.D. Cal. 1993) (government must show probable cause on each element of the offense). Rather than address the lack of probable cause on the Dominican elements, as outlined by Attorney Campos, the government attempts to fit the alleged facts into Massachusetts criminal law.

Regarding the "theft" of the firearm and the conspiracy charge, the government cites Massachusetts larceny, M.G.L. c. 266, § 30, and Massachusetts armed robbery, *id.* § 17. *See* Govt. Resp. at 12-13. Yet the facts do not fit and would indeed be insufficient to show probable cause of either offense. The Dominican government alleges that four officers of the DNCD, in unmarked clothing, jumped out of an unmarked vehicle and tried to "arrest" Mr. Aguasvivas and wrestle him into the car. They handcuffed Mr. Aguasvivas, and "in this moment [his] brother [] Frank Aguasvivas…. questioned [] the agents about the reason for the arrest of his brother and protested by [sic] the arrest. Cristian [] took advantage of the distraction … and, in a surprising way, attacked [the agents]." Bates 56. If the action was a spur-of-the-moment response by Mr. Aguasvivas, while his brother was engaged in questioning the officers, there is no robbery, no armed robbery, and no larceny. Larceny requires the "the specific intent to deprive the other of the property permanently." *Com. v. Liebenow*, 470 Mass. 151, 156 (2014). No such intent is reflected.

Furthermore, the allegation that the brothers *conspired* to steal the firearm makes even less sense. *See* D.E. 24 at 2; D.E. 24-1. No one knew the officers were coming. The brothers did not plan for the officers to show up and grab Mr. Aguasvivas. No words are alleged to have passed between them while the officers were there. *See* Bates 56. Even more baffling, the government asserts that the object of the

5

conspiracy, as charged, was "armed robbery." Govt. Resp. at 12. The *subject* of the alleged robbery was the firearm. The theft of a firearm is not an armed robbery.

In light of the government's new allegations, Mr. Aguasvivas objects to the larceny/robbery and conspiracy to commit armed robbery charges, submits that the requirement of dual criminality is not met with regard to these charges, and submits that there is insufficient evidence of probable cause on the elements of these charges.

In response to the argument that first degree murder under articles 295 and 304 requires premeditation, *see* D.E. 24 at 2, the government asserts that the "evidence adduced in the extradition request" demonstrates that Mr. Aguasvivas acted "willfully [] and intentionally" when he shot Ubri Montero. Govt. Resp. at 34. Yet there is simply no evidence that he possessed an intent to kill, let alone a premeditated intent. *See* D.E. 24 at 2-3; D.E. 24-1. To the contrary: the government's own facts suggest a defensive, spur-of-the-moment reaction. The government posits that premeditation in Massachusetts can be formed instantly. Govt. Resp. at 34-35. This is neither here nor there. The question is what *Dominican* law requires for first-degree murder. Attorney Campos asserts that a pre-planned intent to kill is required under articles 295 and 304 and that the evidence here does not meet that standard. *See* D.E. 24-1 at 2. The government does not controvert this.

Lastly, the government argues that the first-degree murder could be based on the theory that the killing preceded, accompanied, or followed another crime; namely, robbery. Govt. Resp. at 11 n.5. The government again relies on Massachusetts, rather than Dominican, law. Under Dominican law, a "murder" committed in conjunction with another crime has the same mental state as any other "murder." Art. 304 (incorporating art. 295); *see* D.E. 24-1 at 2.

4. **Torture**
   (*Reply to Govt. Resp. at 15-17*)

While the government is correct that Mr. Aguasvivas has not raised the torture of his family and the killing of his brother as direct bars to the extradition at this stage, Mr. Aguasvivas submits that these elements are relevant to evaluating the credibility and weight to be afforded to the Dominican government's submission. The DNCD is serving as both victim and witness in this case. Not only is there widespread evidence that the DNCD rounded up and tortured people in the wake of this shooting;[3] not only is it uncontested that the DNCD shot and killed Frank Aguasvivas, a suspect in this shooting, when they found him; but there is no evidence that an actual investigation was ever conducted in this case. These circumstances "seriously call into question [the] legitimacy" of the government's presentation. *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1365 (S.D. Fla. 1999). As the Ninth Circuit has explained,

> the manner in which evidence used to support probable cause was obtained is relevant in determining whether the probable cause standard has indeed been satisfied. Our case law, including Supreme Court case law …, does not allow us to leave this determination to the Secretary of State—or, for that matter, the Mexican courts—under principles of deference to the executive or international comity.

*Santos v. Thomas*, 830 F.3d 987, 1007 (9th Cir. 2016) (en banc decision reversing the exclusion of evidence that inculpatory statements were obtained through torture).

