**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

In the Matter of the Extradition of

CHRISTIAN STARLING AGUASVIVAS

No. 17-mj-4218-DHH

## ORDER

**July 27, 2018**

Hennessy, M.J.

In this extradition proceeding, the United States seeks, pursuant to the Extradition Treaty between the Government of the United States of America and the Government of the Dominican Republic, Jan. 12, 2015, T.I.A.S. No. 16-1215, available at docket #23-1 (the "Extradition Treaty"), to extradite Christian Starling Aguasvivas ("Aguasvivas" or the "relator") to the Dominican Republic to face criminal charges of conspiracy, murder, robbery, association of malefactors, and illegal possession of firearms. Aguasvivas has opposed the Government's extradition request on various procedural and substantive grounds.

This order addresses evidentiary and discovery issues. Aguasvivas has submitted numerous proposed exhibits, see docket ##39, 40, 41, 43, 48, 56, and has moved to compel the United States to produce certain discovery materials, see docket #46. The Government has contested the admissibility of many of the proposed exhibits and has opposed the motion to compel discovery. The parties argued these matters at hearings held June 8 and June 29, 2018. See docket ##50, 54, 57, 60. At the June 29 hearing, I issued oral rulings concerning most of

Aguasvivas's proposed exhibits, and I denied from the bench Aguasvivas's motion to compel.  I

now expand upon those rulings.

For the reasons that follow, I admit some of Aguasvivas's proposed exhibits into

evidence and find that others are inadmissible.  Aguasvivas's motion to introduce provisions of

Dominican law, docket #56, is GRANTED.  And Aguasvivas's motion to compel discovery,

docket #46, is DENIED.

I.      FACTUAL BACKGROUND

A.      The Shooting

On December 6, 2013, the Dominican Republic issued a domestic warrant for

Aguasvivas's arrest.  <u>See</u> docket #23-1 at 63-67.  The arrest warrant alleges as follows.  In

December 2013, Aguasvivas and his brother, Frank Aguasvivas,[1] were together in the

Dominican city of Bani, when agents of the Dominican Republic's National Directorate for Drug

Control (the "DNCD") tried to arrest Aguasvivas as part of an anti-drug operation.  <u>Id.</u> at 63.

During the attempted arrest, Aguasvivas disarmed DNCD Agent Lorenzo Ubri Montero

("Montero") and shot Montero three times with Montero's gun.  <u>Id.</u>  Montero died from his

wounds.  <u>Id.</u> at 63-64.  Aguasvivas also shot and wounded two other agents.  <u>Id.</u> at 64.

Aguasvivas and his brother then fled the scene.  <u>Id.</u>

Three years after the shooting, on December 12, 2016, a prosecutor of the judicial district

of Peravia prepared an "[a]ffidavit justificatory" of the Dominican Republic's request for

Aguasvivas's extradition.  <u>See id.</u> at 54-62.  That affidavit alleges that the three DNCD agents

allegedly shot by Aguasvivas were conducting an anti-drug operation during which Aguasvivas

was arrested and handcuffed.  <u>Id.</u> at 57.  Aguasvivas's brother Frank was present and protested

---

[1] Various documents refer to Aguasvivas's brother as Francis, Frank, or Fran.  The Court will refer to him as Frank.

Aguasvivas's arrest.  Id.  Aguasvivas then allegedly "took advantage of the distraction of the

agents at the time of the intervention of his brother, and, in a surprising way, attacked . . . [Agent

Montero], to whom [Aguasvivas] disarmed and killed [sic], [before] opening fire on all the

agents of the National Directorate for Drug Control that were present."  Id.

The prosecutor who authored the justificatory affidavit later signed an additional affidavit

supporting extradition.  See id. at 89-90.  In it, the prosecutor "reaffirm[s]" that a photograph

attached to the Dominican Republic's extradition request depicts Aguasvivas.  Id. at 90.  The

prosecutor further avers that the two agents who survived the shooting have identified that

photograph as depicting Aguasvivas, who according to those agents is the shooter.  Id.

B.      Procedural History

Eight months after the shooting, Aguasvivas fled the Dominican Republic and illegally

entered the United States.  Docket #23 at 4.  Once in the United States, Aguasvivas sought in

Immigration Court asylum, withholding of removal, and relief under the Convention Against

Torture, citing fear of the Dominican police.  Id.  The Board of Immigration Appeals ultimately

granted Aguasvivas withholding of removal under the Convention Against Torture, concluding

"that it is more likely than not that [Aguasvivas] w[ould] be tortured at the instigation of or with

the consent or acquiescence of public official[s] in the Dominican Republic" if he were returned

to the Dominican Republic.  Id. at 5.

