|  |  |
|---|---|
| In the Matter of the Extradition of<br><br>CRISTIAN STARLING AGUASVIVAS | **No. 17-mj-4218-DHH** |

## ORDER, CERTIFICATION OF EXTRADITABILITY, AND ORDER OF COMMITMENT

### December 6, 2018

Hennessy, M.J.

The United States seeks to extradite Cristian Starling Aguasvivas ("Aguasvivas" or "the Relator") to the Dominican Republic to face criminal charges of murder, aggravated robbery, association of malefactors, and illegal firearm possession, in violation of Articles 265, 266, 295, 304, 379, and 383 of the Dominican Criminal Code, and Article 39, Paragraph III of Dominican Law 36 on Trade and Possession of Firearms. Dkt. no. 5, at p. 2. Aguasvivas opposes this request and has moved to dismiss the Government's extradition complaint. Dkt. no. 23 (motion to dismiss); see also dkt. no. 24 (supplemental motion to dismiss); dkt. no. 30 (reply to Government's opposition to Aguasvivas's motion to dismiss); dkt. no. 73 (reply to Government's supplemental memorandum in support of extradition). He contends that the extradition complaint does not comply with the treaty governing extraditions between the United States and the Dominican Republic: the Extradition Treaty between the Government of the United States of America and the Government of the Dominican Republic, Jan. 12, 2015, T.I.A.S. No. 06-1215, 2016 WL 9281220 (available at dkt. no. 23-1) ("the Treaty"). The United States opposes

dismissal.  See dkt. no. 28 (opposition to motion to dismiss); see also dkt. no. 65 (supplemental memorandum in support of extradition).

The parties argued the motions to dismiss at a hearing on April 24, 2018.  See dkt. nos. 32, 34.[1]  The Court also held an extradition hearing on June 29, 2018, at which the parties submitted evidence and made legal arguments addressing whether Aguasvivas is extraditable under the Treaty.  See dkt. nos. 57, 60.

For the reasons that follow, Aguasvivas's motion to dismiss (dkt. no. 23) and supplemental motion to dismiss (dkt. no. 24) are DENIED.  Furthermore, I find that the extradition request satisfies the Treaty's requirements and that there is probable cause to believe that Aguasvivas committed murder, aggravated robbery, and illegal firearm possession.  I therefore CERTIFY that Aguasvivas is extraditable as to those crimes and ORDER Aguasvivas detained pending both review of the Dominican Republic's extradition request by the Secretary of State and Aguasvivas's potential surrender to the Dominican Republic.

I.      FACTUAL BACKGROUND

        A.      The Shooting

On December 6, 2013, the Dominican Republic issued a warrant for Aguasvivas's arrest. See dkt. no. 23-1, at pp. 63–67.  The arrest warrant alleges that on or about December 6, 2013,[2] Aguasvivas and his brother, Frank Aguasvivas,[3] were together in the Dominican city of Baní.  Id. at 63.  Three agents of the Dominican Republic's National Directorate for Drug Control (the "DNCD"), Captain Jimenez, Agent Hernandez, and Agent Ubri, tried to arrest Aguasvivas as

---

[1] On June 8, 2018, the Court held a hearing principally devoted to the parties' evidentiary and discovery disputes. See dkt. nos. 50, 54.  On July 27, 2018, I issued an Order resolving evidentiary and discovery matters.  See dkt. no. 62.

[2] Some documents list the date of the shooting as December 5, while others list the date as December 6.

[3] Various documents refer to Aguasvivas's brother as Francis, Frank, or Fran.  The Court will refer to him as Frank.

part of an anti-drug operation. Id. During the attempted arrest, Aguasvivas disarmed and shot Agent Ubri three times using Agent Ubri's gun. Id. Agent Ubri died from his wounds. Id. at 63-64. Aguasvivas also shot Captain Jimenez and Agent Hernandez, who both sustained serious but non-fatal injuries. Id. at 64. Aguasvivas and his brother fled the scene. Id.

An autopsy report regarding Agent Ubri that was prepared soon after the shooting concludes that Agent Ubri sustained three "[d]istant wound[s] by short-barreled firearm projectile." See id. at 70–72. The autopsy report recounts that Agent Ubri "with other three agents [sic] tried to arrest and introduce into a vehicle . . . a presumed drug dealer, but they were injured by someone else, who tried to stop the arrest; in the shooting two more agents were wounded and one left unharmed." Id. at 70. The report lists Agent Ubri's cause of death as "murder." Id. at 71 (capitalization altered). As for Captain Jimenez and Agent Hernandez, medical certificates document "wound[s] by firearm" and express "[g]uarded prognos[e]s" that their wounds would heal. See id. at 73–74.

Three years after the shooting, on December 12, 2016, Feliz Sanchez Arias ("Sanchez"), a prosecutor of the Dominican judicial district of Peravia prepared an "[a]ffidavit justificatory" in support of the Dominican Republic's request for Aguasvivas's extradition. Dkt. no 23-1 at 54–62 (Dec. 12, 2016 Sanchez Aff.). Sanchez avers that on December 6, 2013, at 12:30 p.m., Captain Jimenez, Agent Hernandez, and Agent Ubri were conducting an anti-drug operation during which Aguasvivas was arrested and handcuffed. Id. at 57. Frank Aguasvivas was present and protested his brother's arrest. Id. Aguasvivas "took advantage of the distraction of the agents at the time of the intervention of his brother, and, in a surprising way, attacked . . . [Agent Ubri], to whom disarmed and killed [sic], opening fire on all the agents of the National

Directorate for Drug Control that were present." Id. Sanchez avers that Aguasvivas shot and wounded Captain Jimenez and Agent Hernandez. See id.

Sanchez later signed an additional affidavit in support of the extradition request. See id. at 89–90. In it, Sanchez "reaffirm[s]" that a photograph attached to the extradition request depicts Aguasvivas. Id. at 90. Sanchez further avers:

> The same photograph . . . has also been seen and recognized as corresponding to CRISTIAN STARLING AGUASVIVAS a/k/a Momón by the Captain Felipe de Jesús Jiménez García and the officer . . . José Marino Hernández Rodriguez, who are two surviving victims of the shootout attack on the anti-narcotics patrol carried out by CRISTIAN STARLING AGUASVIVAS a/k/a Momón in the city of Baní, Provincia Peravia; they are also eyewitnesses because they saw . . . CRISTIAN STARLING AGUASVIVAS a/k/a Momón . . . disarm, shoot and kill [] the officer . . . LORENZO UBRI MONTERO.

Id. (capitalization in original).

B.     Immigration Proceedings

Eight months after the shooting, Aguasvivas fled the Dominican Republic and illegally entered the United States. Dkt. no. 23, at p. 4. Once in the United States, Aguasvivas sought in immigration court asylum, withholding of removal, and relief under the Convention Against Torture, citing fear of the Dominican police. Id. After nine hearings, several of which included witness testimony, an Immigration Judge denied all requested relief. Id. at 4–5. On appeal, the Board of Immigration Appeals (the "BIA") reversed and granted Aguasvivas withholding of removal under the Convention Against Torture. Id. at 5. Among other things, the BIA found that witnesses credibly testified that the Dominican authorities had tortured them in an effort to learn Aguasvivas's whereabouts. Id. The BIA concluded "that it is more likely than not that [Aguasvivas] w[ould] be tortured at the instigation of or with the consent or acquiescence of public official[s] in the Dominican Republic" if he were returned to the Dominican Republic. Id.

(third alteration in original).  Aguasvivas was released from immigration custody after the BIA issued its decision.  Id.

C.    Procedural History

On September 15, 2017, Aguasvivas was arrested in Massachusetts on the instant extradition complaint.  Dkt. no. 28, at p. 1.  According to the extradition complaint, the Dominican Republic has charged Aguasvivas with murder, aggravated robbery, association of malefactors, and illegal firearm possession, in violation of Articles 265, 266, 295, 304, 379, and 383 of the Dominican Criminal Code, and Article 29, Paragraph III of Dominican Law 36 on Trade and Possession of Firearms.  Id. at 22; see also dkt. no. 2 ¶ 4.

Following motions to continue the deadline for filing a motion to dismiss, (dkt. nos. 15, 20, 22) Aguasvivas filed a motion to dismiss the extradition complaint on February 27, 2018 and a supplemental motion to dismiss the complaint on March 1, 2018.  Dkt. nos. 23, 24.  After full briefing, the parties argued the motion on April 24, 2018.  See dkt. nos. 32, 34.  The Court then held further hearings on June 8 and June 29, 2018.  See dkt. nos. 50, 54, 57, 60.

On August 1, 2018, the Government submitted a supplementary memorandum in support of extradition.  Dkt. no. 65.  Aguasvivas filed a response to the Government's supplemental memorandum on October 24, 2018.  Dkt. no. 73.

