UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **CRISTIAN AGUASVIVAS** ) | |
| v. ) | |
| ) | Civ. No. |
| **MIKE POMPEO,** ) | |
| Secretary of State, ) | **PETITION FOR WRIT OF** |
| **WILLIAM BARR,** ) | **HABEAS CORPUS UNDER** |
| Attorney General, ) | **28 U.S.C. § 2241 AND COMPLAINT** |
| **JOHN GIBBONS,** ) | **FOR DECLARATORY AND** |
| U.S. Marshal for the ) | **INJUNCTIVE RELIEF** |
| District of Massachusetts, ) | |
| **JAMES HAINSWORTH,** ) | |
| U.S. Marshal for the ) | |
| District of Rhode Island, ) | **ORAL ARGUMENT REQUESTED** |
| **DANIEL MARTIN, Warden,** ) | |
| Wyatt Detention Facility ) | |

## INTRODUCTION

1.  Petitioner Cristian Aguasvivas faces the prospect of being extradited for a crime he did not commit to a country where the Board of Immigration Appeals (BIA) has already found that he will be tortured.

2.  The Dominican Republic seeks the extradition of Mr. Aguasvivas in order to charge him with the shooting death of an officer of the Dominican national drug police, the Direccion Nacional de Control de Drogas (DNCD). A Magistrate Judge in Massachusetts certified Mr. Aguasvivas as extraditable. He asserts two sets of claims here: First, he seeks review of the extraditability determination. Second, he asserts that he may not be sent to the Dominican Republic because he will be tortured there, as the BIA has already found.

3.  As to the former: Mr. Aguasvivas is innocent of the crime. He has been the victim of police corruption in the Dominican Republic. The Dominican Republic fails to produce any

1

actual evidence to support its conclusory allegation that Mr. Aguasvivas is the shooter. Further, its extradition request does not meet the requirements of the Treaty between the two countries.

4. As to the latter: the Convention Against Torture (CAT) prohibits the return of any individual to a country where s/he will face torture. The entire United States government is bound by the CAT. In 2016, the BIA found that it is "more likely than not" that Mr. Aguasvivas will be tortured in the Dominican Republic and therefore granted him withholding of removal under the CAT. The BIA reached this conclusion based on the credible and uncontroverted testimony of multiple witnesses who were tortured by the DNCD, in its attempt to find Mr. Aguasvivas. The DNCD also killed Mr. Aguasvivas' brother, who was also suspected in this shooting.

5. After the BIA's decision, the Dominican Republic submitted an extradition request to the United States Department of State (DOS). The DOS, along with the United States Attorney's Office (USAO), has taken the position that it is free to extradite Mr. Aguasvivas without regard to the decision of the BIA. Further, it takes the position that it is free to do so with no process whatsoever on the question of whether Mr. Aguasvivas will be tortured and killed in the Dominican Republic.

6. The impending extradition is unlawful, unconstitutional, and must be restrained.

## PARTIES

7. Mr. Aguasvivas is in federal custody at the Wyatt Detention Facility at 950 High Street, Central Falls, RI 02863-1506.

8.  Mike Pompeo is the United States Secretary of State, and is a legal custodian of Petitioner. His address is U.S. Department of State, 2201 C. Street, N.W., Washington, D.C. 20520.

9.  William Barr is United States Attorney General, and is a legal custodian of Petitioner. His address is U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C.

10. John Gibbons is the United States Marshal for the District of Massachusetts, and is a legal custodian of Petitioner. His address is John Joseph Moakley U.S. Courthouse, 1 Courthouse Way, Boston, Massachusetts 02210.

11. James Hainsworth is the United States Marshal for the District of Rhode Island, and is a legal custodian of Petitioner. His address is 2 Exchange Terrace, Providence, RI 02903.

12. Daniel Martin is the Warden at the Wyatt Detention Facility, and is a legal custodian of Petitioner. His address is 950 High St, Central Falls, RI 02863.

## JURISDICTION AND VENUE

13. This Court has jurisdiction under 28 U.S.C. § 2241, the habeas statute. It also has jurisdiction under 28 U.S.C. § 1331, Art. I, § 9, Cl. 2 (the Suspension Clause of the U.S. Constitution), and the common law.