---

[3] *See* D.E. 23-2 at 16-17 (pdf pp. 17-18) (Immigration Judge's summary of testimony of four witnesses in Mr. Aguasvivas' immigration case who described being tortured by the DNCD in the wake of this shooting, including being beaten, asphyxiated, kicked, and threatened at gunpoint with their own death or the death of family members if they did not divulge Mr. Aguasvivas' whereabouts); D.E. 23-3 at 2 (pdf p.3) (BIA order describing the credible and uncontested testimony of these witnesses, as well as country conditions reports documenting torture and extrajudicial killings by the Dominican police forces); *see also e.g.,* https://www.youtube.com/watch?v=1lXw9mEy_eA (local news media coverage discussing the abuse visited by the DNCD on the neighborhood in the wake of this shooting, including the torture of the Aguasvivas brothers' male family members by asphyxiation and having their testicles tied up).

**5.  Lack of Probable Cause**
*(Reply to Govt. Resp. at 5, 13-15, 31-35)*

With regard to Mr. Aguasvivas's claim that the government has failed to show probable cause, the government relies on a single sentence in the prosecutor's supplemental affidavit. *See* Govt. Resp. at 14 (D.E. 28) (asserting that the surviving victims "identified [Cristian] as the[] shooter" and citing Bates 82); *see also id.* at 3 (same), 32-33 (quoting the language from Bates 82).

The Supplemental Affidavit, Bates 81-82 (D.E. 23-1 at 82-83), written April 17, 2017, enumerates several corrections to the prosecutor's original affidavit. Paragraph two corrects a typographical error with regard to a date. *See* Bates 81. In paragraph three, the prosecutor himself "reaffirm[s] that the photograph which we attached in the Request for Extradition …. identifies the accused[,] [Cristian Aguasvivas]…." Bates 82. Paragraph four then offers the fact that the victim-witnesses also verify that the photograph "correspond[s]" to the accused: "[t]he same photograph … has also been seen and recognized as corresponding to Cristian Starling Aguasvivas a/k/a Momon by [the two surviving witnesses]." *Id.* After a semicolon, the affiant continues: "they [the victim-witnesses] are also eyewitnesses because they saw [] Cristian Starling Aguasvivas a/k/a Momon [] disarm, shoot and kill … Lorenzo Ubri Montero," *id.*:

> 4- The same photograph attached to the Request for Extradition and indicated in letter f) of inventory, it has also been seen and recognized as corresponding to CRISTIAN STARLING AGUASVIVAS a/k/a Momón by the Captain Felipe de Jesús Jiménez García and the officer of the order José Marino Hernández Rodríguez, who are two surviving victims of the shootout attack on the anti-narcotics patrol carried out by CRISTIAN STARLING AGUASVIVAS a/k/a Momón in the city of Baní, Provincia Peravia; they are also eyewitnesses because they saw to CRISTIAN STARLING AGUASVIVAS a/k/a Momón to disarm, shoot and kill to the officer of the order LORENZO UBRI MONTERO, other of the members of the aforementioned anti-narcotics patrol.

Bates 82 (D.E. 23-1 at 83) (image of English translation).

It is the second half of the last sentence on which the government hangs its entire case. This is the sole reference in any of the government's documents, even conceivably, to any statements or information given by any percipient witness to the shooting. The government has not pointed to any other source for a finding of probable cause, beyond that sentence at Bates 82. There is no forensic evidence. The case law clearly establishes, including *Rice* from the United States Supreme Court, that the bald conclusions of a prosecutor with no personal knowledge do not constitute evidence and do not establish probable cause. *See* Mot. (D.E. 23) at 19-22.[4] The government asks the Court to send Mr. Aguasvivas back to the Dominican Republic on the basis of one fragment of one sentence.

We analyze, then, whether this fragment – asserting that the two victim witnesses "*are eyewitnesses because they saw [] Cristian [commit the shooting]*" – merits an inference that the officer-witnesses *gave* statements inculpating Mr. Aguasvivas, and then a conclusion that this reference to those statements is sufficient to establish probable cause. Mr. Aguasvivas submits that this is incompetent and insufficient to establish probable cause. Despite the government's calls for deference, the standard here is the same as the probable cause standard the Court applies routinely when asked to sign criminal arrest warrants. *See Santos v. Thomas*, 830 F.3d 987, 1006 (9th Cir. 2016) (en banc) (the court's "function in an extradition hearing is ... to ensure that our judicial standard of probable cause is met by the Requesting Nation.").