After being released from immigration custody, on September 15, 2017, Aguasvivas was

arrested in Massachusetts on the instant extradition complaint.  Docket #28 at 1.  The extradition

complaint states that the Dominican Republic has charged Aguasvivas with murder, aggravated

robbery, conspiracy, and illegal firearm possession, in violation of Articles 265, 266, 295, 304,

379, and 383 of the Dominican Criminal Code, and Article 29, Paragraph III of Dominican Law 36 on Trade and Possession of Firearms.  Id. at 1.

Aguasvivas has proffered the following to contest extradition: an exhibit and witness list, docket #39; a CD containing a video of the shooting, docket #41; a supplement to the exhibit and witness list, docket #43; a notice of intent to introduce a document, docket #48; and a motion to introduce provisions of Dominican law, docket #56.  The Government has responded in writing to Aguasvivas's proposed witness and exhibit list.  See docket #44.

Aguasvivas also has moved to compel the United States to produce certain materials in discovery.  Docket #46; see also docket #36 (letter from Aguasvivas to the Government respecting discovery).  The Government opposes the motion to compel.  See docket #42.

II.	LAW

Extradition proceedings are governed by 18 U.S.C. ch. 209 ("chapter 209").  That statute "establishes a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State."  United States v. Kin-Hong, 110 F.3d 103, 109 (1st Cir. 1997).  The judicial officer's limited responsibilities are set forth at 18 U.S.C. § 3184, which instructs the judicial officer to determine whether the evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.

Here, the applicable extradition treaty provides, "[A] request for extradition of a person who is sought for prosecution shall . . . be supported by . . . such information as would provide a reasonable basis to believe that the person sought committed the offense or offenses for which extradition is requested."  See Extradition Treaty, Art. 7(3)(c), available at docket #23-1 at 25. When then-Secretary of State John Kerry submitted the Treaty to President Obama for approval, he characterized this language as "mirror[ing] the probable cause standard applied in U.S. law."

Extradition Treaty, Dom. Rep.-U.S., Jan. 12, 2015, S. Treaty Doc. No. 114-10, at VIII (2016), available at docket #23-1 at 15. Secretary Kerry's interpretation is entitled to deference. See, e.g., El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168 (1999) (citation omitted) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."); United States v. Li, 206 F.3d 56, 63 (1st Cir. 2000) (en banc) (according "substantial deference" to the United States Department of State's interpretation of treaties). Moreover, the parties do not dispute that the probable cause standard applies. Thus, the Court must determine in the instant proceedings whether each of the charged offenses is supported by probable cause. Under chapter 209, other determinations—including country conditions in the Dominican Republic and whether Aguasvivas may face torture if extradited—are left exclusively to the Secretary of State. See Kin-Hong, 110 F.3d at 109-111.

Extradition proceedings have distinct evidentiary rules. See id. at 120 (citations omitted) ("Neither the Federal Rules of Criminal Procedure . . . nor the Federal Rules of Evidence apply to extradition hearings."). Chapter 209 provides that when conducting an extradition hearing, the judicial officer "shall" admit into evidence any "[d]epositions, warrants, or other papers or copies thereof . . . if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes" in the courts of the country requesting extradition. 18 U.S.C. § 3190. A certificate from "the principal diplomatic or consular officer of the United States" residing in the requesting country "shall be proof" that such documents are properly authenticated. Id. Additionally, Article 8 of the Treaty instructs, in relevant part, that documents

submitted with an extradition request "shall be received and admitted as evidence in extradition proceedings if . . . they bear the certificate or seal of the Department of Justice, or Ministry of Department responsible for foreign affairs, of the Requesting Party . . . ."  Docket #23-1 at 26.

The relator may submit "explanatory evidence" when contesting extradition.  See Koskotas v. Roche, 931 F.2d 169, 176 (1st Cir. 1991) (citations omitted).  However, "contradictory evidence" offered by the relator is not properly considered.  See id. (citations omitted).  "While the line between 'contradictory' and 'explanatory' evidence is not sharply drawn, the purpose of permitting explanatory evidence is to afford the relator 'the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause.'"  Id. at 175 (quoting Matter of Sindona, 450 F. Supp. 672, 685 (S.D.N.Y. 1978)).  Admissible, i.e., explanatory, evidence thus must be relevant to the question of probable cause.  Further, case law emphatically instructs that evidence submitted at an extradition hearing should not turn the hearing into a dress rehearsal for a full trial on the merits.  Id. (quoting Jhirad v. Ferrandina, 536 F.2d 478, 484 (2d Cir. 1976)) (citing Quinn v. Robinson, 783 F.2d 776, 817 n.41 (9th Cir. 1986)).