II.    LEGAL BACKGROUND AND STANDARD OF REVIEW

A.    Statutory and Legal Framework

Extradition proceedings are governed by 18 U.S.C. ch. 209 ("Chapter 209").[4]  "The statute establishes a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State."  United States v. Kin-Hong, 110 F.3d 103, 109 (1st

---

[4] Chapter 209 comprises §§ 3181–3196 of Title 18 of the U.S. Code.

Cir. 1997). The judicial officer's responsibilities are set forth at 18 U.S.C. § 3184. That section instructs the judicial officer to determine whether the evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If so, the judicial officer "shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State," who then "may" order the relator's extradition. Id. Section 3184 further instructs that if the judicial officer makes this certification, the judicial officer "shall" order the relator incarcerated until the extradition is carried out. Id.

If the judicial officer certifies the relator's extraditability, "[i]t is then within the Secretary of State's sole discretion to determine whether or not the relator should actually be extradited." Kin-Hong, 110 F.3d at 109 (citing 18 U.S.C. § 3186). The Secretary of State may review the judicial officer's factual findings and legal conclusions de novo. Id. Further, "[t]he Secretary may also decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations." Id. (collecting authorities).

Under this division of labor, the judicial officer's inquiry is narrow: it concerns "the existence of a treaty, the offense charged, and the quantum of evidence offered." Id. at 110. "The larger assessment of extradition and its consequences is committed to the Secretary of State," who is best positioned to address matters that implicate U.S. foreign policy.[5] Id.; see also id. at 111 (noting that "another branch of government . . . has both final say and greater discretion in these proceedings"). But while the judicial officer's role is circumscribed, "[t]his is

---

[5] Thus, a concern that the relator would be tortured after extradition is not properly before the judicial officer, but instead must be directed to the Secretary of State. "It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed." United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997).

not to say that a judge . . . [in] an extradition proceeding is expected to wield a rubber stamp." Santos v. Thomas, 830 F.3d 987, 1006 (9th Cir. 2016) (alterations and omission in original) (quoting Skaftouros v. United States, 667 F.3d 144, 158 (2d Cir. 2011)).  Rather, in order to certify an extradition, the judicial officer must find that: (1) the judicial officer has jurisdiction to conduct the extradition proceedings; (2) the extradition court has jurisdiction over the relator; (3) the applicable extradition treaty is in full force and effect; (4) the crime or crimes for which extradition is sought comply with the extradition treaty's terms; and (5) the evidence supports a finding of probable cause as to each offense for which the relator's extradition is sought. Zanazanian v. United States, 729 F.2d 624, 625–26 (9th Cir. 1984) (citation omitted); see also, e.g., Skaftouros, 667 F.3d at 155–56; Yapp v. Reno, 26 F.3d 1562, 1565 (11th Cir. 1994); Emami v. U.S. Dist. Court for N. Dist. of Cal., 834 F.2d 1444, 1447 (9th Cir. 1987) (citations omitted); Dkt. no. 23, at p. 6 (collecting cases); Dkt. no. 28, at pp. 8–9 (citations omitted).  "[A]s the party seeking extradition on behalf of the requesting state, the government bears the burden of demonstrating extraditability."  In re Extradition of Santos, 473 F. Supp. 2d 1030, 1037 (N.D. Cal. 2006).

Extradition proceedings have distinct evidentiary rules.  See Kin-Hong, 110 F.3d at 120 (citations omitted) ("Neither the Federal Rules of Criminal Procedure . . . nor the Federal Rules of Evidence . . . apply to extradition hearings.") (internal citations omitted).  When conducting an extradition hearing, the judicial officer "shall" admit into evidence any "[d]epositions, warrants, or other papers or copies thereof . . . if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes" in the courts of the state requesting extradition. 18 U.S.C. § 3190.  A certificate from "the principal diplomatic or consular officer of the United States" residing in the requesting country "shall be proof" that such documents are properly

authenticated. Id. Moreover, Article 8 of the Treaty also instructs, in relevant part, that documents submitted with an extradition request "shall be received and admitted as evidence in extradition proceedings if: (a) they bear the certificate or seal of the Department of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting Party; or (b) they are certified or authenticated in any manner consistent with the laws of the Requested Party." Dkt. no. 23-1, at p. 26.

Finally, insofar as the extradition hearing's purpose is to determine whether probable cause supports the relator's extradition, evidence supporting extraditability "may consist of hearsay, even entirely of hearsay." Kin-Hong, 110 F.3d at 120 (citing Collins v. Loisel, 259 U.S. 309, 317 (1922)).

B.    Relator's Right to Submit Evidence[6]

A relator may submit "explanatory evidence," within the discretion of the district court, when contesting an extradition. See Koskotas v. Roche, 931 F.2d 169, 176 (1st Cir. 1991) (citations omitted). However, "contradictory evidence" is not properly considered. See id. (citations omitted). "While the line between 'contradictory' and 'explanatory' evidence is not sharply drawn, the purpose of permitting explanatory evidence is to afford the relator 'the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause.'" Id. at 175 (quoting Matter of Sindona, 450 F. Supp. 672, 685 (S.D.N.Y. 1978)). Admissible explanatory evidence thus must be relevant to the question whether there is probable cause to believe the relator has committed the crimes for which his or her extradition is sought. Further, case law emphatically instructs that "extradition proceedings are not to be converted into a dress rehearsal trial." Id.

---

[6] In an Order dated July 27, 2018, the Court discussed at greater length Aguasvivas's right to submit evidence, and ruled on Aguasvivas's proposed exhibits and motion to compel discovery. See dkt. no. 62.

(quoting <u>Jhirad v. Ferrandina</u>, 536 F.2d 478, 484 (2d Cir. 1976)) (citing <u>Quinn v. Robinson</u>, 783 F.2d 776, 817 n.41 (9th Cir. 1986)).

C.      The Extradition Treaty

I now summarize the Treaty's relevant provisions.  Article 2 of the Treaty defines extraditable offenses.  <u>See</u> dkt. no. 23-1, at pp. 22–23.  The definition follows the doctrine of "dual criminality."  Under that doctrine, "an accused may be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations."  <u>United States v. Anderson</u>, 472 F.3d 662, 665 n.1 (9th Cir. 2006) (citation omitted).  "The purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries."  <u>Kin-Hong</u>, 110 F.3d at 114 (citing <u>United States v. Saccoccia</u>, 58 F.3d 754, 766 (1st Cir. 1995)).  Thus, Article 2 instructs, in relevant part, that "[a]n offense shall be an extraditable offense if, under the laws of both Parties, the maximum applicable penalty is deprivation of liberty for more than one year or a more severe penalty."[7]  Dkt. no. 23-1, at p. 22.  The dual criminality doctrine does not require that corresponding criminal offenses in the requesting and extraditing nations be identical.  <u>See</u> <u>In re Manzi</u>, 888 F.2d 204, 207 (1st Cir. 1989).  Instead, "[i]t is enough if the particular act charged is criminal in both jurisdictions," including when the jurisdictions criminalize the act under different names, assign different elements to the relevant crimes, or impose different kinds of liability.  <u>Id.</u> (quoting <u>Collins v. Loisel</u>, 259 U.S. at 312).  Dual criminality is satisfied so long as "the acts upon which the [relator's] . . . charges are based are proscribed by similar provisions of federal law, [state] law or the law of the preponderance of the states."  <u>Id.</u> (omission and second alteration in original) (quoting <u>Brauch v. Raiche</u>, 618 F.2d 843, 851 (1st Cir. 1980)).

---

[7] In addition, an attempt or conspiracy to commit such a crime, or participation in the completion of such a crime, also is an extraditable offense under the Treaty.  <u>See</u> dkt. no. 23-1, at p. 22.

Article 7 of the Treaty sets forth extradition procedures and required documents. It provides, again in relevant part:

All extradition requests shall be supported by:

(a) documents, statements, or other types of information that describe the identity, nationality, and probable location of the person sought;

(b) information describing the facts of the offense or offenses and the procedural history of the case;

(c) the text of the law or laws describing the offense or offenses for which extradition is requested and the applicable penalty or penalties; [and]

(d) [a statement from the Requesting Party that its statute of limitations does not bar the relator's prosecution or punishment.]

Id. at 25. Further, where, as here, the relator is sought for prosecution, the extradition request also must contain:

(a) a copy of the warrant or order of arrest or detention issued by a judge or other competent authority;

(b) a copy of the document setting forth the charges against the person sought; and

(c) such information as would provide a reasonable basis to believe that the person sought committed the offense or offenses for which extradition is requested.

Id.