14. Venue lies in the U.S. District Court for the District of Rhode Island because the petitioner is detained at the Wyatt Detention Facility in Central Falls, Rhode Island, under color of the authority of the United States, in violation of the Constitution, laws or treaties thereof. 28 U.S.C. §§ 1391, 2241.

## FACTS AND PROCEDURAL HISTORY

**Events in the Dominican Republic**

15. Until 2013, Mr. Aguasvivas lived peacefully in Baní, Dominican Republic with his common-law wife and two small children. He worked as an apprentice to a cabinet-maker, as he had since he was 12 years old.

16. On December 6, 2013, Mr. Aguasvivas was waiting outside his boss's house to go to a job. An unmarked vehicle pulled up and four men got out. They were not wearing any clothing that identified them as police, their car did not identify them as police, and they did not identify themselves as police.

17. They grabbed Mr. Aguasvivas, beat him, and forced him into the passenger's seat of the vehicle.

18. A video, taken by a bystander and uploaded to YouTube, shows the scene.[1] The situation unfolds in broad daylight, in front of a crowd. The men are forcibly wrestling Mr. Aguasvivas into the vehicle. He is doubled over at the waist, facing backwards, in the passenger's seat of the car, his hands handcuffed in front of him. Women scream Mr. Aguasvivas' brother, Francis Aguasvivas, is yelling at the men, "You can't take my brother!" One of the men continues to push down on Mr. Aguasvivas lower back, stuffing him further into the car.

19. Shots ring out. One of the men is killed and two others are wounded.

---

[1] *See* https://www.youtube.com/watch?v=sl8I71OFDyo . Mr. Aguasvivas appears in a light blue shirt and the decedent appears in a black shirt. Mr. Aguasvivas' brother, Francis Aguasvivas, is in a white shirt and white baseball cap, seeking to stop the men. The video was entered into evidence in both the immigration case and the extradition case before the Magistrate Judge.

20. In the chaos, Mr. Aguasvivas managed to escape. He later learned that the four men were agents of the DNCD, the national drug police, and that one of them had been killed. He also learned that the decedent was the brother of a high-ranking military general named Rafael Montero.

21. Mr. Aguasvivas and his brother knew that their lives were in danger. They went on the run. They lasted for eight months inside the Dominican Republic. At that point, they had to separate. The morning after they parted ways, Mr. Aguasvivas called his brother's phone. An unknown voice answered and said "do you see what we did to him? We are going to do the same thing to you."

22. The DNCD had found Francis Aguasvivas and shot him dead.

23. Mr. Aguasvivas fled the country.

**Immigration proceedings**

24. Mr. Aguasvivas came to the United States. He sought asylum, withholding of removal, and relief under the CAT.

25. Between May 2015 and February 2016, United States Immigration Judge Steven Day, in Boston, held nine hearings in this case. The government argued that Mr. Aguasvivas was ineligible for asylum because he had perpetrated the shooting. Mr. Aguasvivas argued that he was innocent. He presented the testimony of nine witnesses, including several character witnesses, one percipient witness to the shooting, and four victims who had been tortured by the DNCD. The torture victims testified that in the days, weeks, and months after the shooting, they were abducted from their homes by DNCD agents and taken to an unknown location, where they were interrogated tortured. The DNCD agents conducting the torture

5

demanded information about Mr. Aguasvivas' whereabouts. They stated that they would burn Mr. Aguasvivas alive.

26. Mr. Aguasvivas also submitted evidence about the murder of his brother. He submitted extensive evidence documenting the rampant police corruption and impunity in the Dominican Republic, including kidnappings, torture, and extrajudicial killings carried out by the police.

27. On February 23, 2016, Judge Day denied all forms of relief, including CAT. *See In the Matter of the Extradition of Cristian Starling Aguasvivas*, Dist. Ma. Case No. 17-mj-04218-DHH, D.E. 23-2 (IJ decision).[2]

28. On August 17, 2016, the Board of Immigration Appeals reversed, determining that Mr. Aguasvivas was entitled to relief under the CAT. It found that the witnesses had credibly testified that they had been tortured in an effort to locate Mr. Aguasvivas and that the torture methods employed were documented practices of the Dominican security forces. The Board concluded it was "more likely than not" that Mr. Aguasvivas would be tortured if sent to the Dominican Republic. *See* MJ D.E. 23-3 (BIA decision).