The syntax and context of the sentence at Bates 82 suggest a different reading than the one the government offers. *See* Govt. Resp. at 33 ("There can be no doubt that these facts derive from

---

[4] *See, e.g., United States v. Nolan*, 651 F. Supp. 2d 784, 810, 814–15 (N.D. Ill. 2009) (government's conclusions would only be considered to the extent "supported by a statement or abstract of a statement from an individual with personal knowledge… or any other corroborating evidence"); *Matter of Extradition of Lehming*, 951 F. Supp. 505, 517 (D. Del. 1996) (denying extradition because the "information submitted amounts to unsupported conclusory statements which are insufficient to satisfy probable cause"); *U.S. ex rel. Karadzole v. Artukovic*, 170 F. Supp. 383, 390 (S.D. Cal. 1959) (rejecting hearsay statements in complaint because it was unclear how the information was obtained); *In re Gambino*, 421 F. Supp. 2d 283, 316 (D. Mass. 2006) (Bowler, J.) (finding no probable cause on one count, where the source of statements tying the relator to the crime was "unclear," and contrasting cases supported by sworn affidavits).

statements made by Captain Jimenez and Agent Enriquez"). Hypothetically, if a third-hand source was given two pieces of information, (a) X event occurred, and (b) Joe Smith was there, the third-hand source could easily recount that Joe Smith "saw" X event occur. If, for instance, a UPS truck crashed into a car in front of my boss's house and I knew from the news coverage that the car exploded immediately, I might tell a friend that "my boss saw the car explode!" This does not mean that I asked her whether the car exploded and she told me that it did; in other words, the statement is not intended as an assertion that the car exploded. Rather, it is an assertion that the witness *saw* whatever it is that we all agree happened. The affiant could have formed the opinion that the officers "saw" this based on something he was told by another prosecutor, based on a phone call from his supervisor, or he could have made the assumption himself.

The affidavit asserts that Mr. Aguasvivas committed the shooting; it should not be taken as a statement that the officers *perceived* the event in that way – that they were in a position to see who fired the shots, they perceived Mr. Aguasvivas grabbing the gun, that they remembered that memory when they woke up in the hospital. The statement provides no information about the witnesses' perception against which the Court can make a determination about weight or credibility.

The context of the sentence at Bates 82 further supports abstaining from the inference that the information comes from statements by the witnesses. The purpose of paragraphs three and four of the Supplemental Affidavit is to authenticate the photographs. Paragraph three asserts that the affiant has reviewed the photographs. Paragraph four asserts that the officers – the witnesses – have reviewed the photographs and are in a position to authenticate them. Read in context, the second part of the last sentence is simply a further substantiation of the first part: the officers recognize the photographs and are in a position to do so because they were there. The affiant *assumes* that Mr. Aguasvivas was the shooter. It follows that the officers saw it.

Contrary to the government's reading, then, the affidavit does not identify "the sources of [the affiant's] information and the grounds of his belief." *Rice v. Ames*, 180 U.S. 371, 375-76 (1901); *see supra*

10

note 5. Because it does not, it is not competent evidence to support probable cause. Given the torture, given the inconsistencies in the paperwork, given the dearth of evidence, and given the apparent lack of an investigation, the Court should not infer from this fragment that the officer-witnesses gave statements and should not find those unproduced statements worthy of probable cause.[5]

The government takes the position that once the documents are authenticated, the Court should take all assertions as true and adopt a position of extreme deference. *See* Govt. Resp. at 5-7. This is incorrect. "Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause. Were that the case, the judiciary's role in the extradition process would be meaningless. Our role here is indeed a limited one, but '[t]his is not to say that a judge ... [in] an extradition proceeding is expected to wield a rubber stamp.'" *Santos v. Thomas*, 830 F.3d 987, 1006 (9th Cir. 2016) (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)).

Respectfully submitted,

CRISTIAN STARLING AGUASVIVAS,
by his attorneys,

*/s/ Jennifer C. Pucci*
Jennifer C. Pucci
B.B.O. #669823

*/s/ Amy Barsky*
Amy Barsky
Cal. Bar 270846

FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061

---

[5] The government argues that multiple hearsay is permitted. *See* Govt. Resp. at 33-34. Yet Aguasvivas' point is that this assertion is not hearsay – of any number of levels – because *there is no declarant*. That is the distinction between hearsay and rumor. The former provides at least some information from which to evaluate the credibility and weight of the statements.

<u>Certificate of Service</u>

      I, Jennifer C. Pucci, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

Date:   March 30, 2018                                            <u>/s/ Jennifer C. Pucci</u>
                                                                                 Jennifer C. Pucci