Controlling cases also recognize that, given the circumscribed nature of extradition proceedings, affirmative defenses like self-defense are irrelevant and should not be considered.  See Collins v. Loisel, 259 U.S 309 (1922) (finding that the relator's proposed testimony establishing a defense was properly excluded); Charlton v. Kelly, 229 U.S. 447, 458 (1913) (holding that evidence of insanity, though clearly relevant at trial or a competency hearing, was properly excluded at an extradition proceeding); see also In re Harusha, No. 07-x-51072, 2008 WL 1701428, at *5 (E.D. Mich. Apr. 9, 2008) (citing Charlton, 229 U.S. at 462; Collins, 259 U.S. at 316-17) ("Given that a respondent may only introduce explanatory evidence, it follows

that affirmative defenses, including self-defense, are not relevant in an extradition hearing and should not be considered.").

"[I]t is well-established by case law that [a relator] has no per se constitutional right to discovery." In re Koskotas, 127 F.R.D. 13, 27 (D. Mass. 1989), aff'd, 931 F.2d 169 (1st Cir. 1991) (quoting Singh, 123 F.R.D. at 123-4, 126-7). Nor does chapter 209 give a relator a right to discovery; at most, one section empowers a court to authorize funds to compel the appearance of witnesses. See 18 U.S.C. § 3191. Discovery in an extradition proceeding thus is both "discretionary with the court" and "narrow in scope." Koskotas, 931 F.2d at 175; see In re Kraiselburd, 786 F.2d 1395, 1399 (9th Cir. 1986) (citations omitted) ("[D]iscovery in an international extradition hearing is limited and lies within the discretion of the magistrate."); Jhirad v. Ferrandina, 377 F. Supp. 34, 37 (S.D.N.Y. 1974), aff'd, 536 F.2d 478, 484 (2d Cir. 1976) ("[U]nder the traditional extradition standards discovery is limited and discretionary . . . ."); see also Merino v. U.S. Marshal, 326 F.2d 5, 12-13 (9th Cir. 1963) (upholding the judicial officer's refusal to authorize depositions). When allowed, discovery should be tailored to the question whether there exists probable cause for the crimes for which extradition is sought. See Kraiselburd, 786 F.2d at 1399; Singh, 123 F.R.D. at 111 (finding there is no right to discovery in extradition proceedings, but noting that "if discovery is permissible it must be confined to the purpose of the extradition hearing and to the limitation on defendants' proofs").

III.    ANALYSIS: PROPOSED EXHIBITS

I now address each of Aguasvivas's proposed exhibits in turn.

A.      Video and audio of the shooting, with transcription and translation

Aguasvivas has offered a video of the shooting, along with a Spanish transcription and English translation of audio captured on the recording.  The Government does not contest the accuracy of the transcription and translation.  See docket #54 at 38.

The video is twenty-eight seconds long.  Most of it depicts men in plain clothes struggling to put a man wearing a light blue shirt into a parked car.  Aguasvivas concedes that he is the man in the light blue shirt.  Docket #39 at 2.  Approximately six seconds into the video, a man in a white shirt and baseball cap, presumably Aguasvivas's brother Frank, is seen and heard.  He comes near to those struggling with Aguasvivas and yells at them.  Agent Montero, seen wearing a black or navy blue shirt, succeeds in forcing Aguasvivas into the car and stands immediately next to Aguasvivas, facing him.  Seconds later, three gunshots are heard, and Montero falls to the ground.  The camera turns away, and three more gunshots ring out before the video ends.

I will receive the video, transcription, and translation.  The Government does not dispute the video's authenticity.  See docket #54 at 21.  It captures the shooting of Montero and the moments immediately preceding it; it therefore bears on the question of probable cause.  Further, a recording of events, by its nature, is not contradictory.  I also note that the video is clear-cut and narrow: its admission does not involve receiving testimony from a witness subject to impeachment or risk turning the extradition hearing into a dress rehearsal trial.  Cf. Koskotas, 931 F.2d at 175-76 (instructing that explanatory evidence should be "reasonably clear-cut," "of limited scope," and should not convert the proceedings "into a dress rehearsal trial").  Though it is less clear whether the video has "some reasonable probability of negating a showing of

probable cause," id. at 175 (quotation omitted), exercising my discretion, I will receive the video, its audio, and Aguasvivas's Spanish transcription and English translation of the audio.