Next, Article 15 adopts the "rule of specialty." See id. at 28–29. That rule "requires that an extradited person be tried only 'for the crime[s] for which he has been extradited.'" Anderson, 472 F.3d at 665 n.1 (alteration in original) (quoting Benitez v. Garcia, 449 F.3d 971, 976 (9th Cir. 2006)). The Article provides, in part, the following:

1. A person extradited under this Treaty may only be detained, tried, or punished in the Requesting Party for:

(a) any offense for which extradition was granted, or a differently denominated offense carrying the same or lesser penalty and based on the same acts or omissions as the offense for which extradition

was granted, provided such offense is extraditable, or is a lesser included offense;

(b)     any offense committed after the extradition of the person; or

(c)     any offense for which the competent authority of the Requested Party . . . consents to the person's detention, trial, or punishment.

Dkt. no. 23-1, at pp. 28–29.[8]  Accordingly, if Aguasvivas is extradited, the Dominican Republic may try him only for the offenses on which the United States orders his extradition.

Finally, two notable principles guide the judicial officer's interpretation and application of an extradition treaty.  First, "extradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement because they are 'in the interest of justice and friendly international relationships.'"  Kin-Hong, 110 F.3d at 110 (quoting Factor v. Laubenheimer, 290 U.S. 276, 298 (1933)).  Second, the judicial officer must abide by the "rule of non-inquiry."  Id. That rule requires the judicial officer to "refrain from 'investigating the fairness of a requesting nation's justice system,' and from inquiring 'into the procedures or treatment which await a surrendered fugitive in the requesting country.'"  Id. (internal citation omitted) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1995)).  As noted above, Chapter 209 assigns consideration of such matters to the Secretary of State.

III.   ANALYSIS

In order to prove Aguasvivas's extraditability, the Government must demonstrate that: (1) the judicial officer has jurisdiction to conduct the extradition proceedings; (2) the extradition court has jurisdiction over the relator; (3) the applicable extradition treaty is in full force and effect; (4) the crime or crimes for which extradition is sought comply with the extradition

---

[8] Article 15 also provides that a person extradited under the Treaty cannot then be extradited onward to another country or surrendered for an offense committed before the extradition, unless the extraditing nation consents.  See id. at 29.

treaty's terms; and (5) the evidence supports a finding of probable cause as to each offense for which the relator's extradition is sought. <u>Zanazanian</u>, 729 F.2d at 625–26 (citation omitted). I address each prong in turn.

A. This Court Has Jurisdiction to Conduct this Extradition Proceeding

First, it is both clear and undisputed that this Court has jurisdiction over the instant matter. The text of 18 U.S.C. § 3184 instructs that when the United States has an extradition treaty with another nation, "any magistrate judge authorized to do so by a court of the United States . . . may, upon [an extradition] complaint made under oath, . . . issue [a] warrant for the apprehension of the person so charged, that he may be brought before such . . . magistrate judge, to the end that the evidence of criminality may be heard and considered." <u>Id.</u> Rule 1(e) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts authorizes Magistrate Judges in this judicial district to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. Section 3184 . . . ." MJ L.R. 1(e). This Court thus has jurisdiction over this case.

B. This Court Has Jurisdiction over Aguasvivas

Second, it is equally apparent that this Court has jurisdiction over Aguasvivas. The text of § 3184 again resolves the question. That statute confers upon an authorized judicial officer jurisdiction over "any person found within [the judicial officer's] jurisdiction." 18 U.S.C. § 3184. It is undisputed that Aguasvivas was arrested in this District. <u>See</u> dkt. no. 28, at p. 1. Therefore, the Court has jurisdiction over the Relator.

C. The Extradition Treaty Is in Full Force and Effect

Third, the Treaty is in full force and effect. When assessing this question, the judicial officer must defer to the executive branch. <u>See</u> <u>Kastnerova v. United States</u>, 365 F.3d 980, 986

(11th Cir. 2004) ("[E]xtradition is a function of the Executive and the 'question whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and . . . the courts ought not . . . interfere with the conclusions of the political department in that regard.'" (omissions in original) (internal citation omitted) (quoting <u>Terlinden v. Ames</u>, 184 U.S. 270, 288 (1902))).  The record contains a signed declaration from an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, attesting that the treaty is in full force and effect.  <u>See</u> dkt. no. 23-1, at pp. 2, 4.  Aguasvivas has not challenged this contention.  On this information the Court concludes that the Treaty is in full force and effect.

       D.       The Crimes Charged Comply with the Terms of the Extradition Treaty

Fourth, the crimes with which Aguasvivas has been charged in the Dominican Republic comply with the Treaty's terms.  As previously discussed, under Article 2 of the Treaty "[a]n offense shall be an extraditable offense if, under the laws of both Parties, the maximum applicable penalty is deprivation of liberty for more than one year or a more severe penalty."  Dkt. no. 23-1, at p. 22.  This dual criminality requirement is satisfied so long as the relator's alleged criminal acts are criminal in both jurisdictions, even if the requesting and extraditing nations "criminalize the act under different names, assign different elements to the relevant crimes, or impose different kinds of liability."  <u>In re Manzi</u>, 888 F.2d at 207 (quoting <u>Collins</u>, 259 U.S. at 312).

I find that the dual criminality requirement is satisfied.  First, Aguasvivas is charged with murder.  Article 295 of the Dominican Criminal Code provides: "Whoever voluntarily kills another, is guilty of murder."  <u>See</u> dkt. no. 23-1, at p. 59 (Dec. 12, 2016 Sanchez Aff.).  Under Article 304, "[m]urder is punish[able] with thirty years of imprisonment, when its commission

precedes, accompanies or follows another crime." Id. at 60. The law further states that the same penalty shall be imposed when "the murder was intended to prepare, facilitate, or execute a crime." Id. Under Massachusetts law, Aguasvivas could be charged with either first or second-degree murder in connection with the alleged shooting and killing of Agent Ubri, crimes with maximum penalties well over one year's imprisonment. MASS. GEN. LAWS ch. 265, §§ 1,2; see also 18 U.S.C. §§ 1111, 1114 (noting murder of a federal official is punishable with death or life imprisonment).

Second, Aguasvivas is charged with robbery on a public road. Article 379 of the Dominican Criminal Code defines robbery: "[w]ho by fraud subtracts a thing that does not belong to him, is guilty of robbery." Dkt. no. 23-1, at p. 59 (Dec. 12, 2016 Sanchez Aff.). The Court notes Dominican Prosecutor Sanchez's explanation that the term "fraud" as used in the statute means "the illegal appropriation of the property of others perpetrated by the offending agent to the detriment of the owner of the property." Dkt. no. 65-1, at p. 7 (July 17, 2018 Sanchez Aff.). Under Dominican law, robbery on a public road is punishable by imprisonment of not less than three years. Id. (citing Dominican Criminal Code, Article 383 ("Robbery committed on public roads . . . shall be punished with the maximum penalty of imprisonment . . . . In all other cases, guilty parties will be sentenced to three to ten years in prison.")). Under Massachusetts law, Aguasvivas could be charged with multiple crimes for the disarmament and forceful taking of Agent Ubri's firearm. See Commonwealth v. Goldstein, 768 N.E. 2d 595, 598 (Mass. App. Ct. 2002) ("Larceny is the unlawful taking and carrying away of the personal property of another with the specific intent to deprive the person of the property permanently. Robbery includes all of the elements of larceny and in addition requires that force and violence be used against the victim or that the victim be put in fear." (citations omitted)); see also MASS.

GEN. LAWS ch. 265, § 17 ("Whoever, being armed with a dangerous weapon, assaults another and robs, steals or takes from his person money or other property which may be the subject of larceny shall be punished by imprisonment in the state prison for life or for any term of years.")

Third, the Dominican government has charged Aguasvivas with the crime of association of malefactors by collaborating with others to rob the DNCD agents and murder Agent Ubri. See dkt. no. 65-1, at 6. Article 265 of the Dominican Criminal Code states "[a]ny association formed, regardless of its duration and number of members, any agreement established, for the purpose of preparing or committing crimes against persons or properties, constitutes a crime against public peace." The succeeding Article provides "the person who has affiliated to an association or who has participated in an agreement established for the purposes specified [in Article 265]" shall be punished with imprisonment. Dominican Crim. Code Art. 266. Under domestic law, Aguasvivas could be charged with the offense of conspiracy for intending to and knowingly joining in an agreement or plan with one or more other persons for the purpose of carrying out some illegal activity. See Commonwealth v. Nee, 935 N.E.2d 1276, 1282 (Mass. 2010); Mass. Crim. Model Jury Instructions § 4.160 (2018) (setting forth elements of conspiracy); see also MASS. GEN. LAWS ch. 274, § 7 (describing penalties for committing conspiracy and stating "[i]f a person is convicted of a crime of conspiracy for which crime the penalty is expressly set forth in any other section of the General Laws, . . . the penalty therefor[e] shall be imposed pursuant to the provisions of such other section"). Federal law also provides for the alleged criminal conduct which underpins the Dominican charge. See 18 U.S.C. § 372 ("If two or more persons . . . conspire to prevent, by force, intimidation, or threat, any person . . . from discharging any duties . . . where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office .