29. On September 30, 2016, the IJ granted withholding of removal under the CAT.

**Extradition proceedings**

30. On September 13, 2017, the USAO acting on behalf of the Dominican Republic, filed the present extradition Complaint in the District of Massachusetts. *See* 18 U.S.C. § 3184

---

[2] Entries on the Magistrate Judge case docket, *In the Matter of the Extradition of Cristian Starling Aguasvivas*, Dist. Ma. Case No. 17-mj-04218-DHH, will be referred to as "MJ D.E. [__]."

*et. seq.*; MJ D.E. 2. Mr. Aguasvivas was arrested by the United States Marshal Service and has been in the Marshal's custody since approximately September 15, 2017.

31. The Dominican Republic seeks the extradition of Mr. Aguasvivas in order to charge him with murder, conspiracy, and the robbery of the officers' firearms. It argues that the police were arresting Mr. Aguasvivas when he grabbed the gun from the decedent officer and shot him and the two other officers.

32. In support of the extradition request, the Dominican Republic submitted a packet of papers consisting of: an arrest warrant, two affidavits by a Dominican prosecutor with no personal knowledge of the events, an autopsy of the decedent, and medical certificates documenting the injuries to the two surviving officers. MJ D.E. 23-1 (Extradition packet submitted by the Dominican Republic). The Dominican prosecutor alleges that Mr. Aguasvivas disarmed the decedent, shot the three officers, and then, in concert with his brother and an uncle,[3] stole the firearms from the downed officers.

33. Mr. Aguasvivas filed a Motion to Dismiss the extradition complaint, *see* MJ D.E. 23 & 24, raising claims under the extradition statute, 18 U.S.C. § 3184 *et. seq.*, and the Treaty Between the United States of America and the Dominican Republic, T.I.A.S. 16-1215 (Jan. 12, 2015) (Treaty). He argued that:

  a. The Dominican government's evidence was insufficient to show probable cause because the prosecutor's allegations were conclusory, failed to identify

---

[3] Mr. Aguasvivas' uncle, Ramon Aguasvivas, was extradited from Massachusetts in a separate action. *See In the Matter of the Extradition of Ramon Emilio Aguasvivas Mejia*, D.Ma. 17-mj-01250-DLC.

7

        the source of the underlying information, and were contradicted by the autopsy;

    b.  The Dominican government's extradition request violated the Treaty because it failed to include an adequate warrant and evidence of pending charges against Mr. Aguasvivas in the Dominican Republic; and

    c.  The facts precluded the murder charges, given Dominican law on the intent element of those offenses.

34.    The government argued, in response, that the prosecutor's affidavits were sufficient to show probable cause and the Dominican warrant was sufficient to satisfy the Treaty's requirements of a warrant and a charging document. *See* MJ D.E. 28.

35.    On June 29, 2018, Magistrate Judge Hennessy held an extradition hearing. Mr. Aguasvivas' ability to present evidence was severely restricted. He was prevented from presenting any evidence that was "contradictory" of the government's evidence. *See* MJ D.E. 75 at 8, 20; D.E. 44 at 2-4. Even within those confines, the Magistrate Judge excluded much of the evidence Mr. Aguasvivas sought to present. *See* MJ D.E. 39 (evidence proffered).

36.    The parties filed supplemental briefing, with the assistance of Dominican law experts, addressing the substantive requirements for conspiracy and robbery under Dominican law, as well as whether Dominican law requires that formal charges be pending before an extradition can be requested. *See* MJ D.E. 65; D.E. 73; D.E. 74.

37.    On December 11, 2019, the Magistrate Judge certified Mr. Aguasvivas as extraditable on all of the offenses for which extradition was sought, except for the two conspiracy offenses. *See* MJ D.E. 75, 76. The Magistrate Judge found that the government met its

8

obligations under the Treaty and that the Dominican prosecutor's assertion that the officer-victim-witnesses "saw" Mr. Aguasvivas grab the gun and shoot was sufficient to show probable cause. MJ D.E. 75.

38. The Magistrate Judge stayed the extradition pending the filing of, and during the pendency of, the present habeas petition. MJ D.E. 75 at 38.