B.     Aguasvivas's Immigration Court testimony

In support of the video of the shooting, Aguasvivas has offered a transcript of his testimony in Immigration Court. Aguasvivas's counsel stated that the transcript was intended only for the limited purpose of authenticating the video. See docket #54 at 42-43 ("[J]ust to make clear, we offered it as authenticating the video. We didn't offer it in substance."). The Government has stipulated that the video is authentic. Aguasvivas's Immigration Court testimony therefore is unnecessary, and I decline to admit it.

C.     Affidavits of Dominican attorney Francisco Campos

Aguasvivas has offered two affidavits of Francisco Campos, a Dominican attorney whom Aguasvivas proffers as an expert on Dominican law. See docket ##24-1, 39-3. According to his affidavits, Attorney Campos has practiced law in the Dominican Republic for fifteen years, during which he has "worked on approximately five cases involving the DNCD." Docket # 39-32 at 3. Attorney Campos avers that he advises international and domestic clients on legal and financial issues with a focus on criminal law. Docket #24-1 at 1. He is a member of the bar association of the Dominican Republic and is certified by the Florida International Bankers Association and by Florida International University. Id.

Attorney Campos's first affidavit, docket #24-1, addresses some elements of the Dominican crimes of conspiracy, association of malefactors, and aggravated homicide. His second affidavit, docket #39-3, describes differences between the Dominican crimes of voluntary homicide and involuntary homicide; discusses certain points of Dominican criminal procedure; recounts Attorney Campos's efforts to learn whether a case has been initiated against Aguasvivas

in Dominican criminal court; and opines that the officers allegedly shot by Aguasvivas failed to follow proper police procedures in the encounter that culminated in the shooting.

I find that Attorney Campos's affidavits are inadmissible. Attorney Campos's fifteen years of advising clients on legal and financial issues, specializing in criminal law, do not qualify him as an expert on Dominican criminal procedure. Moreover, insofar as Aguasvivas uses Attorney Campos's affidavits as a means to discuss applicable provisions of Dominican law, I have received the Dominican statutes themselves into evidence, see infra, rendering unnecessary an attorney's interpretation of those statutes. I also note that in fifteen years, Attorney Campos has worked on only five cases involving the DNCD. Docket #39-3 at 3. He therefore is unqualified to opine whether the officers who tried to arrest Aguasvivas complied with proper police procedures. See docket #39-3 at 3 ("[I]t does not appear that the officers followed [police] procedures in this case."). Lastly, Attorney Campos's opinion is "[b]ased on the video" that Aguasvivas has offered into evidence, id.—a video that spans just twenty-eight seconds and does not capture the entirety of the agents' conduct. For these reasons, I reject Aguasvivas's proffer of Attorney Campos's two affidavits.

After I ruled from the bench that Attorney Campos's affidavits would not be received, Aguasvivas orally moved for more time to locate a Dominican law expert satisfactory to the Court. See docket #54 at 37-38. I denied that motion. Id. at 43-44. Having received into evidence copies of the relevant Dominican statutes, I find that an expert's opinion on the meaning of those statutes is unnecessary. I further note that Aguasvivas, who was arrested on the instant extradition complaint in September 2017, has had ample time to locate and retain a qualified expert witness.

D.    Articles 161 and 294 of the Dominican Criminal Procedure Code

Next, Aguasvivas has proffered Articles 161 and 294 of the Dominican Criminal

Procedure Code in the original Spanish and in English translation.  Article 161 governs "Active

Extradition[s]."  See docket #39-4 at 1.  Article 294 governs the preparation and presentation of a

Dominican charging document known as an "acusación," which is an instrument "requiring the

opening of [a] trial."  See id. at 2.  The Government has not contested the admissibility of this

proposed exhibit.  The statutes are relevant.  In order to help determine whether the

Government's extradition request meets the Extradition Treaty's technical and documentary

requirements, I will receive this exhibit.

E.    Affidavit of Sandra Ybelisse Aguasvivas

Aguasvivas has offered an affidavit of Sandra Ybelisse Aguasvivas ("Sandra"), his aunt,

which avers that Aguasvivas has never been arrested or been in trouble with the law.  Docket

#39-5.[2]  Aguasvivas's reason for offering the affidavit is that it evidences that he had no criminal

record when the shooting took place.  Docket #54 at 33.  He argues that if he had no criminal

record, then he was more likely to believe the agents were kidnappers, and thus to have shot the

agents in self-defense.  Id.

I reject this line of reasoning.  First, Sandra's affidavit, based only on her personal

knowledge, does not suffice to establish that Aguasvivas had no criminal record at the time of

the shooting.  Second, even if Aguasvivas had no criminal record, it does not follow that he

therefore had no reason to believe that the men he allegedly shot were law enforcement officers.