. . or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties, each of such persons shall be fined . . . or imprisoned not more than six years, or both.").

Fourth, Aguasvivas could also be charged under domestic law for the firearms offense he is charged with under Dominican Law 36 of Trade of Possession of Firearms, Article 39.[9] Under Massachusetts law, "Whoever, except as provided or exempted by statute, knowingly has in his possession; or knowingly has under his control in a vehicle; a firearm, loaded or unloaded . . . shall be punished by imprisonment in the state prison for not less than two and one-half years nor more than five years, or for not less than 18 months nor more than two and one-half years in a jail or house of correction." Mass. Gen. Laws ch. 269, § 10.

Moreover, under Article 2, § 5 of the Treaty, a relator's misdemeanor-level crimes are also extraditable if felony-level crimes are also charged and extraditable. Dkt. no. 23-1, at p. 23 ("If extradition has been granted for an offense specified in paragraphs 1 or 2 of this Article, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by a maximum term of one year's deprivation of liberty or less, provided that all other requirements of extradition are met.").

Lastly, the crimes charged are not "political offenses" for which a person cannot be extradited under Article 4 of the Treaty. See id. at 23–24. Thus, the crimes with which Aguasvivas has been charged in the Dominican Republic comply with the Treaty's terms, satisfy the dual criminality standard, and qualify for extradition.

---

[9] "Any person who manufactures, receives, purchases in any way, has in his possession or custody, sells, uses or carries any firearms or airguns, its parts or spare parts and the ammunitions for them, at violation of the provisions of this Act, he shall be punished in the manner indicated below: Paragraph III. If it comes [sic] to gun or revolver, this is, those firearms for which it is possible to obtain a special license . . . it shall be punished with imprisonment." Dominican Law 39 of Trade and Possession of Firearms. See dkt. no. 23-1 at pp. 58-59 (Dec. 12, 2016 Sanchez Affidavit).

E.     There Is Probable Cause to Believe Aguasvivas Committed Crimes Charged

The Dominican Republic requests Aguasvivas's extradition to face prosecution for the following crimes:  (1) murder; (2) illegal possession of firearms; (3) robbery; and (4) association of malefactors.  See dkt. no. 23-1, at p. 55 (Dec. 12, 2016 Sanchez Aff.).[10]  The Treaty requires the Court to determine whether each of these offenses is supported by "such information as would provide a reasonable basis to believe that the person sought committed . . . the offenses." See id. at 25 (Treaty, Art. 7(3)(c)).  Secretary of State John F. Kerry, in his letter submitting the Treaty to President Obama, explained that "this language mirrors the probable cause standard applied in U.S. criminal law."  See dkt no. 23-1 at p. 15, attachment to letter of submittal, Extradition Treaty, Dom. Rep.-U.S., Jan. 12, 2015, S. Treaty Doc. No. 114-10, at VIII (2016). Secretary Kerry's interpretation is entitled to deference.  See, e.g., El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168 (1999) (citation omitted) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."); United States v. Li, 206 F.3d 56, 63 (1st Cir. 2000) (en banc) (according "substantial deference" to the United States Department of State's interpretation of treaties).

The First Circuit has offered the following guidance on the meaning of probable cause:

Probable cause determinations are, virtually by definition, preliminary and tentative.  The exact degree of certainty required to establish probable cause is

---

[10] In one respect, the offenses identified in the request for extradition vary from those in the warrant for Aguasvivas's arrest that Acting Judge Garcia issued on December 6, 2013.  The arrest warrant refers to Article 309 of the Dominican Code, while the extradition request refers to Article 379 of the Dominican Code, which defines robbery.  I am satisfied that the warrant contains a typographical error, and that the warrant erroneously cites "309" and not "379."  Unlike the extradition request, the arrest warrant also excludes a citation to Article 383, which prescribes punishment for robbery.  In any case, because the treaty Articles refer throughout to the "request for extradition" as the controlling document, I analyze each offense listed in the extradition request.

> difficult to quantify; it falls somewhere between bare suspicion and what would
> be needed to justify conviction.  As always, the touchstone of the Fourth
> Amendment is reasonableness.  Probable cause thus exists if the facts and
> circumstances within the relevant actors' knowledge and of which they had
> reasonably reliable information would suffice to warrant a prudent person in
> believing that a person has committed or is about to commit a crime.

Burke v. Town of Walpole, 405 F.3d 66, 80 (1st Cir. 2005) (quotations, citations, alterations, and

internal quotation marks omitted).

In support of probable cause, the Government, on behalf of the Dominican Republic,

offers the following:  (1) the December 12, 2016 affidavit of Dominican prosecutor Sanchez,

which attaches the arrest warrant; the autopsy report for Agent Ubri; medical certificates for the

two other drug agents who were shot and wounded; and two photographs of the person sought;

(2) the March 29, 2017 supplemental affidavit of prosecutor Sanchez; (3) the declaration of State

Department legal counsel Tom Heinemann, which attaches the Treaty, the Secretary of State's

Letter of Submittal, and the President's request to the Senate requesting ratification; (4) a

supplemental declaration from Attorney Heinemann; (5) the May 25, 2018 supplemental

affidavit of prosecutor Sanchez; and (6) the July 17, 2018 second additional affidavit of

prosecutor Sanchez.  Contesting probable cause, Aguasvivas has submitted the following

information:  (1) a Youtube video, with audio, of the shooting; (2) his concession that he is the

person seen on the video wearing a blue shirt; (3) a Spanish transcription and English translation

of statements heard on the video; (3) the affidavit of prosecutor Sanchez in support of extraditing

Aguasvivas's uncle, Ramon Emilio Aguasvivas; (4) transcriptions and translations of the

following articles of the Dominican Criminal Procedure Code:  Article 161 on "Active

Extradition," Article 294, regarding criminal procedure when an investigation provides a basis to

prosecute a defendant, and Articles 328 and 329 regarding the effect of a finding of justification

of self-defense; (5) an October 2018 affidavit of attorney Ambar M. Maceo, regarding the

elements necessary to charge the crime of conspiracy under Articles 265 and 266 of the Dominican Criminal Code; and (6) a decision from the Supreme Court of Justice of the Dominican Republic regarding the elements of conspiracy.

I now review the information submitted by the parties as to each of the offenses for which the Government seeks Aguasvivas' extradition.

1.   <u>Murder</u>

Article 295 of the Dominican Code provides, "Whoever voluntarily kills another, is guilty of murder." <u>See</u> dkt. no. 23-1, at p. 59 (Dec. 12, 2016 Sanchez Aff.). The penalty for murder is imprisonment for thirty years. <u>Id.</u> at 60.

The information from the Government concerning the murder charge is succinct, but compelling. The Sanchez affidavit recounts that just after noon on December 6, 2013, law enforcement agents were conducting an anti-drug operation in Bani. <u>Id.</u> at 57. Agents arrested and handcuffed Aguasvivas during the operation. <u>Id.</u> As they did so, Aguasvivas's brother Frank protested, distracting some agents from Aguasvivas's arrest. <u>Id.</u> Aguasvivas capitalized on the distraction to disarm Agent Ubri and then shoot and kill him, before shooting and injuring Captain Jimenez and Agent Hernandez. <u>Id.</u> at 57-58. Carrying the gun, Aguasvivas then escaped with his brother. <u>Id.</u> at 58.

An autopsy report, <u>id.</u> at 68-72, documents that Agent Ubri suffered three gunshot wounds. One bullet entered his chest from front to back and top to bottom, lacerating his pericardium, left lung, and left pulmonary veins and arteries before exiting his back—this one killed him. <u>Id.</u> at 70. A second bullet entered his chest below the above-described shot. <u>Id.</u> at 71. A third bullet entered and exited the anterior region of Agent Ubri's upper left arm. <u>Id.</u> The two agents who were shot by Aguasvivas and survived later identified a photograph of

Aguasvivas as the shooter.  Id. at 83 (March 29, 2017 Sanchez Aff.).  It is uncontested that the person produced in this Court is the person whom agents identified in the photograph.  Nor could it be: the photographs are plainly of Aguasvivas.

I find that this information supports probable cause.  In a nutshell, the prosecutor assigned to investigate this matter has sworn in an affidavit that two police officers who were present—and who were themselves wounded during the crime—saw Aguasvivas shoot Agent Ubri, and that Agent Ubri died of the gunshot wounds Aguasvivas inflicted.  While a more detailed affidavit certainly could have been presented, more is not necessary to establish probable cause.