## LAWS AND REGULATIONS REGARDING EXTRADITION

39. Extradition is governed by 18 U.S.C. § 3184 *et seq*. Extradition hearings are generally handled by magistrate judges. The magistrate judge is asked to certify that the respondent – or "relator" – is extraditable under the statute and the relevant treaty.

40. After the extradition court certifies the extradition, the decision is reviewable through a petition for habeas corpus. *See United States v. Kin-Hong*, 110 F.3d 103, 106 (1st Cir. 1997); *Valenzuela v. United States*, 286 F.3d 1223, 1229 (11th Cir. 2002).

## LAWS AND REGULATIONS REGARDING TORTURE

**CAT**

41. The United Nations Convention Against Torture and Other, Cruel, Inhuman or Degrading Treatment or Punishment (CAT) was ratified by the United States Senate in 1990 and entered into force in November 1994. *See* U.N. Doc. 571 Leg. SER. E/13.IV.9 (1995); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8478 (Feb. 19, 1999). Article 3 of the CAT provides, without exception, that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Art. 3, §1; *see Saint Fort v. Ashcroft*, 329 F.3d 191, 195-96 (1st Cir. 2003).

42. In October 1998, Congress passed the Foreign Affairs Reform and Restructuring Act ("FARRA"), implementing its obligations under CAT. The FARRA states that:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds[4] for believing the person would be in danger of being subjected to torture....

FARRA § 2242(a), 112 Stat. at 2681–822 (codified as note to 8 U.S.C. § 1231).[5] The FARRA gives Article 3 of the CAT "wholesale effect" domestically. *Medellin v. Texas*, 552 U.S. 491, 520 (2008).

43. The FARRA delegates the responsibility for "prescrib[ing] regulations to implement the obligations of the United States [under the CAT]" to "heads of the appropriate agencies." *Id.* § 2242(b).

**Department of Justice Regulations**

44. The DOJ has established procedures for raising a CAT claim. *See* Regulations Concerning the Convention Against Torture, 64 Fed.Reg. 8478 (Feb. 19, 1999). Under these, an individual is entitled to protection from removal if s/he can prove "that it is more likely

---

[4] "Substantial grounds" has been interpreted by the Agency to mean that torture is "more likely than not." 22 C.F.R. § 95.1(c).

[5] Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" for the purposes of obtaining information or a confession, punishment, intimidation, coercion, or discrimination. Torture Convention; FARRA§ 2242 (same); 8 C.F.R. § 1208.18(a)(l)(2007). "Severe physical or mental pain or suffering," includes "(A) actual or threatened infliction of severe physical pain or suffering; (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (C) the threat of imminent death; or (D) the threat that another person will imminently be subjected to any of the above." 18 U.S.C. § 2340 (2008); 22 C.F.R. § 95.1(b).

than not that he or she would be tortured if removed to the proposed country of removal."
8 C.F.R. §1208.16(c)(2)-(4).[6]

45. DOJ regulations establish two types of protection under the CAT: withholding of removal, 8 C.F.R. § 1208.16(c), and deferral of removal, 8 C.F.R. § 1208.17. Individuals who meet the burden of proof for CAT relief but are ineligible for withholding based on section 1208.16(d)(2) are granted deferral of removal. *See* 8 C.F.R. § 1208.17(a); *Khouzam v. Attorney Gen. of U.S.*, 549 F.3d 235 (3d Cir. 2008).

**Department of State Regulations**

46. The Department of State has also promulgated regulations implementing the CAT. *See* 22 C.F.R. §§ 95.1-95.4. These regulations provide that: "In order to implement the obligation assumed by the United States pursuant to Article 3 of the Convention [Against Torture], the Department considers the question of whether a person facing extradition from the U.S. 'is more likely than not' to be tortured." 22 C.F.R. § 95.2(b). Specifically, "[i]n each case where allegations relating to torture are made ..., appropriate policy and legal offices [will] review and analyze information relevant to the case in preparing a recommendation to the Secretary as to whether or not to sign the surrender warrant." 22 C.F.R. § 95.3(a). After conducting this analysis, "the Secretary may decide to surrender the fugitive to the requesting State." *Id.* § 95.3(b).

47. The State Department's Foreign Affairs Manual also guides the State Department in performing its duties. *See* 7 FAM § 1634.