---

[2] In addition to attesting to Aguasvivas's lack of a criminal record, Sandra's affidavit also recounts torture and
physical abuse allegedly perpetrated by the Dominican police against Sandra, her daughter, and her two nephews in
the days after the shooting.  As noted above, country conditions in the Dominican Republic, as well as whether
Aguasvivas may face torture if extradited, are not matters on which this Court possesses the authority to opine.
Rather, those important questions are for the Secretary of State.  See United States v. Kin-Hong, 110 F.3d 103, 109-
11 (1st Cir. 1997).

Because Aguasvivas has not identified any proper purpose served by Sandra's affidavit, I find that it is inadmissible and decline to receive it.

F.      Affidavit of Unique Samella Romero

Aguasvivas also has offered an affidavit of Unique Samella Romero, who has known Aguasvivas since grade school.  Docket #43 at 9-12.  The Romero affidavit attests to Aguasvivas's good character and lack of a criminal record.  Id. ¶¶ 2-3, 12.  It also avers that Frank, not Christian, shot the officers, id. ¶ 4; opines that Aguasvivas's version of the shooting "appears true," id. ¶ 5; and recounts Aguasvivas's and Frank's movements within the Dominican Republic in the months after the shooting, id. ¶¶ 6-11.  Lastly, the affidavit states that the Dominican police are "very corrupt" and "often" commit killings and disappearances, and that Aguasvivas would "no doubt" be murdered by the police if he were returned to the Dominican Republic.  Id. ¶ 13.

I reject the Romero affidavit.  Aguasvivas's character and alleged lack of a criminal record, as well as Aguasvivas's and Frank's movements months after the shooting, are irrelevant to the probable cause question before the Court.  Insofar as the affidavit states that Frank shot the officers, that directly contradicts the Government's allegation that Aguasvivas committed the shooting.  Contradictory evidence is not properly considered.  See Koskotas, 931 F.2d at 175-76.  Finally, the likelihood of Aguasvivas facing torture by Dominican law enforcement is a matter exclusively for the Secretary of State.  See Kin-Hong, 110 F.3d 109-11.

G.      Immigration Court testimony of Maira Yolanda Diaz-Nivar

Aguasvivas has offered a transcript of the Immigration Court testimony of Maira Yolanda Diaz-Nivar, allegedly an eyewitness to the shooting.  See docket #39-6.[3]  Aguasvivas offers this

---

[3] The document submitted by Aguasvivas contains testimony of three witnesses: Angel Pimenthal, Joseline Ballez, and Diaz-Nivar.  Diaz-Nivar's testimony is recorded at pages 23-46 of the document.  Aguasvivas's arguments

testimony to contest probable cause as to the conspiracy charge and to suggest that the Government has failed to show he shot Montero with the intent to kill, because he could have shot Montero in self-defense.  See docket #39 at 8; see also docket #54 at 34.

Diaz-Nivar testified that Aguasvivas worked for her husband; that immediately prior to the shooting, Aguasvivas was outside her house putting a license plate onto his motorcycle, while waiting to go to work with her husband; that four men in plain clothes pulled up in an unmarked car; that the men started beating Aguasvivas; that Frank rushed to the scene and tried to strike the four men with crutches; that shots then rang out; that Aguasvivas was not dealing drugs at the time; and that Diaz-Nivar never saw Aguasvivas holding a gun.  See docket #39-6 at 23-46; see also docket #39 at 8 (Aguasvivas's description of the testimony).

I reserve decision on this proposed exhibit.  I have allowed the Government an opportunity to supplement its submission regarding the conspiracy charge.  See docket #57.  Because Diaz-Nivar's testimony arguably relates to that charge, I will rule on this proposed exhibit's admissibility after reviewing the Government's forthcoming supplemental filing.

H.      Evidence regarding country conditions in the Dominican Republic

Aguasvivas has submitted voluminous materials describing country conditions in the Dominican Republic, including descriptions of widespread police abuses and police violence against civilians.  See docket #43 at 4-7 (summarizing the exhibits).  I find that these materials are inadmissible.  Again, conditions in the Dominican Republic are for the Secretary of State, not the judicial officer, to assess.  See Kin-Hong, F.3d at 109-111.  Exhibits bearing on those conditions are irrelevant to the narrow probable cause question before the Court.

---

address only Diaz-Nivar's testimony.  See docket #39 at 8.  Accordingly, I will consider only whether Diaz-Nivar's testimony is admissible, and will not address the testimony of Pimenthal or Ballez.