Aguasvivas has argued that probable cause is absent as to the murder charge because there is no evidence that he acted with an intent to kill.  This argument ignores the autopsy report.  That report documents that Agent Ubri suffered three gunshot wounds: two to the chest near the heart, and one to the upper left arm.  Id. at 70–71.  Three bullets fired at short range to the area of the heart are sufficient to establish probable cause that Aguasvivas shot Agent Ubri with an intent to kill him.

Aguasvivas offered into evidence a video recording events immediately before and during the shooting.  Cognizant that contradictory evidence offered by the relator should not be admitted at an extradition hearing, see, e.g., Koskotas, 931 F.2d at 175 (citations omitted), I admitted the video because the Government did not object to its authenticity; because the video is narrow in scope, did not require cross-examination of a witness, and did not involve issues of credibility; and because the recording does not contradict the government's evidence.  Aguasvivas suggests that the video undermines probable cause because it establishes both the chaos surrounding the shooting and Aguasvivas's location when the shots were fired.

I find that the video certainly does establish both matters, but it does not undermine probable cause. If anything, the video supports a probable cause finding. The scene depicted in the video is clearly chaotic. But what the video also shows is that the arrest occurred at midday, in good light, with the agents within feet of Aguasvivas when the shots were fired. The agents thus were well positioned to see the shooting and identify the shooter. The video also shows Aguasvivas struggling with officers to resist being placed in the car, and therefore situated to disarm Agent Ubri. If, as the Government states, Aguasvivas was handcuffed, the video indicates that Aguasvivas's hands were cuffed in front of him, rather than behind his back.

More importantly, the video shows Aguasvivas's location when the shots were fired. It shows at least two agents struggling to put Aguasvivas into the front passenger seat of a parked car. The struggle implies that Aguasvivas resisted their efforts. At the same time, a male, presumably Frank, stood near the open passenger door screaming and protesting. At least one officer tried to move Frank away from the car. Aguasvivas was pushed into the car, principally by Agent Ubri. The video shows that once Aguasvivas was inside the car, his back faced the front windshield, with Aguasvivas apparently kneeling on the car's front seat. Agent Ubri's torso faced the open car door through which he pushed Aguasvivas. Agent Ubri's hands were on Aguasvivas when the first shot rang out, at approximately seventeen seconds into the video. Two more shots followed in quick succession.

Bearing in mind the location and trajectory of Agent Ubri's mortal wounds—from front to back and top to bottom—it is here that video serves a purpose Aguasvivas does not anticipate: it corroborates the prosecutor's sworn statement that the eyewitness law enforcement officers saw Aguasvivas shoot Agent Ubri. At the time of the shooting, Agent Ubri's torso was below the roof of the car and only inches outside the open passenger-side door. That means the shots

that struck Agent Ubri were not fired across the top of the car, from anywhere behind Agent Ubri, or from Agent Ubri's left or right. Rather, the shooter was either inside the car, or outside the car on the driver's side, with the bullet passing through the inside of the car. Aguasvivas was inside the car; of course, that corroborates the Government's allegation that Aguasvivas was the shooter. But more importantly, Aguasvivas's body was between Agent Ubri and the driver's side of the car. A still from the video at eighteen seconds shows Aguasvivas kneeling on the front seat with his head above the seat and near the car's roof, and with his back facing the front windshield. Thus, Aguasvivas occupied the space through which, if someone other than Aguasvivas shot Agent Ubri, the bullets would have had to travel before hitting Agent Ubri in the left side of his chest and his left upper arm. Hence, the video establishes that it is implausible that someone fired through the car from the driver's side, and into Agent Ubri. That, too, corroborates the Government's allegation that Aguasvivas is the killer.

Aguasvivas dissects the autopsy report to attack the Government's assertion of probable cause. First, he notes that the autopsy report contains a narrative that significantly varies from the account in the Sanchez affidavit. In relevant part, the autopsy report states, "the deceased with other three agents [sic] tried to arrest and introduced into a vehicle to [sic] a presumed drug dealer, but they were injured by someone else who tried to stop the arrest." Dkt. no. 23-1, at p. 70. Second, Aguasvivas attacks the pathologist's use of the word "distant" to describe Agent Ubri's wounds, arguing that this term does not describe the short distance between Aguasvivas and Agent Ubri when the shots were fired.

These matters are not unimportant, but they are not sufficient to negate probable cause. The tension between the investigating prosecutor's affidavit and the autopsy report must be kept in context. The autopsy report was prepared less than six hours after the shooting. See id. at 69

(listing the time of the examination as 6:00 p.m. on the day of the shooting). At that time, the eyewitnesses were hospitalized with guarded prognoses. See id. at 73–74 (medical certificates documenting the eyewitnesses' prognoses). Moreover, the shooting of three law enforcement agents, and the killing of one of them, likely engendered confusion, especially given that Aguasvivas fled, was armed, and had not been apprehended. See id. at 58 ("[Aguasvivas] escaped from the place along with his brother helped by [an]other and carrying [illegible] gun.").

Similarly, the pathologist's description of Agent Ubri's gunshot wounds as "distant" is also a concern. The Concise Oxford Dictionary, a descriptive dictionary, defines distant as "far" and "remote." Distant, Concise Oxford Dictionary (6th ed. 1976). Nevertheless, the Court is left with a prosecutor's affidavit compellingly recounting two eyewitnesses' statements, which are corroborated by the video that Aguasvivas has offered into evidence. Considering all the evidence before me, I find that the autopsy report's discrepant narrative and its use of the word "distant," while certainly fodder for cross-examination of witnesses at trial, do not negate the Government's showing of probable cause that Aguasvivas committed murder.[11]

Finally, Aguasvivas suggests that if he did shoot Agent Ubri, he was acting in self-defense. It is with this suggestion in mind that Aguasvivas has offered Articles 328 and 329 of the Dominican Criminal Code. Article 328 provides that "[t]here is no crime . . . when [a] homicide . . . [is] caused by the actual necessity for legitimate self-defense or defense of another." Dkt. no. 56-1, at p. 2. Article 329 lists two circumstances "considered to be an actual necessity for legitimate defense": first, "fending off the scaling or breaking into of homes, walls

---

[11] Aguasvivas also suggests that another affidavit, prepared by the same prosecutor in support of the extradition of Aguasvivas's uncle, Ramon Emilio Aguasvivas, militates against finding probable cause. I disagree. That affidavit avers that Ramon was in a passenger vehicle at the scene of the shooting, exited the car, collected the agents' guns after Aguasvivas shot the agents, fired several shots himself, and then drove his nephews, Aguasvivas and Frank, away from the scene. See dkt. no. 48-1, at p. 5. These allegations do not negate the Government's probable cause showing in the instant case.

or fences, or breaking of doors or entrances to inhabited areas, or their dwellings or dependencies, during the night"; and second, an act "performed in defense against assault by persons committing [a] robbery or theft with violence."[12] Id.

Neither Article applies here. But Aguasvivas claims that an expert on Dominican law, if the Court had allowed one, would have opined that the circumstances listed in Article 329 are meant to be illustrative and not exclusive. Setting aside Aguasvivas's preserved objections to my rulings to exclude his proffered expert and not to afford him more time to find an expert satisfactory to the Court, this argument is a non-starter.

First, it is well-established that, given the circumscribed nature of extradition proceedings, affirmative defenses like self-defense are irrelevant and should not be considered. See Collins v. Loisel, 259 U.S at 316-317 (finding that the relator's proposed testimony establishing a defense was properly excluded); Charlton v. Kelly, 229 U.S. 447, 458 (1913) (holding that evidence of insanity, though clearly relevant at trial or a competency hearing, was properly excluded at an extradition proceeding); In re Harusha, No. 07-x-51072, 2008 WL 1701428, at *5 (E.D. Mich. Apr. 9, 2008) (citing Charlton, 229 U.S. at 462; Collins, 259 U.S. at 316–17) ("Given that a respondent may only introduce explanatory evidence, it follows that affirmative defenses, including self-defense, are not relevant in an extradition hearing and should not be considered."). Relatedly, because the premise of Articles 328 and 329 is that a homicide has been committed, neither Article would undermine probable cause. Article 328 says, "There is no crime . . . when [a] homicide . . . [is] caused by the actual [need for self-defense]." Dkt. no.

---

[12] In full, Article 329 provides: "The following cases are considered to be an actual necessity for legitimate defense: 1. When homicide is committed or injuries are inflicted, or force is used in fending off the scaling or breaking into of homes, walls, or fences, or breaking of doors or entrances to inhabited areas, or their dwellings or dependencies, during the night. 2. When the act is performed in defense against assault by persons committing the robbery or theft with violence." Id.