---

[6] 8 C.F.R. § 1208.16 is identical to 8 C.F.R. § 208.16.

11

## CLAIMS FOR RELIEF

### Count 1 – Extradition Statute, 18 U.S.C. § 3184 *et. seq.*

48. The foregoing allegations are realleged and incorporated herein.

49. The extradition statute requires that an extradition request be supported by probable cause that the accused is guilty of the crimes for which extradition is sought. *Ordinola v. Hackman*, 478 F.3d 588, 608 (4th Cir. 2007). This includes probable cause as to each element of each offense. *Extradition of Sauvage*, 819 F.Supp. 896, 901 (S.D. Cal. 1993).

50. The Dominican Republic's documentation supporting its request consists of: medical records indicating that three people were shot, and two affidavits by a prosecutor who alleges, in conclusory fashion, that Mr. Aguasvivas was the shooter. The prosecutor-affiant fails to disclose the information underlying his belief and accusation.

51. The prosecutor's allegation is controverted by the government's own evidence. The autopsy concludes that the decedent was killed by "remote" or "distant" wounding. Mr. Aguasvivas cannot have delivered a remote or distant wound because he was right next to the decedent, as shown on the video. *See* n.1, above. The autopsy also explicitly states that someone else committed the shooting. MJ D.E. 23-1 at Bates 69.

52. The DNCD is the victim, investigator, and witness in this case. The DNCD tortured Mr. Aguasvivas' family members in order to catch him. And the DNCD killed Francis Aguasvivas. Yet in all of the Dominican Republic's submission, there is no sign that an actual, legitimate investigation was ever conducted into this crime. The DNCD is inherently unreliable as a source of information.

53. Accordingly, the government has failed to produce competent legal evidence upon which probable cause may be determined.

54. Homicide under Dominican Articles 295 and 304 requires a showing that the defendant intentionally killed the victim. That mental state cannot be found when an individual acts in a situation of surprise or self-defense, as a matter of Dominican law. There is no probable cause on the intent element of the homicide charges.

### Count 2 - Treaty between the United States and the Dominican Republic

55. The foregoing allegations are realleged and incorporated herein.

56. Extradition must be denied where an extradition request fails to comply with the terms of the Treaty. *See Howard*, 996 F.2d at 1329; Treaty art. 1.

57. The Treaty between the two countries requires that an extradition request be accompanied by a warrant and a charging document. Treaty Art. 7 § 3(a)-(b).

58. A "document setting forth the charges against the person," Art. 7 § 3(b), requires that formal charges have been filed in the requesting country. No formal charges have been filed against Mr. Aguasvivas in the Dominican Republic. The Dominican Republic explicitly requests the extradition for investigative purposes.

59. Treaty Article 7 § 3(a) requires a warrant. The warrant submitted by the Dominican Republic is overbroad and defective.

60. Treaty Article 7 § 3(c) requires probable cause. Probable cause was not established.

61. Because the extradition request does not comply with the Treaty, extradition must be denied.

13

### Count 3 – Convention Against Torture and FARRA

62. The foregoing allegations are realleged and incorporated herein.

63. The entire United States government is bound by the CAT and therefore barred from sending Mr. Aguasvivas to a country where it is more likely than not that he will be tortured.

64. The Board of Immigration Appeals has already found that it is more likely than not that Mr. Aguasvivas will be tortured in the Dominican Republic.

65. The threat of torture and death awaits Mr. Aguasvivas in the Dominican Republic.

66. Accordingly, the United States government may not send him there.

### Count 4 – Res Judicata

67. The foregoing allegations are realleged and incorporated herein.

68. Res judicata is "[t]he general principle announced in numerous cases [] that a right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies." *Southern Pacific Railroad v. United States*, 168 U.S. 1, 48-49 (1897).

69. The issue of whether it is more likely than not that Mr. Aguasvivas will be tortured in the Dominican Republic was fully and fairly litigated, to resolution, in immigration court.

70. The government has no right to re-litigate in a forum that is obviously favorable to the government because of the lack of process in the DOS procedure.

### Count 5 – Administrative Procedures Act

71. The foregoing allegations are realleged and incorporated herein.

72. The Administrative Procedures Act (APA), 5 U.S.C. § 551 *et seq.*, permits courts to override agency "action, findings, and conclusions" that are: "arbitrary, capricious, … or

14

otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction [or] authority;" or "without observance of procedure required by law." 5 U.S.C. § 706(2).