Aguasvivas argues that evidence of conditions in the Dominican Republic bears on his state of mind at the time of the shooting, and tends to show that other materials prepared by Dominican law enforcement officers are unreliable. See docket #54 at 47-48. I reject both arguments. As for state of mind, Aguasvivas has failed to show that the proffered country condition materials are relevant. (Indeed, if anything, endemic extrajudicial killings by the police would make it more, not less, likely that Aguasvivas pulled the trigger with intent.) I also am unpersuaded that evidence concerning police violence in the Dominican Republic undermines the reliability of the Government's evidence. Here, the account of the shooting is corroborated by the video Aguasvivas has offered,[4] and eyewitnesses have identified Aguasvivas as the shooter. The country conditions materials thus do not have "some reasonable chance of negating a showing of probable cause." See Koskotas, 931 F.2d at 175 (quotation omitted).

I.      Autopsy report regarding Frank Aguasvivas

Aguasvivas has submitted an autopsy report regarding the death of his brother Frank, in both the original Spanish and in English translation. Docket #43 at 167-90. Aguasvivas has represented that his brother Frank was shot and killed by Dominican police several months after the shooting. See docket #43 at 2. He argues that the autopsy report evidences the Dominican police's "documented practice of carrying out terribly troubling extrajudicial activity," casting doubt on the reliability of the Government's evidence. See docket #54 at 48.

I find this proposed exhibit inadmissible. Frank's death occurred, and the autopsy report was written, in September 2014, more than nine months after the shooting. See docket #43 at 171, 175. The report therefore is not relevant to the question of probable cause. Moreover, as stated above, the Government's version of the shooting is supported by the video and by

---

[4] I will discuss the video's contents in greater detail in a subsequent order.

eyewitness identifications. I reject Aguasvivas's argument that the autopsy report renders the Government's evidence so unreliable as to defeat a showing of probable cause.

J.      Dominican prosecutor's affidavit regarding Ramon Aguasvivas

Aguasvivas has offered a Dominican prosecutor's affidavit (the "Ramon affidavit") prepared in connection with extradition proceedings against Aguasvivas's uncle, Ramon Emilio Aguasvivas Mejia, who also fled to the United States after the shooting. See docket #48-1. According to the affidavit, Ramon was present when the agents tried to arrest Aguasvivas; he took the agents' guns after Aguasvivas shot the agents; and he then fired several shots before driving Aguasvivas and Frank away from the scene. Id. at 4-5.

I find that the Ramon affidavit is admissible. The Government has not contested its admissibility. The affidavit is clear-cut and narrow, would not require witness testimony, and would not yield a dress rehearsal trial. I also note that the Ramon affidavit was authored by the same Dominican prosecutor who is pursuing Aguasvivas's extradition in the instant case. The Government has offered other affidavits, authored by the same prosecutor, describing the same incident. See docket #23-1 at 54-62, 89-90. In fairness to Aguasvivas, I will admit into evidence a third affidavit on the same subject by the same affiant.

K.      Dominican criminal statutes regarding self-defense

Finally, Aguasvivas has submitted Dominican statutes setting forth the law of self-defense. Docket #56-1. These statutes are relevant to assessing Aguasvivas's assertion that self-defense renders his shooting of Agent Montero non-criminal. The Government does not oppose this exhibit's admission. I find that the exhibit is admissible.

IV.     ANALYSIS: MOTION TO COMPEL DISCOVERY

Aguasvivas served the United States with a discovery letter seeking sixteen categories of reports, records, ballistic evidence, and pleadings, as well as information pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  <u>See</u> docket #36.  After the United States declined to produce responsive discovery, <u>see</u> docket #42, Aguasvivas filed a motion to compel production, <u>see</u> docket #46.

Aguasvivas's motion to compel claims that the information sought in the discovery letter is "material to his defense" and will "appreciably advance" the resolution of his challenge to extradition.  <u>See</u> docket #36 at 1; <u>see also</u> docket #46 at 1-2.  The parties argued the motion at the June 8 hearing.  Following argument, I denied Aguasvivas's motion for the reasons stated on record.  I now augment the reasoning I provided from the bench.

A.      Enumerated Discovery Requests

I begin with the sixteen discovery requests in Aguasvivas's discovery letter.  <u>See</u> docket #36 at 3-4.  As a practical matter, the discovery letter and subsequent motion to compel make no effort to accommodate the well-rehearsed boundaries of discovery in an extradition case.  By way of illustration, Aguasvivas seeks, among other things:

1.  Any police notes, reports, or other investigative documents created during the investigation of the shooting on December 5, 2013. . . .

4.  Any records of interviews, arrests, or interrogations of any civilian eyewitnesses to the . . . shooting, including any audio and video. . . .