56-1, at p. 2 (emphasis added). Article 329 describes circumstances in which a "homicide is committed." Id. Contrary to Aguasvivas's contention, his theoretical assertion of self-defense, if successful, would not mean that a homicide did not occur; rather, the homicide would be deemed justified, negating Aguasvivas's guilt at trial.

Second, even if self-defense were considered in the instant extradition proceeding, there is no evidence to support it. Rather, self-defense is based on a representation by Aguasvivas's counsel that because the officers were in plainclothes, Aguasvivas could have believed he was being kidnapped, and thus lawfully resisted his apparent kidnappers with deadly force. Aguasvivas himself has not testified or proffered evidence of his state of mind at the time of the shooting. Moreover, the available information suggests that persons present at the shooting were, in fact, aware that the agents were law enforcement officers. For instance, the transcript of the audio component of the video includes the following attribution to an unidentified female: "Look what the Police does—Oh!" Dkt. no. 39-1, at 2.

Lastly, Aguasvivas testified at his asylum hearing in Immigration Court that he did not shoot anyone and has never fired a gun in his life. See dkt. no. 39-2, at p. 28 (Q: Okay. And do you know who fired those shots— . . . just to be very careful, not from what you've been told, but from what you saw, did you see who fired the shots? A: No, I didn't see. I didn't see. I can't say. I didn't see."); id. at 136 ("Q: Have you ever fired a gun before? A: No, sir. Q: Never in your life? A: Never, sir."). Putting aside this tension between the argument of Aguasvivas's counsel and Aguasvivas's testimony under oath, a self-defense claim in this case, even when raised in the proper forum, would be problematic.

For all these reasons, I find that there is probable cause to believe that Aguasvivas committed the murder with which he has been charged in the Dominican Republic. I will

therefore certify to the Secretary of State that Aguasvivas is extraditable to be tried on the murder charge.

2.    Illegal Firearm Possession

Article 39 of Dominican Republic Law 36 on Trade and Possession of Firearms prohibits the possession, custody or use of a firearm in the commission of a crime or in violation of law. See dkt. no. 23-1, at pp. 58–59 (Dec. 12, 2016 Sanchez Aff.).  Specifically, the law states:  "Any person who . . . has in his possession or custody, . . . uses or carries any firearms . . . and ammunition for them, at violation of the provisions of this Act, he shall be punished [as indicated]."  The law further states that possession of a "gun or revolver, this is, those firearms for which it is possible to obtain a special license . . . shall be punished with imprisonment." Dkt. no. 28, at p. 13 n.8.

It is alleged that Aguasvivas violated this prohibition and faces imprisonment and a fine. Dkt. no. 23-1, at pp. 63–67.  I find sufficient evidence to support probable cause to believe Aguasvivas committed this offense.  As the discussion of probable cause for murder shows, Aguasvivas necessarily possessed a firearm and ammunition for it, given the compelling evidence that he murdered Agent Ubri by means of firing three shots from a gun.  I will therefore certify to the Secretary of State that Aguasvivas is extraditable to be tried on the Firearm Possession charge.

3.    Robbery

Article 379 of the Dominican Criminal Code defines robbery as "who, by fraud subtracts a thing that does not belong to him, is guilty of robbery." See id. at 59.  Robbery is punishable by imprisonment of not less than three years.  Id. (citing Dominican Criminal Code, Article 383 ("Robbery committed on public roads . . . shall be punished with the maximum penalty of imprisonment . . . .  In all other cases, guilty parties will be sentenced to three to ten years in prison.")).

I find that the information submitted supports this offense.  According to prosecutor Sanchez's affidavit, Aguasvivas was arrested and handcuffed during an anti-drug operation on a public road in the city of Bani.  See id. at 57.  Aguasvivas' brother, Frank, protested and distracted the arresting agents.  Id.  Aguasvivas took advantage of his brother's distraction, disarmed Agent Ubri, and used the agent's firearm to shoot Agent Ubri, Captain Jimenez, and Agent Hernandez.  Id.  The video also shows that a struggle involving Agent Ubri, other law enforcement officers, and Aguasvivas preceded the fatal shooting of Agent Ubri by Aguasvivas. Since Aguasvivas shot Agent Ubri, a fair inference from this evidence is that during the struggle Aguasvivas forcibly took Agent Ubri's gun from him.  Thus, probable cause exists to believe that Aguasvivas subtracted "a thing that [did] not belong to him" and therefore committed a robbery.

In addition, Aguasvivas participated with his uncle Ramon and brother Frank in taking by force firearms that belonged to Captain Jimenez and Agent Hernandez.  In this regard, Aguasvivas was the "force" component of the robbery: he shot Captain Jimenez and Agent Hernandez causing them to drop their guns or neutralizing their ability to oppose Frank and Ramon's removal of the guns from their persons.  Accordingly, the evidence supports a probable

cause finding of robbery on this separate theory.  Aguasvivas is extraditable on this charge, and I will certify the same to the Secretary of State.

> 4. <u>Association of Malefactors</u>

The Dominican Republic alleges two conspiracy-based crimes pursuant to Articles 265 and 266.  Article 265 of the Dominican Criminal Code defines the crime of association of malefactors:  "Any association formed, regardless of its duration or number of members, any agreement established, for the purpose of preparing or committing crimes against persons or properties, constitutes a crime against public peace."  Dkt. no. 65-1, p. 59.  Pursuant to Article 266, the penalty imposed upon those found guilty of this crime is imprisonment.  <u>See</u> <u>id.</u>  In this case, the Government argues that because Aguasvivas acted in concert with his brother Frank and his uncle Ramon in committing the crimes of murder, illegal firearm possession, and robbery, Aguasvivas committed the crime of association of malefactors.  Prosecutor Sanchez's affidavit lays out the facts relevant to the charge, pointing to Frank's distraction that allowed Aguasvivas to "snatch" Agent Ubri's firearm and use it against him, Captain Jimenez, and Agent Hernandez.  Dkt. no. 65-1, at pp. 6–7 (July 17, 2018 Sanchez Aff.).  Additionally, the affidavit notes that Ramon Aguasvivas helped collect the remaining firearms and helped Aguasvivas and Frank into Ramon Aguasvivas' vehicle to escape.  <u>Id.</u>  In the affidavit, Prosecutor Sanchez explains that given the sequence of events, "it has been determined that the behavior assumed by Cristian Starling Aguasvivas a/k/a Momon . . . has the characteristics of the criminal profile typified and sanctioned respectively by articles 265 and 266."  <u>Id.</u>  The Government essentially argues that because Aguasvivas, his brother, and his uncle acted together, they must have had an agreement or plan to do the same.

28

The crime of association of malefactors can be likened to the domestic crime of conspiracy. As prosecutor Sanchez notes, in the Dominican Republic it includes as an element an "association formed or agreement established" to do something the law prohibits. See dkt. no. 23-1 at p. 59 (Dec. 12, 2016 Sanchez Aff.). In this case, there is evidence of joint action, and such joint action can sometimes serve as proof of an agreement or conspiracy. See United States v. Glover, 814 F.2d 15, 16 (1st Cir. 1987) ("a conspiratorial agreement need not be express, but may consist of no more than a tacit understanding"). Prosecutor Sanchez suggests that there are two objects of this conspiracy or association of malefactors: one to commit murder and one to carry off the weapons of the murdered and wounded drug agents. See dkt. no. 65-1 at pp. 6-7 (July 17, 2018 Sanchez Aff.). While the evidence could perhaps be cabined into such theories, I disagree with this analysis and find insufficient evidence of an "association formed" or "agreement established."

Probable cause is not a stringent standard, yet there must be "reasonably reliable information . . . adequate to warrant a prudent person in believing that the object of his suspicions had perpetrated or was poised to perpetrate an offense." Fernandez-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 324, (1st Cir. 2015) (quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 254 (1st Cir. 1996)) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004)). Aguasvivas argues that there is insufficient evidence of a prior agreement to commit criminal acts in order to establish probable cause for the crime of association of malefactors. In Aguasvivas's reply to the Government's supplementary memorandum, he cites to "Sentencia NO. 25 de fecha 21 de Marzo del 2012, B.J. No. 1216," a decision by the Dominican Supreme Court of Justice interpreting articles 265 and 266. Dkt. no. 73, at p. 2. According to Attorney Maceo's affidavit, the referenced decision supports the proposition that an agreement, for

29

purposes of Article 265, "requires the following elements: (i) a meeting between co-conspirators; (ii) an agreement to commit two or more crimes, and (iii) an overt act." Id. at 2–3.