73. Extradition under the terms outlined in DOJ's letter, MJ D.E. 77, violates the APA.

74. Given the BIA's finding, any contrary determination by the DOS would be arbitrary and capricious, outside the scope of the agency's authority, and contrary to law.

75. It would further be arbitrary and capricious as a reversal of another agency's reasoned decision without acknowledging or justifying the change.

76. Any rule, policy or procedure maintaining that DOS has discretion to extradite an individual who has already been found to qualify for CAT relief is contrary to law and invalid. Any such rule or policy either does not apply or is unlawful as applied here.

77. Because the DOS does not have discretion to extradite Mr. Aguasvivas, it must be estopped from doing so. Denial of the extradition request is required.

## Count 6 – Procedural Due Process under the U.S. Constitution

78. The foregoing allegations are realleged and incorporated herein.

79. The Due Process Clause guarantees Mr. Aguasvivas a meaningful opportunity to contest and litigate the torture issue. This includes, but is not limited to: the right to have the claim adjudicated by a neutral and impartial arbiter; a meaningful opportunity to examine the government's evidence, address the government's evidence, and present evidence and argument on his behalf; and a process involving factfinding based on a record that is produced before the decision-maker and disclosed to Mr. Aguasvivas.

80. The process set forth in the government's letter, MJ D.E. 77, is constitutionally inadequate. Any attempt to proceed without due process violates the Fifth Amendment.

## Count 7 – Substantive Due Process under the U.S. Constitution

81. The foregoing allegations are realleged and incorporated herein.

82. Governmental conduct that "shocks the conscience" or "offends a sense of justice" violates substantive due process. *Rochin v. California*, 342 U.S. 165, 169, 172-73 (1952).

83. Mr. Aguasvivas has a due process interest in the United States' compliance with its obligations under the CAT.

84. Mr. Aguasvivas has a due process interest in availing himself of the full benefit of the BIA's decision. This includes the right to have that decision fully respected, recognized, and adhered to by other agencies. It also includes the right to avail himself of the procedures and protections that apply in the immigration system.

85. Extraditing Mr. Aguasvivas to the Dominican Republic, where he will be tortured and/or killed, violates the substantive due process guarantee of the U.S. Constitution.

## REQUEST FOR ORAL ARGUMENT

86. Petitioner requests oral argument on this Complaint and Petition for Habeas Corpus.

## REQUEST FOR BRIEFING SCHEDULE

87. Petitioner requests that the Court establish a schedule for further briefing. Petitioner intends to submit a memorandum of law in support of both sets of claims: those regarding extraditability/review of the Magistrate Judge's certification decision (Counts 1-2); and the torture-based claims (Counts 3-7).

## PRAYER FOR RELIEF

88. Petitioner asks that the Court grant the following relief:

89. Deny the extradition, pursuant to Claims 1-2, because Mr. Aguasvivas is not extraditable under the statute and Treaty;

90. Permanently enjoin the DOS from surrendering Petitioner;

91. Declare that the DOS may not extradite Petitioner absent an open process to address the torture question, including the right to present and review evidence, examine evidence and witnesses, and appear before a neutral arbiter;

92. Declare that the DOS has no discretion to extradite an individual who has already been found by another agency of the U.S. government to be protected under the CAT;

93. Declare that the DOS must adhere to, recognize, and abide by the BIA order;

94. Direct the DOS to either deny extradition or agree to an adequate process for considering the torture issue;

95. Order Petitioner's release from custody because he cannot be extradited and the litigation in this case is likely to be substantial, complex, and prolonged;

96. Order any further relief this Court deems just and proper.

CRISTIAN STARLING AQUASVIVAS,
By his attorneys,

*/s/ Olin Thompson*
Olin Thomson (RI Bar # 5684)
Federal Public Defender Office
10 Weybosset Street, 3rd floor
Providence, RI  02903
401-528-4281

                              Amy Barsky (Cal. Bar 270846)
                              Samia Hossein (Mass. Bar # 696329)
                              Federal Public Defender Office
                              51 Sleeper Street, 5th Floor
                              Boston, MA 02210
                              617-223-8061