7.  Any written policies or protocols of the DNCD regarding the execution of anti-drug operations . . . .

13.  Any complaints against the [surviving victims] for lying or giving false testimony . . . .

Docket #36 at 3-4.

16

Such requests are not narrowly crafted to address the existence or absence of probable cause. The discovery letter contains blanket discovery requests that, far from being tailored to the issues presented in this extradition proceeding, resemble a comprehensive discovery request in a domestic prosecution. Such a request is improper in an extradition proceeding, where the Government acts in a ministerial role on behalf of the requesting sovereign. See In re Drayer, 190 F.3d 410, 414 (6th Cir. 1999) ("[T]he involvement of the United States can only be characterized as ministerial in the sense that it merely received factual information developed by . . . authorities [in the country seeking extradition].").

Further, apart from the discovery requests' sheer breadth, Aguasvivas does not explain how or why the enumerated materials pertain to probable cause, or indeed to any other question before the Court. In In re Kraiselburd, 786 F.2d 1395 (9th Cir. 1986), the Ninth Circuit affirmed the extradition magistrate's denial of discovery using language equally applicable here:

> [The relator] does not articulate what he expected the file to reveal. The magistrate granted his discovery motion to the extent it related to the question whether there existed probable cause tying appellant to the murders. Because the purpose of the extradition hearing is simply to determine whether there exists probable cause that the fugitive committed the offense charged, the magistrate properly limited discovery.

Id. at 1399 (citing Merino, 326 F.2d at 12-13; Quinn, 783 F.2d at 817 n.41). It is axiomatic that discovery should be permitted only insofar as it bears some relation to the claims at issue in the case. See id.; Singh, 123 F.R.D. at 111. As in Kraiselburd, Aguasvivas has not explained what the materials identified in his discovery letter would reveal, nor has he explained why those materials would better position him or the Court to address the matters at hand.

Indeed, the only explanation Aguasvivas offers for the discovery requests is that they seek documents that are "material to his defense"—language borrowed from 18 U.S.C. § 3191, which authorizes subpoenas for indigent fugitives facing extradition. See docket #36 at 1

(quoting 18 U.S.C. § 3191) (citations omitted).  No doubt that the documents are material; but they are material not to his defense in this extradition proceeding, but rather to his defense at trial.  As the Government has observed, responsive materials likely are in the custody of Dominican prosecutors.

For all these reasons, I exercise my discretion to deny Aguasvivas's motion to compel production of the sixteen categories of documents listed in his discovery letter.

B.      Brady Material

Aguasvivas's motion to compel also seeks production of "any exculpatory information in the possession of the U.S. government."  Docket #36 at 2.  This demand for Brady material "also extends to material relevant to the credibility of the inculpating eyewitnesses."  Id. (citing Giglio, 405 U.S. 150).  Noting that the Department of Homeland Security ("DHS") and the Department of State both were involved in Aguasvivas's Immigration Court proceedings, the motion seeks an order compelling the U.S. Attorney to ask those Departments whether they have responsive materials, and if so, compelling the Government to produce them.  Id.

I deny Aguasvivas's motion to compel production of Brady material.  As an initial matter, it is not clear that Brady and Giglio apply in extradition proceedings.  Brady held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  Courts have reasoned that because an extradition court does not decide "guilt or . . . punishment," id., Brady is inapplicable. See Koskotas, 127 F.R.D. at 27 (citing Merino, 326 F.2d at 12) ("Courts have expressly held that Brady principles do not pertain to extradition hearings because no determination of guilt or innocence is being made."); Singh, 123 F.RD. at 112 (citing Merino, 326 F.2d at 13) ("Since an

extradition proceeding is not a criminal prosecution, it is questionable whether <u>Brady</u> is applicable.  In any event, since there will not be a <u>trial</u> in the United States, <u>Brady</u> is inapplicable.").  Similarly, courts also have held that a relator does not have the right at an extradition hearing to attack an adverse witness's credibility.  <u>See</u> <u>Bovio v. United States</u>, 989 F.2d 255, 259 (7th Cir. 1993) (citation omitted); <u>In re Shaw</u>, No. 14-cv-81475-WM, 2015 WL 3442022, at * 4 (S.D. Fl. May 28, 2015) ("An extraditee is not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses.").  Rather, "issues of credibility are to be determined at trial."  <u>Bovio</u>, 989 F.2d at 259.