Here, the chaos and reactive nature of the circumstances prove only crimes of opportunity and not an agreement or association. With respect to a conspiracy with murder as its object, Prosecutor Sanchez's affidavit recites that Frank distracted agents who arrested Aguasvivas and that Aguasvivas "unexpectedly took advantage of this moment of distraction and snatched [Agent Ubri's] firearm" which he used to shoot and kill Agent Ubri. See dkt. no. 65-1 at pp. 6-7 (July 17, 2018 Sanchez Aff.). Far from showing some tacit agreement or formed association, the recitation of facts shows that Aguasvivas seized an unanticipated advantage – "unexpectedly" – and committed a crime that circumstances positioned him to commit: to disarm Agent Ubri and shoot him to death. There is little room in these facts for the notion that there was a conspiracy, that Aguasvivas or anyone else even knew agents would arrest Aguasvivas and that Frank's protestations would sufficiently distract agents from effecting Aguasvivas's arrest.

Similarly, the evidence undermines the notion of a conspiracy with robbery as its object. No one could have anticipated that Aguasvivas, who was handcuffed, might be able to not only disarm Agent Ubri, but with that gun successfully fire it and kill Agent Ubri. Further, no one could anticipate that the remaining shots would hit and disable Captain Jimenez and Agent Hernandez, and that such a shooting would present Ramon and Frank with the opportunity to take Captain Jimenez and Agent Hernandez's firearms (whether from their persons or from the ground where they might have been dropped). Indeed, the evidence shows it was precisely that: a crime of opportunity, not the product of an agreement, tacit or otherwise.

The United States is quite right that the courts owe deference to a foreign sovereign's interpretation of its own laws. But here, it is not the law with which the Court has a quarrel, but

the evidence. It is insufficient to support a probable cause finding of an association of malefactors. I therefore deny the request to certify these offenses to Secretary of State Pompeo.[13]

F.     Aguasvivas's Arguments for Dismissal

Aguasvivas presented in his motion to dismiss and supplemental motion to dismiss multiple arguments attacking the Government's request for extradition. See dkt. nos. 23, 24, 73. I address these arguments in turn.

1.     Validity of the Arrest Warrant Pursuant to Article 7, § 3(a) of the Treaty

Aguasvivas argues that the arrest warrant is invalid because it fails to properly name Aguasvivas, because it lists only five of the seven charges on which the Dominican Republic seeks his extradition, and because the language of the arrest warrant is overbroad. The Court rejects Aguasvivas's arguments and finds that the arrest warrant is valid.

Aguasvivas first argues the arrest warrant is invalid because it lists his name as "Estarling Aguasvivas, AKA Mamon," whereas his actual name is Cristian Starling Aguasvivas, a/k/a Momón. Dkt. no. 23, at p. 9. The purposes for stating a name on an arrest warrant is to ensure that the person before the court is the person accused in the extradition request and that there exists evidence that the same person committed the offenses for which extradition is sought. Manta v. Chertoff, 518 F.3d 1134, 1143 (9th Cir. 2008). In the instant matter, there is no substantive dispute that the person described in the arrest warrant is Aguasvivas. Indeed, Aguasvivas concedes that he is the person depicted in the video recording of the shooting. Furthermore, as noted, the photographs of the person for which extradition is requested are

_____

[13] The Court's determination not to certify the charge of association of malefactors to the Secretary of State does not affect the Court's certification of extraditability for the charges of murder, illegal firearm possession, or robbery. See Kin-Hong, 939 F. Supp. at 947 n.12.

plainly the relator before the Court.  See dkt. no. 23-1 at pp. 77, 78 (Dec. 12, 2016 Sanchez Aff. appending two photographs).  Generally, "arguments that 'savor of technicality' are 'peculiarly inappropriate in dealings with a foreign nation.'"  Skaftouros v. United States, 667 F.3d 144, 160 (2d Cir. 2011) (citing Shapiro v. Ferrandina, 478 F.2d 894, 904 (2d Cir. 1973) (quoting Bingham v. Bradley, 241 U.S. 511, 517 (1916)).  Therefore, the Court finds that any inaccuracies in Aguasvivas's name on the arrest warrant are inconsequential.[14]

Aguasvivas also notes that the Government's extradition request lists seven charges, but the Dominican arrest warrant lists only five.  Dkt. no. 23, at p. 9.  The Government argues this is accepted practice.  Dkt. no. 28, at pp. 21–22.  While Aguasvivas is correct that the Government must prove each individual charge is extraditable, the Treaty does not specifically require that all charges be listed on the arrest warrant.  See Hill v. United States, 737 F.2d 950, 950 (11th Cir. 1984) (noting that "[t]he warrant may specify all the charges if the requesting country so chooses, but it need refer to only one").  The Court thus concludes that the Government has met its burden and that the absence, or error, in listing certain charges on the arrest warrant is unavailing.[15]

Furthermore, Aguasvivas claims that the arrest warrant is overbroad because it permits provisional arrest for investigative purposes.  See dkt. no. 23 at 10-11.  Aguasvivas claims that accepting a provisional arrest warrant as a warrant for purposes of extradition expands the

---

[14] Aguasvivas also notes that the official English "translation" provided by the Dominican Government actually corrects this fundamental defect in the warrant:  while the original warrant requests "Estarling Aguasvivas, AKA 'Mamon,'" the English translation of the warrant calls for the arrest of "Cristian Starling Aguasvivas, aka Momón.'" Dkt. no. 23, at p. 9.  He further notes that "an interpreter cannot properly attempt to cure a defective warrant in this way" and as such "[t]he translation is incompetent."  See id. (stating that requesting government must provide translation pursuant to Article 9 of the Treaty).  Nevertheless, identification of the accused by a different name does not bar extradition where the identity of the relator is unchallenged.  Fernandez v. Phillips, 268 U.S. 311, 312–13 (1925).

[15] In addition, and as previously discussed, the Court also finds that the warrant incorrectly cites Article 309 of the Dominican Criminal Code, rather than Article 379, a mistake which also does not alter the Court's findings.

warrant requirement, intended to ensure some measure of judicial oversight in the requesting country, to the point of irrelevance. In this case, the facts of the incident were presented to Acting Judge Garcia for issuance of a warrant. See dkt. no. 23-1, at pp. 63-67. Judge Garcia lists the evidence upon which the issuance of the warrant is based as: the prosecutorial note dated December 6, 2013, Agent Ubri's death certificate, and the medical certifications for Captain Garcia and Agent Rodriguez. Id. Judge Garcia also recites the factual predicate for the warrant's issuance. Id. Based upon these submitted matters, Judge Garcia issued the warrant for Aguasvivas's arrest. Id. The Court finds the warrant was the product of sufficient and careful judicial oversight, and concludes that the warrant was sufficient to support criminal process against Aguasvivas pursuant to law of the Dominican Republic.

  2.  <u>Pending Charges Pursuant to Article 7, § 3(b) of the Treaty</u>

  Aguasvivas argues that the warrant is insufficient to show that he has been formally charged with the crimes for which his extradition is sought. Dkt. no. 23, at p. 11–14. He argues that an acusación, or a similar formal initiation of criminal charges, is required, and cites to <u>In re Extradition of Chapman</u> in support of this contention. No. CIV07-00365SOM/BMK, 2007 WL 3254880, at *1 (D. Haw. Nov. 5, 2007). In <u>Chapman</u>, the District Court's decision to dismiss the request for extradition is based upon language in the extradition treaty between Mexico and the United States, which states that the countries agree to extradite: "persons who the competent authorities of the requesting Party have charged with an offense," and that the request be supported by "[a] certified copy of the warrant of arrest issued by a judge or other judicial officer of the requesting party." <u>Id.</u> at *1. The Court found, pursuant to the relevant treaty, that "[a] person may not be extradited where there are no pending criminal charges against that person, or where there is no valid arrest warrant as required by the treaty." <u>Id.</u> (citations omitted).

Aguasvivas asks the Court to interpret the word "charges" in the Treaty at issue here to mean "formal criminal charges," or rather a charging document that conforms to the requirements for commencement of a criminal action under United States law.

The Government does not dispute Aguasvivas's statement of the law as requiring pending charges against a fugitive in order for extradition to issue, but instead refutes Aguasvivas's argument that the official documentation provided does not show that Aguasvivas has been charged. See dkt. no. 28, at p. 23.