Aguasvivas does not cite, or attempt to distinguish, these cases.  Instead, he relies in part on the Sixth Circuit's opinion in <u>Demjanjuk v. Petrovsky</u>, 10 F.3d 338 (6th Cir. 1993), for the proposition that <u>Brady</u> attaches in the extradition context.  In <u>Demjanjuk</u>, the Sixth Circuit held that "<u>Brady</u> should be extended to cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeded against."  <u>Id.</u> at 353.  But the Sixth Circuit subsequently limited <u>Demjanjuk</u>'s holding.  In <u>In re Drayer</u>, 190 F.3d 410 (6th Cir. 1999), the court explained that <u>Demjanjuk</u> presented an unusual fact pattern: there, "the United States had conducted its own investigation of the offense underlying the request for extradition and uncovered exculpatory material in the course of that effort."  <u>Id.</u> at 414 (citing <u>Demjanjuk</u>).  The <u>Drayer</u> court warned that <u>Demjanjuk</u>'s "seemingly broad language must be read in the context of a case that involved an unusual set of circumstances."  <u>Id.</u>[5]

---

[5] The Sixth Circuit found that in <u>Drayer</u> itself, "the involvement of the United States c[ould] only be characterized as ministerial in the sense that it merely received factual information developed by Canadian authorities."  <u>In re Drayer</u>, 190 F.3d 410, 414 (6th Cir. 1999).  The <u>Drayer</u> court held that "the United States was obliged to turn over any exculpatory materials in its possession" that would undercut a probable cause finding—but this disclosure obligation did not apply to materials held by the government of the nation requesting extradition.  <u>Id.</u> at 415.

Seeking to align this case with <u>Demjanjuk</u>, Aguasvivas claims that "the United States has undertaken an investigation of the underlying crime in this case, as part of its preparation of" proceedings against Aguasvivas in Immigration Court. Docket #46 at 1. But Aguasvivas fails to support this claim by showing that either DHS or the Department of State has, in fact, conducted an investigation of his alleged commission of the underlying crimes. The Board of Immigration Appeals ultimately determined that Aguasvivas likely would be tortured if surrendered to Dominican authorities. <u>See</u> docket #23-3 at 3. Aguasvivas points to no evidence, as there was in <u>Demjanjuk</u>, that the United States undertook an independent investigation of Aguasvivas's alleged crimes in the Dominican Republic. Thus, as in <u>Drayer</u>, the Government is performing ministerial duties on behalf of the nation seeking extradition, based on documents it has received from that nation's government. <u>See Drayer</u>, 190 F.3d at 414. For these reasons, I find that <u>Demjanjuk</u> is distinguishable from the instant case.

Another aspect of the record further supports denying Aguasvivas's motion to compel production of <u>Brady</u> material. The U.S. Attorney's Office has represented that it already has produced to Aguasvivas any responsive material in its possession. <u>See</u> docket #42 at 2. Accordingly, Aguasvivas's discovery demand concerns only materials in the possession of DHS or the Department of State. In this regard, Aguasvivas has acknowledged having reviewed the voluminous materials generated in connection with his Immigration Court proceedings. But when asked to identify any basis for believing that DHS or the Department of State possesses any materially exculpatory information, Aguasvivas responded that he had none. <u>See</u> docket #54 at 17-18. [6]

---

[6] In another case cited by Aguasvivas, <u>Martinez v. United States</u>, 793 F.3d 533 (6th Cir. 2015), <u>vacated</u> (Oct. 14, 2015), <u>on reh'g en banc</u>, 828 F.3d 451 (6th Cir. 2016), an appellate panel held that the relator was entitled to <u>Brady</u> discovery. <u>See id.</u> at 555-56. The panel found it "likely" that the discovery sought by the relator would be material to the relator's claim that the extradition request violated his speedy trial rights. <u>Id.</u> at 556. The panel's opinion was

On the basis of this record, I deny the motion to compel any further production of <u>Brady</u> and <u>Giglio</u> materials.

## <u>Conclusion</u>

The Court rules on the admissibility of Aguasvivas's proposed exhibits as set forth above.

Aguasvivas's motion to introduce provisions of Dominican law, docket #56, is GRANTED.

Aguasvivas's motion to compel discovery, docket #49, is DENIED.

It is so ordered.

<u>/s/ David H. Hennessy</u>
David H. Hennessy
U.S. Magistrate Judge

---

vacated. The Sixth Circuit, sitting <u>en banc</u>, ultimately concluded that the relator's <u>Brady</u> rights had not been violated, noting that the Magistrate Judge had "ordered the United States to produce 'any exculpatory materials in its possession that would undercut a finding that there is probable cause'" that the relator committed the crime. <u>See Martinez v. United States</u>, 828 F.3d 451, 470 (6th Cir. 2016) (en banc). Here, the U.S. Attorney has produced all responsive materials in its possession, and Aguasvivas has access to records of the Immigration Court proceedings.