While it appears that an acusación is one way to initiate a Dominican prosecution, the record does not establish that it is the only way. The Court finds that Judge Garcia's arrest warrant demonstrates that Aguasvivas is currently charged with extraditable offenses. See dkt. no. 23-1 at pp. 62–66. Indeed, Prosecutor Sanchez's affidavit avers that the procedures followed in this case are a proper way to initiate criminal proceedings in the Dominican Republic against a defendant who has fled the country.[16] Dkt. no. 23-1, at pp. 54–55 (Dec. 12, 2016 Sanchez Aff.). Moreover, the Government cites to several cases that reject the argument that extradition based upon a warrant for investigation is improper. See, e.g., Emami v. U.S. Dist. Court for N. Dist. of Cal., 834 F.2d 1444, 1451 (9th Cir. 1987); In re Extradition of Handanovic, 829 F. Supp. 2d 979, 986 (D. Or. 2011); In re Lam, No. 1:08-MJ-247 GSA, 2009 WL 1313242, at *3 (E.D. Cal. May 12, 2009); In re Extradition of Sacirbegovic, 280 F. Supp. 2d 81, 83-84 (S.D.N.Y. 2003); Borodin v. Ashcroft, 136 F. Supp. 2d 125, 129–30 (E.D.N.Y. 2001). The nuances of the law of the Dominican Republic respecting the commencement of criminal process are not appropriately

---

[16] Under the rule of non-inquiry, discussed herein, the Court should not attempt to discern the particularities of Dominican law; rather, the Dominican government's representations about its domestic practices are entitled to deference. See Kin-Hong, 110 F.3d at 110.

before the Court. The Court finds that the warrant at issue shows, for purposes of the Treaty and extradition pursuant to it, that Aguasvivas has been charged with extraditable crimes.

      3.    <u>Inconsistencies within Documentation</u>

Aguasvivas contends that the information provided by the Government cannot support a finding of probable cause because there are numerous factual inconsistencies in the two Diplomatic Notes submitted by the State Department and four supporting documents submitted by the Dominican authorities in support of the extradition request. Dkt. no. 23, at pp. 14–17. Therefore, Aguasvivas argues, the Court should dismiss the request. <u>Id.</u> Aguasvivas directs the Court's attention to inconsistencies involving the date of the incident, the place where the incident occurred, and Aguasvivas's name, in addition to other inconsistencies as to which Treaty applies, as to the Articles intended to be charged, and as to whether anyone else was also responsible for the shooting. <u>Id.</u> at 1–4, 14–16.

The inconsistencies do exist—but even together, they do not undermine the Government's probable cause showing. The photos submitted by the Government clearly depict Aguasvivas, and Aguasvivas concedes that the video of the shooting depicts him as present at the time and place of the crimes alleged. There is simply no question that Aguasvivas was present during the incident and centrally involved in it. Aguasvivas also relies on inconsistencies in the date of the shooting, noting that the arrest warrant list December 5, 2013, Prosecutor Sanchez's affidavit lists December 6, 2013, and a prosecutor's affidavit in support of extradition of Ramon Aguasvivas lists December 9, 2013. <u>See</u> dkt. no. 23-1, at pp. 57, 63; <u>see also</u> dkt. no 48. These inconsistencies are of no consequence. Charging documents in the U.S. typically allege commission of an offense "on or about" a particular date, and the modest discrepancies here are analogous to that pleading convention. More importantly, the inconsistencies create no doubt

about what incident is the subject of the crimes. Indeed, Aguasvivas himself has offered a video recording of the incident.

Inconsistencies concerning the location of the incident which Aguasvivas uses to attack the extradition request are similarly inconsequential, to the extent that an inconsistency exists at all. Aguasvivas notes that Prosecutor Sanchez's affidavit puts the shooting at Francisca la Francisquera Street in the Pueblo Nuevo sector of Bani, whereas Acting Judge Garcia puts it at 5th Street in the Pueblo Nuevo sector of Bani. See dkt. no. 23, at pp. 2-3. In fact, Prosecutor Sanchez puts the anti-drug operation on Francisca la Francisquera, while Acting Judge Garcia puts the shooting at 5th Street. See dkt. no. 23-1, at pp. 57, 63. Because Prosecutor Sanchez and Acting Judge Garcia are describing two different events, it is not clear that any discrepancy exists. However, if one does, Aguasvivas's offer of the video recording settles any meaningful concern about what incident is the subject of the charges. This proffer of the recording renders trivial any inconsistencies in the papers as to the shooting's precise location and timing, and as to the perpetrator's name.

        4.    Evidence of Torture

Aguasvivas argues the DNCD's alleged use of torture should undermine the Court's confidence in the Government's evidence. Dkt. no. 23, at p. 23 (citing Santos v. Thomas, 830 F.3d 987, 1006 (9th Cir. 2016) (stating "evidence that inculpatory statements were obtained through torture was admissible in extradition proceeding because 'the manner in which evidence used to support probable cause was obtained is relevant in determining whether the probable cause standard has indeed been satisfied'")).

It is true that the BIA found torture a likely proposition. But here, even accepting as true allegations in the record that the DNCD tortured civilians in search of Aguasvivas, none of the

evidence on which the extradition request relies was derived through torture. Rather, probable cause principally derives from the identifications of Aguasvivas by Captain Jimenez and Agent Hernandez, who were themselves shot and witnessed the shooting of Agent Ubri. Torture is not alleged to have played any role in the officers' photo identifications of Aguasvivas. The Ninth Circuit Court of Appeals rejected a similar argument in <u>Barapind v. Enomoto</u>, 360 F.3d 1061, 1073 (9th Cir. 2004). In that case, the relator argued that acknowledgment of torture, and therefore the unreliability of some evidence, negated probable cause for all evidence presented. The Ninth Circuit considered and rejected the argument:

> We faced similar situations in <u>Mainero v. Gregg</u>, 164 F.3d 1199 (9th Cir.1999) and <u>Cornejo-Barreto v. Seifert</u>, 218 F.3d 1004 (9th Cir.2000). In <u>Mainero,</u> both the magistrate judge and the district court acknowledged that evidence of torture was present in the record. <u>Mainero</u>, 164 F.3d at 1206. However, both judges reviewed all of the statements and determined, as found by the magistrate judge, that "none of the evidence on which it is necessary to rely was obtained by torture." <u>Id</u>.

<u>Barapind</u>, 360 F.3d at 1073. The Ninth Circuit found that evidence presented and obtained by reliable methods could be considered to support a determination of probable cause even in the wake of evidence of torture in the record. <u>Id.</u> Likewise, it is this Court's view that the evidence supporting the request for extradition was not obtained by torture and that reliable evidence supports the Court's probable cause determinations.

   5.   <u>Insufficient Evidence of Charges for which Extradition Is Sought</u>

Finally, Aguasvivas argues that the Government cannot demonstrate probable cause as to each offense for which extradition is sought, and that therefore extradition is inappropriate under Treaty Article 7, § 3(c). Dkt. no. 24, at p. 3. Except as noted in the Court's analysis above, this argument is unavailing. As mentioned above, the Court's determination not to certify the charge of association of malefactors to the Secretary of State does not affect the Court's certification of extraditability for the charges of murder, illegal firearm possession, or robbery. See <u>Kin-Hong</u>,

939 F. Supp. at 947 n.12.  In addition, Article 15 of the Treaty provides in relevant part that any "person extradited under this Treaty may only be detained, tried, or punished . . . for (a) any offense for which extradition was granted."  Dkt. no. 23-1, at p. 28.  In other words, pursuant to the Treaty, Aguasvivas may be tried in the Dominican Republic only for the crimes for which extradition was sought <u>and</u> for which probable cause exists.

For the above reasons, the Court denies Aguasvivas's motion to dismiss (dkt. no. 23) and supplemental motion to dismiss (dkt. no. 24).

## <u>Conclusion</u>

In accordance with the foregoing memorandum and pursuant to 18 U.S.C. § 3184, the Court finds that Cristian Starling Aguasvivas is extraditable to the Dominican Republic for the offenses charged of murder, aggravated robbery, and illegal firearm possession.  The Court finds that Aguasvivas is <u>not</u> extraditable on the charges of association of malefactors.  The Certificate of Extradition is stayed for 60 days from the date of its issuance to allow Aguasvivas to pursue habeas relief and, if a petition for writ of habeas corpus is filed, during the pendency of such proceedings.

It is further ORDERED that Aguasvivas shall be committed to the custody of the U.S. Marshal for this District, to be held pending final disposition of this matter by the Secretary of State, and pending Aguasvivas's potential surrender to the Dominican Republic.

No later than seven days after the date of this decision, the government shall file a proposed extradition certification and order of commitment.

Aguasvivas's motion to dismiss (dkt. no. 23) and supplemental motion to dismiss (dkt. no. 24) are DENIED.

The Court ORDERS that the Clerk of Court shall forward a certified copy of this Order, Certification of Extraditability, and Order of Commitment, together with a copy of all the testimony and evidence taken before this Court, to the Secretary of State, Department of State, to the attention of the Office of the Legal Adviser.

<u>/s/ David H. Hennessy</u>
David H. Hennessy
U.S. Magistrate Judge