## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| CRISTIAN AGUASVIVAS,<br>    Plaintiff, | ) ) ) ) | |
| v. | ) ) | |
| MIKE POMPEO, Secretary of State,<br>WILLIAM BARR, Attorney General,<br>JOHN GIBBONS, U.S. Marshal for the<br>District of Massachusetts, WING<br>CHAU, U.S. Marshal for the District of<br>Rhode Island, and DANIEL MARTIN,<br>Warden, Wyatt Detention Facility,<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) | C.A. No. 19-123-JJM-PAS |

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Petitioner Cristian Aguasvivas filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 and a complaint for declaratory and injunctive relief, claiming that he faces the prospect of being extradited for a crime he did not commit to a country where he will be tortured. The Court grants Mr. Aguasvivas' Petition for a Writ of Habeas Corpus, dismisses the Extradition Complaint for failure to comply with the relevant Treaty[1]; finds that Mr. Aguasvivas' extradition would violate the United Nations Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"), given

---

[1] Dominican Republic-American Treaty, DR-U.S., art. 7 § 3(c), Jan. 12, 2015, T.I.A.S. No. 06-1215 ("Treaty").

the final Board of Immigration Appeals ruling; and orders Mr. Aguasvivas released from custody.

I.    FACTS

On December 6, 2013, Mr. Aguasvivas, a cabinet-maker apprentice and father of two, was waiting outside his boss' house to travel with him to a job, when agents of the Dominican Republic's National Directorate for Drug Control (DNCD) dressed in civilian clothing[2] and in an unmarked vehicle tried to arrest him for suspected drug dealing in the Dominican Republic.

Chaos erupted because Mr. Aguasvivas and his family and friends witnessing the event believed he was being kidnapped. The police cuffed Mr. Aguasvivas' hands in front of his body and forced him into the front passenger's seat of their unmarked vehicle. While two officers were physically pushing Mr. Aguasvivas into the vehicle, shots were fired. DNCD Agent Lorenzo Ubri Montero[3] died from his wounds, and Captain Felipe de Jesus Jimenez Garcia and Agent Jose Marino Hernandez Rodriguez[4] sustained non-fatal injuries in the commotion. Mr. Aguasvivas and his brother Francis Aguasvivas, who witnessed the event, fled from the scene.[5]

---

[2] According to Mr. Aguasvivas, police officers with the DNCD usually wear black vests marked with "DNCD." ECF No. 9-2 at 8.

[3] Agent Ubri was the brother of a high-ranking military general in the Dominican Republic. ECF No. 1 at 5.

[4] The Complaint seeking extradition listed this agent as Agent Hernandez, though all other documents refer to him as Henriquez. *In re Aguasvivas*, Misc. No. 17-MJ-4218-DHH (D. Mass. Sept. 13, 2017), ECF No. 2 at 2.

[5] The available information about the shooting comes from the testimony of witnesses in the immigration proceedings, a YouTube video capturing the incident (*available at* https://www.youtube.com/watch?v=sl8I71OFDyo) (last visited Sept. 16, 2019), and the documents submitted by the Dominican Republic in support of its

Documents written after the incident give conflicting evidence of the perpetrator of the killing. The autopsy of Agent Ubri conducted hours after the shooting states that "[Agent Ubri] was seriously injured when he and other agents of the [DNCD] were performing an anti-drug operation…[and] tried to arrest and introduce into a vehicle to a presumed drug dealer, but they were injured by someone else, who tried to stop the arrest." ECF No. 9-4 at 71. It also states that the decedent was killed by "distant" wounding. *Id.* But the arrest warrant issued by the Dominican police the day of the shooting, states "at the moment when the agents of the [DNCD] were making an anti-drug operation and were preparing to arrest Estarling Aguasvivas[6]…[he] disarmed and fired three shots to the [decedent]." *Id. at* 64. An affidavit by the Dominican prosecutor, written three years later, alleges that Mr. Aguasvivas "in a surprising way, attacked to the agent the [decedent], to whom disarmed and killed, opening fire on all the agents of the [DNCD] that were present." *Id.* at 58. In a supplemental affidavit dated four months later, the prosecutor asserts that the two "surviving victims of the shootout attack on the anti-narcotics patrol carried out by [Mr. Aguasvivas]" are "eyewitnesses because they saw [Mr. Aguasvivas] disarm, shoot, and kill the [decedent]." *Id.* at 84.

Following the shooting, to extract information from them about Mr. Aguasvivas' location, the DNCD tortured members of Mr. Aguasvivas' family,

---

extradition request, including an arrest warrant, two affidavits by a Dominican prosecutor, the autopsy of the decedent, and medical certificates of the injured officers.

[6] Mr. Aguasvivas' middle name is "Starling."

according to four family members.[7] *See* ECF No. 9-2 at 16-18 (summarizing the torture victims' testimony). The victims consistently testified about "having [] black bags placed over their heads and onions placed in their mouths," and that "the black bag/onion tactic, [was] intended to simulate/cause suffocation." ECF No. 9-5 at 2.

The Dominican police shot and killed Mr. Aguasvivas' brother, Francis Aguasvivas, soon after the brothers went their separate ways. Mr. Francis Aguasvivas' autopsy shows that he was killed "by contact of a firearm projectile" to the chest and lists his manner of death as homicide caused by wound to the heart. ECF No. 9-7 at 5, 6. The police maintain that they killed him in a shootout.

Mr. Aguasvivas fled the country and came to the United States upon hearing the news of his family's torture and his brother's death.

## II.   PROCEDURAL HISTORY

*Immigration Proceedings*

Upon arrival in the United States, Mr. Aguasvivas sought asylum, withholding of removal, and protection under the CAT in immigration court. The Immigration Judge held nine hearings and considered the testimony of ten witnesses. *See* ECF No. 9-2 at 14-15 (listing witnesses). Mr. Aguasvivas testified and called eight witnesses: Joseline Ballez, Angel Pimenthal, Keila Aguasvivas, and Sandra Aguasvivas testified to being tortured; Yolanda Diaz testified as a percipient witness; and three individuals testified as character witnesses. The Government called one

---

[7] They testified during Mr. Aguasvivas' immigration hearing proceedings. The Immigration Judge found all the victims credible, except for Sandra Aguasvivas. ECF No. 9-2 at 24.

witness, a DEA agent working in the Dominican Republic. *See id.* at 13-14 (summarizing the DEA agent's testimony). Mr. Aguasvivas also presented reports and articles documenting human rights violations by the Dominican police. *See id.* at 2-3, 5. The Government submitted documents in support of its allegation that Mr. Aguasvivas committed the shooting, including the Dominican arrest warrant, police reports, an Interpol notice for Mr. Aguasvivas, and news articles about Mr. Aguasvivas' involvement in the shooting. *See id.* at 4-5.

The Immigration Judge found that Mr. Aguasvivas was not eligible for asylum or withholding of removal because he did not establish persecution because of his race, religion, nationality, membership in a particular social group, or political opinion. *See id.* at 29. The Immigration Judge also found there were "serious reasons for believing" that Mr. Aguasvivas had committed the murder, a serious nonpolitical crime. *See id.* at 26, 29. The Immigration Judge also denied Mr. Aguasvivas the CAT relief. *See id.* at 30-31. Mr. Aguasvivas appealed.

The Board of Immigration Appeals ("BIA") reversed the decision on the CAT relief, concluding that Mr. Aguasvivas "met his burden of demonstrating on this record that it is more likely than not that he will be tortured at the instigation of or with the consent or acquiescence of public official[s] in the Dominican Republic." ECF No. 9-5 at 2. Significantly, the BIA held that

> The record contains evidence of human rights conditions in the Dominican Republic, including evidence revealing that despite efforts to curb abuses, there have been persistent reports of arbitrary arrests, extrajudicial killings, impunity, and corruption involving police and security forces, and that "the police were involved in incidents that resulted in maiming or severe injury to unarmed civilians." Indeed,

> "[a]lthough the law prohibits torture, beatings, and physical abuse of detainee and prisoners, there were instances in which members of the security forces, primarily police, reportedly carried out such practices."

*Id.* (internal citations omitted). The BIA granted Mr. Aguasvivas withholding of removal. ECF No. 9-8. This represented the final order on the CAT. Mr. Aguasvivas was released from custody and the United States Government was barred from removing him from this country because of the likelihood that he would be tortured.

*Extradition Proceedings*

About one year after the BIA granted Mr. Aguasvivas withholding of removal under the CAT, the United States Government filed an Extradition Complaint in the United States District Court for the District of Massachusetts. *In re Aguasvivas*, Misc. No. 17-MJ-4218-DHH (D. Mass. Sept. 13, 2017). The request sought extradition on conspiracy, homicide, illegal possession of firearm, and robbery charges stemming from his arrest in the Dominican Republic. ECF No. 9-4 at 56. The United States Marshal Service detained Mr. Aguasvivas and he has been in federal custody at the Wyatt Detention Facility in Central Falls, Rhode Island for the last two years. Mr. Aguasvivas moved to dismiss the Extradition Complaint. The Magistrate Judge held a hearing on the motion to dismiss and an evidentiary hearing on the extradition request.

The Magistrate Judge found that the Treaty between the United States and the Dominican Republic was in full force and effect, and that the Treaty covered the crimes for which the Dominican Republic requested surrender. ECF No. 9-12 at 12-16. He also found that there was enough evidence to support a probable cause finding

on the charges of robbery, illegal possession of firearms, and murder, denying

certification on the conspiracy charges. *Id.* at 17-31. He later issued an Order

denying the motion to dismiss, issued a Certificate of Extraditability, and an Order

of Commitment. *Id.* at 2, 38-39. The Magistrate Judge did not have the issue of the

CAT before him. The matter now comes here by a Petition for Writ of Habeas Corpus,

in essence appealing the Magistrate Judge's order.[8]

## III.  DISCUSSION

Mr. Aguasvivas sets forth two arguments in seeking review of the Magistrate

Judge's certificate of extradition.  First, he challenges his extradition under the

Treaty between the two countries by both claiming that there was no probable cause

established that he committed the crimes, and that the Dominican Republic

government did not meet the documentary requirements of the Treaty.  Second, he

argues that extradition is unlawful under the CAT because he will be tortured in the

Dominican Republic if the United States returns him there.  While the Court agrees

with some of Mr. Aguasvivas' arguments and disagrees with others, ultimately it

finds that Mr. Aguasvivas is not extraditable under either the Treaty or the CAT.

---

[8] The extradition proceedings were held in the District of Massachusetts, but
Mr. Aguasvivas is being held in custody at the Wyatt Detention Facility in Rhode
Island.  The Government is not contesting that venue is proper in the District of
Rhode Island.  *Zhenli Ye Gon v. Holder*, 992 F. Supp. 2d 637, 643 (W.D. Va. 2014),
*aff'd sub nom. Zhenli Ye Gon v. Holt*, 774 F.3d 207 (4th Cir. 2014) (venue is proper in
the district of custody).

A.     TREATY DETERMINATION

    1.     Probable Cause Finding

        a.     Standard of Review

An extradition request must establish probable cause that the accused committed the offense or offenses for which extradition is sought. 18 U.S.C. § 3184; *see* Treaty. The First Circuit has held that on habeas corpus review of a Certificate of Extraditability, the court need only examine the Magistrate Judge's determination of probable cause to see if there is "any evidence" to support it. *United States v. Kin-Hong*, 110 F.3d 103, 116 (1st Cir. 1997) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). Previously, the Circuit interpreted the concept of "any evidence" liberally and historically conducted a deferential review of a magistrate judge's findings. *See Koskotas v. Roche*, 931 F.2d 169, 176 (1st Cir. 1991); *In re Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir. 1989); *Brauch v. Raiche*, 618 F.2d 843, 854 (1st Cir. 1980); *Greci v. Birknes*, 527 F.2d 956, 958 (1st Cir. 1976).

But in *Kin-Hong*, the First Circuit acknowledged that other appellate courts have engaged in a more rigorous review of the evidence presented before a magistrate judge, that "it is arguable that the 'any evidence' standard is an anachronism, and that this court should engage in a more searching review of the magistrate's probable cause findings." *Kin-Hong*, 110 F.3d at 117. Despite this reflection, the court failed to adopt explicitly a more searching review because the government had met its burden in that case through whatever prism the court reviewed the record. *Id.* Thus,

the Court need only examine the Magistrate Judge's determination of probable cause to see if there is "any evidence" to support it.

### b.  Any Competent Evidence

In support of probable cause, the Government, on behalf of the Dominican Republic, offered: (1) the affidavit of Dominican Prosecutor Feliz Sanchez Arias, which attached the arrest warrant; the autopsy report for Agent Ubri; medical certificates for the two other drug agents who were shot; and two photographs of the person sought; (2) the supplemental affidavit of Prosecutor Sanchez; (3) the declaration and the supplement of State Department legal counsel Tom Heinemann; and  (4) the second additional affidavit of Prosecutor Sanchez.

Contesting probable cause, Mr. Aguasvivas submitted: (1) a YouTube video of the shooting; (2) his concession that he is the person in the video wearing a blue shirt; (3) a Spanish transcription and English translation of statements heard on the video; (4) the affidavit of Prosecutor Sanchez in support of extraditing Mr. Aguasvivas' uncle, Ramon Emilio Aguasvivas; (5) transcriptions and translations of pertinent articles of the Dominican Criminal Procedure Code; (6) an affidavit of attorney Ambar M. Maceo, about the elements necessary to charge the crime of conspiracy under the Dominican Criminal Code; and (7) a decision from the Supreme Court of Justice of the Dominican Republic on the elements of conspiracy.

The Magistrate Judge's probable cause determination was based in part on Prosecutor Sanchez's affidavit recounting the incident and citing two eyewitnesses to

the shooting.[9]  ECF No. 9-12 at 20 ("In a nutshell, the prosecutor assigned to investigate this matter has sworn in an affidavit that two police officers who were present—and who were themselves wounded during the crime—saw Mr. Aguasvivas shoot Agent Ubri, and that Agent Ubri died of the gunshot wounds Mr. Aguasvivas inflicted.  While a more detailed affidavit certainly could have been presented, more is not necessary to establish probable cause.").  The Magistrate Judge also found that the autopsy report and the video evidence supported a probable cause finding.  *Id.* at 20-21.  He held that three bullets fired at short range to the area of the heart, as documented in the autopsy report, are enough to establish probable cause that Mr. Aguasvivas shot Agent Ubri with the intent to kill him.  *Id.* at 20.  He also held that the video supports a probable cause finding because it shows that the arrest occurred in good light with the agents within feet of Mr. Aguasvivas when the shots were fired, and thus they were well positioned to see the shooting and identify the shooter.  *Id.* at 21.

Through the generous and deferential prism of "any evidence warranting the finding that there was reasonable ground to believe the accused guilty," the Court finds that the Magistrate Judge's probable cause determination was supported by

---

[9] Mr. Aguasvivas argues that the statements of the two eyewitnesses are not "competent evidence" because the source of the statements is unknown.  But "competent evidence" is defined as "that which is properly admissible at the extradition hearing."  *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993).  The First Circuit has held that evidence supporting extraditability "may consist of hearsay, even entirely of hearsay." *Kin-Hong*, 110 F.3d at 120.

evidence (the affidavit, the video, the autopsy physical findings) and so this Court must uphold that decision.[10] *Fernandez*, 268 U.S. at 312.

### 2. Treaty Compliance

Article 7 § 3 of the Treaty states that "a request for extradition of a person sought for prosecution shall [] be supported by," *inter alia*:

> (a) a copy of the warrant or order of arrest or detention issued by a judge or other competent authority;
> (b) a copy of the document setting forth the charges against the person sought; and
> (c) such information as would provide a reasonable basis to believe that the person sought committed the offense or offenses for which extradition is requested.

Mr. Aguasvivas argues that in addition to the warrant, the Treaty requires a formal charging document lodged in the court system be presented. He stresses that the warrant alone cannot satisfy the second requirement of section 3. The Court agrees with Mr. Aguasvivas.

### a. Document Setting Forth the Charges

---

[10] A more searching review of the evidence, however, raises questions about the source and sufficiency of the eyewitness statements in the prosecutor's affidavit and the finding of probable cause. First, about the eyewitness statements in the prosecutor's affidavit, there is nothing in the record sourcing the statements from the officers identifying Mr. Aguasvivas as the shooter—the identification is assumed from a single sentence in the final paragraph of the prosecutor's supplemental affidavit. ECF No. 9-4 at 83-84. Additionally, the context in which the paragraph appears suggests that the police included that sentence to bolster the reasons why the officers were qualified to identify a photograph of Mr. Aguasvivas, rather than to serve as a statement by eyewitnesses. *Id.* Second, the medical examiner, who wrote the autopsy report only hours after the shooting, concluded that someone else, not Mr. Aguasvivas, committed the shooting. *Id.* at 71. Third, by the Government's own account, Mr. Aguasvivas was handcuffed throughout the event and during the time the shots were fired. *Id.* at 58. This Court's review of the video supports a finding that Mr. Aguasvivas was not the shooter. But this Court does not believe it has the legal mandate to do a more rigorous review.

The Treaty's requirement that the Dominican Republic government must include "the document setting forth the charges against the person," refers to a formal charging document. The Government has not set forth any evidence to show that the Dominican Republic government has formally charged Mr. Aguasvivas because there was no charging document. But the Government argues that formal charges are not required, and as the Magistrate Judge agreed, the arrest warrant itself satisfies the Treaty's requirement under both sections (a) and (b) cited above.

This Court rejects the Government's interpretation of Article 7 § 3.[11] The plain language of the Treaty supports the requirement that the requesting country must produce a formal charging document in addition to the warrant to support extradition.[12] The use of the qualifier "the" instead of "a" in front of "document setting forth the charges" in § 3(b) signifies that there must be a specific charging document presented. Additionally, the canon against surplusage supports this interpretation of § 3(b). If section (b) is to have any meaning, it must impose a requirement beyond what is required by subsection (a). In other words, if a warrant, required by § 3(a), satisfied both the warrant requirement and the charging document requirement, § 3(b) would be stripped of any meaning.

While the Magistrate Judge agreed with the Government's contention that the single Dominican arrest warrant could satisfy both requirements, the Court finds the

---

[11] Because this is a question of law, this Court reviews this issue de novo. *Bath Iron Works Corp. v. U.S. Dept. of Labor*, 336 F.3d 51, 55 (1st Cir. 2003).

[12] The Court also notes the use of the conjunction "and" in between sections (b) and (c).

basis for Magistrate Judge's reasoning flawed.   In finding Mr. Aguasvivas extraditable, the Magistrate Judge relied on cases involving extradition treaties with other countries that did not contain the added requirement of a charging document. *See In re Assarsson*, 635 F.2d 1237, 1243 (7th Cir. 1980) (U.S.-Switzerland treaty required "a duly certified or authenticated copy of the warrant of arrest or other order of detention"); *Emami v. U.S. Dist. Ct. for N. Dist. of Cal.*, 834 F.2d 1444, 1448 n. 3 (9th Cir. 1987) (U.S.-Germany treaty required "[a] warrant of arrest issued by a judge of a Requesting State and such evidence as...would justify his arrest and committal for trial"); *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1186 n.2 (U.S.-Mexico treaty required a "certified copy of the warrant of arrest issued by a judge or other judicial officer").   Indeed, the courts in *Assarsson* and *Emami* noted that the inclusion of the charging document in the list of required documents would have resulted in a different outcome.   *See Assarsson*, 635 F.3d at 1243 ("If the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided."); *Emami*, 834 F.2d at 1448.

Here, the Treaty clearly requires that the requesting country produce and include a copy of the warrant *and* "the document setting forth the charges against the person."  Because the Government's request for extradition was not supported by both a warrant and charging document, the Court finds that the Treaty does not allow for the extradition of Mr. Aguasvivas.   But even if the Government fulfilled all the requirements of the Treaty, the extradition of Mr. Aguasvivas would still be prohibited.

## B.   EXTRADITION AND TORTURE DETERMINATION

Mr. Aguasvivas' second point in support of his argument that he is not extraditable is that the United States Government cannot lawfully extradite him because it is more likely than not that the Dominican Republic government will torture him if he returns to the Dominican Republic.   The BIA has already found that Mr. Aguasvivas is more likely than not to be tortured, so Mr. Aguasvivas argues that extradition is barred by the CAT, the Foreign Affairs Reform and Restructuring Act ("FARRA"), and the implementing regulations.  The relevant guiding laws state:

- *Convention Against Torture* :   Article 3 of the CAT states that "[n]o State Party shall expel, return ("refouler") or extradite a person to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture."  CAT Art. 3, § 1.

- *Foreign Affairs Reform and Restructuring Act*: Congress implemented the United States' obligations under the CAT through the FARRA in 1998.  It states that:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture....

FARRA, Pub. L. No. 105-227, Div. G, § 2242(a), 112 Stat. 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

- *Department of State Regulations:*  The Department of State's ("DOS") implementing regulations state: "Article 3 of the Convention imposes on the parties

certain obligations with respect to extradition" and quotes the non-refoulement language of Article 3. *See* 22 C.F.R. § 95.2(a).[13] The "substantial grounds" language has been interpreted to mean that torture is "more likely than not." 22 C.F.R. § 95.1(c). The regulations also contemplate an internal procedure for determining compliance:

> In order to implement the obligation assumed by the United States pursuant to Article 3 of the Convention, the Department considers the question of whether a person facing extradition from the U.S. "is more likely than not" to be tortured in the State requesting extradition when appropriate in making this determination.

22 C.F.R. § 95.2(b).

- *Department of Justice Regulations*: Under the Department of Justice's ("DOJ") implementing regulations on the CAT,[14] an individual cannot be returned to a country if "it is more likely than not that he or she would be tortured." 8 C.F.R. § 1208.16(c)(2)-(4). There are two types of protection under the CAT: withholding of removal and deferral of removal. *See* 8 C.F.R. § 1208.16(c); 8 C.F.R. § 1208.17.

CAT prohibits a signatory country from returning an individual to a country where they would be tortured. Given CAT and its implementing statute and regulations, it is without question that it is United States' policy that it will not extradite a person after a determination is made that he or she is more likely than not to be tortured in that other country. The Government levels arguments against

---

[13] The full text of the DOS' implementing regulations appear at 22 C.F.R. §§ 95.1-95.4.

[14] *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999).

the applicability of these legal authorities and precedent. Mr. Aguasvivas argues that res judicata precludes the DOS from revisiting the Executive Branch determination on torture. The Court will deal with each of these arguments in turn.

### 1. Ripeness

In arguing against application of the CAT, the Government first presses that the claims are not ripe for review because the Secretary of State has not yet decided whether to extradite Mr. Aguasvivas. The Government cites several cases where courts have held that the CAT torture claims are not ripe where the Secretary of State has not yet decided whether to surrender the petitioner. *See Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1357 (11th Cir. 2012); *Hoxha v. Levi*, 465 F.3d 554, 565 (3d Cir. 2006); *Masopust v. Fitzgerald*, No. 2:09-cv-1495-ARH, 2010 WL 324378, at *4 (W.D. Pa. Jan. 21, 2010); *Perez v. Mims*, Case No. 1:16-cv-00447-DAD-SKO, 2016 WL 3254036, at *2-3 (E.D. Cal. June 14, 2016).

But these cases did not involve a finding on the torture issue. Here, the BIA has already found that the Dominican Republic government is likely to torture Mr. Aguasvivas if the United States returns him. Indeed, the cited authority recognized that a prior finding on the likelihood of torture affects ripeness. *See Hoxha*, 465 F.3d at 565 (noting that petitioner's argument that he would be tortured was not ripe under the Administrative Procedures Act *because there was no prior finding on the torture issue*); *see also Meza*, 693 F.3d at 1357 (finding that the CAT claim is unripe before the Secretary's consideration *in the first instance* of humanitarian issues before Secretary's consideration). Because there has been a

16

final and conclusive finding of likelihood of torture, the issues in this habeas corpus case are ripe for this Court's review.

### 2.    Jurisdiction

Next, the Court considers the Government's argument that it is barred from hearing the claims Mr. Aguasvivas raises under the statutes and regulations.  The Government argues that the Court has no jurisdiction (1) because the doctrine of non-inquiry precludes consideration of torture claims; (2) under the CAT and FARRA; and/or (3) under the REAL ID Act.  The Government also argues that limiting habeas corpus review here does not implicate the Suspension of Habeas Corpus Clause because the Secretary of State's surrender decision is outside the scope of habeas review.  The Court rejects the Government's arguments and finds that there is jurisdiction to review the claims.  The Court will begin with the Suspension Clause argument.

### a.  Suspension of Habeas Corpus Clause

The United States Constitution provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.  "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001).

The Government argues that the Suspension Clause does not apply in this context because historically and practically, the role of a habeas court has not been

extended to issues about the treatment a fugitive would receive in a foreign state, but the caselaw says otherwise. The Supreme Court has held that "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" *Id.* (citation omitted). The First Circuit has looked at whether a CAT claim fell within the historical ambit of habeas and found that it did. *See Saint Fort*, 329 F.3d at 201 ("American courts have exercised habeas review over claims of aliens based on treaty obligations since the earliest days of the republic."). It specifically recognized that review of extradition was historically among the functions of habeas, noting that "for centuries" "'federal courts employed the writ of habeas corpus to inquire into [,] [*inter alia,*] ..., extradition of aliens accused of crime....'" *Id.* at 197 (quoting G.L. Neuman, *Jurisdiction and the Rule of Law after the 1996 Immigration Act*, 113 Harv. L. Rev. 1963, 1966 (2000)). Thus, because the Suspension Clause of the Constitution has been interpreted to guarantee this Court's habeas jurisdiction, any attempt to remove such jurisdiction over Mr. Aguasvivas' CAT claim would violate the Suspension Clause. *See Saint Fort*, 329 F.3d at 200-02.[15]

---

[15] The Government argues that Mr. Aguasvivas' claims fall outside the Suspension Clause because the Secretary of State's decision to extradite involves an exercise of discretion, but the Court notes that Mr. Aguasvivas is arguing that his extradition is *prohibited* and so the Secretary has *no* discretion to extradite him. *Plaster v. United States*, 720 F.2d 340, 349 (4th Cir. 1983); *see also Mironescu v. Costner*, 480 F.3d 664, 670 (4th Cir. 2007) ("although the Executive has unlimited discretion to *refuse* to extradite a fugitive, it lacks the discretion to extradite a fugitive when extradition would" be unlawful).

### b. Doctrine of Non-Inquiry

The Government next argues the doctrine of non-inquiry deprives this Court of jurisdiction here. First, the rule of non-inquiry is not a jurisdictional rule. This doctrine counsels that extradition courts should refrain from evaluating petitioner claims that they will face mistreatment in a Requesting State in deference to the Executive Branch on such matters. While the First Circuit has held that non-inquiry encourages deference to the Executive Branch, it is not an absolute restraint on the courts. *See Kin-Hong*, 110 F.3d at 112 ("[n]one of these principles, including non-inquiry, may be regarded as an absolute."). A few courts that have applied non-inquiry have held that the rule implicates the *scope* of habeas review and does not affect federal habeas *jurisdiction*. *See Munaf v. Geren*, 553 U.S. 674, 700 (2008) (holding that the political branches should address the torture claims raised by habeas petitioners seeking to avoid transfer to a foreign country); *see also Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956 (9th Cir. 2012) ("the rule [of non-inquiry] implicates only the *scope* of habeas review; it does not affect federal habeas *jurisdiction*.") (emphasis in original); *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980) (holding that the degree of risk to petitioner's life from extradition is an issue that falls within the purview of the Executive Branch). Thus, the rule of non-inquiry is applied when the petitioner questions the *wisdom* of the Secretary of State's decision to extradite, but it does not fit here, where Mr. Aguasvivas questions the *legality* of the extradition.

Additionally, and notably, the Executive Branch has already found that torture is probable. The Government argues that the doctrine of non-inquiry is important so as to not "undermine the Government's ability to speak with one voice in this area," *Munaf*, 553 U.S. at 702, but here, the Executive Branch has already spoken—the BIA found that it is more likely than not that the Dominican Republic government will torture Mr. Aguasvivas. Indeed, the Supreme Court in *Munaf* determined that habeas was not appropriate in a case in which the petitioners were in a foreign country, not seeking release from U.S. custody, and who had not raised a bona fide CAT/FARRA claim,[16] but distinguished that situation from "a more extreme case" where "the Executive *has determined that a detainee is likely to be tortured but decides to transfer him anyway.*" *Id.* (emphasis added). This is precisely that extreme case.

### c. The CAT and FARRA

FARRA contains a jurisdiction-limiting provision:

> [N]o court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, ... except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. [§] 1252).

FARRA § 2242(d). The Government argues that this language restricts a court's CAT review of a final order of removal in an immigration case, effectively repealing a court's habeas jurisdiction. But to repeal habeas jurisdiction, the Supreme Court has

---

[16] Mr. Aguasvivas is not in a foreign country, is seeking release from United States custody, and has raised a bona fide CAT/FARRA claim.

recognized a "strong presumption in favor of judicial review of administrative action and [a] long standing rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *St. Cyr*, 533 U.S. at 298. When statutory language signals an intent to strip jurisdiction, courts must consider whether "an alternative interpretation of the statute is 'fairly possible.'" *Id.* at 299-300 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The United States Supreme Court in *St. Cyr* found that language much like FARRA § 2242(d) had no clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas, and so did not remove habeas jurisdiction. *Id.* at 314.

Following *St. Cyr*, the First Circuit held that FARRA § 2242(d) does not remove habeas jurisdiction over the CAT claims. *Saint Fort v. Ashcroft*, 329 F.3d 191, 201 (1st Cir. 2003). In that case, Mr. Saint Fort sought to challenge the BIA's denial of the CAT relief and his only recourse was habeas as he was statutorily ineligible for a review of a final order of removal. *Id.* at 193. The Government argued that FARRA § 2242(d) precluded habeas jurisdiction, but the First Circuit disagreed, holding that § 2242(d) "is a consolidation of statutory jurisdiction, not a repeal of habeas jurisdiction." *Id.* at 201. The First Circuit concluded that "FARRA does not expressly refer to 28 U.S.C. § 2241 or to habeas review and we would not imply an intent to repeal habeas jurisdiction from silence." *Id.* at 201.

The Government argues that *Saint Fort* is distinguishable because it is an immigration case with no applicability to extradition. The Court rejects the distinction and finds no legal, statutory, or policy basis to read the language of

§2242(d) with one result for immigration habeas petitioners and another result for extradition habeas petitioners. Because FARRA contains no clear statement removing this Court's habeas jurisdiction, the Court finds that it does not do so.

### d. REAL ID Act

Congress passed the REAL ID Act in 2005. It provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

8 U.S.C. § 1252(a)(4). The Government argues that this provision removes habeas jurisdiction over Mr. Aguasvivas' CAT claims. The Court disagrees.

It is undisputed that Mr. Aguasvivas has no alternative to habeas to obtain judicial review of his claims so before finding that 8 U.S.C. § 1252(a)(4) removes habeas jurisdiction, the Court should look for "an alternative interpretation of the statute [that] is 'fairly possible.'" *Trinidad y Garcia*, 683 F.3d at 956 (quoting *St. Cyr*, 533 U.S. at 299-300). In *Trinidad y Garcia*, the Ninth Circuit explained that the REAL ID Act can be construed as confined to addressing final orders of removal, without affecting habeas jurisdiction as the surrounding provisions of § 1252 relate to immigration orders. *Id.* at 956.[17] "Given the plausible alternative statutory

---

[17] The purpose of the REAL ID Act's jurisdiction-stripping provisions was to "consolidate judicial review of immigration proceedings into one action in the court of appeals." *Id.* at 958 (Thomas, J., concurring) (quoting *St. Cyr*, 533 U.S. at 313).

construction," the court found that it could not "conclude that the REAL ID Act actually repealed the remedy of habeas corpus." *Id.* (citing *St. Cyr*, 533 U.S. at 299-300). Here, considering the Suspension Clause questions that would arise if the Court construed the provision to divest it of habeas jurisdiction, the Court must find that the statute does not affect its habeas jurisdiction "to avoid such problems." *See St. Cyr*, 533 U.S. at 300. The Court has habeas jurisdiction over Mr. Aguasvivas Petition.

### 3. Res Judicata

Mr. Aguasvivas asserts that the DOS is precluded or estopped under res judicata from revisiting the BIA's adjudication of the likelihood of torture. Res judicata is a principle that "a right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies." *S. Pac. R.R. v. United States*, 168 U.S. 1, 48-49 (1897). For an issue to be precluded from reexamination, the First Circuit requires that five elements must be met:

> 1. the determination must be over an issue which was actually litigated in the first forum; 2. that determination must result in a valid and final judgment; 3. the determination must be essential to the judgment which is rendered by, and in, the first forum; 4. the issue before the second forum must be same as the one in the first forum; and 5. the parties in the second action must be the same as those in the first.[18]

---

[18] The First Circuit has recognized that those in privity are also bound by res judicata. *NLRB*, 836 F.2d at 34-35 (finding privity where the interests of one party "cannot be disassociated from the interests" of the other).

*See NLRB v. Donna-Lee Sportswear Co., Inc.*, 836 F.2d 31, 34 (1st Cir. 1987). The Court finds that all factors here have been met, res judicata applies, and the BIA's torture determination cannot be disputed.

First, the issue was fully and fairly litigated. In immigration court, there were nine hearings, testimonial and documentary evidence that Mr. Aguasvivas' brother Francis was killed, extensive documentation of police practices in the Dominican Republic, and testimony by four victims of DNCD torture. *See* ECF No. 9-2. The record supports the conclusion that the Government had the capacity to litigate fully its position that the police acted in a legitimate law enforcement capacity. Mr. Aguasvivas appealed the Immigration Judge's denial of his asylum application and the Government opposed it. ECF No. 9-5. In litigating this case, the Government had all the available tools and utilized all opportunities to obtain diplomatic assurances from the Dominican Republic. Indeed, the Government contacted the Dominican Republic during the 2015-2016 litigation and submitted documents obtained from the Dominican Republic in the immigration proceedings. *See* ECF 9-2 at 4-7, 30-31. Both parties had a full and fair opportunity to litigate the issue.

Second, a valid and binding judgment found that Mr. Aguasvivas would likely be tortured in the Dominican Republic. The BIA determined that "[i]n view of the country conditions evidence in the record and the credible and detailed testimony of the respondent's witness,...the respondent has met his burden of demonstrating on this record that *it is more likely than not that he will be tortured at the instigation or with the consent or acquiescence of public officials in the Dominican Republic*."

24

ECF No. 9-5 at 2 (emphasis added). The Government argues that the BIA finding is not binding on the Secretary of State in this extradition proceeding because immigration and extradition proceedings are separate and independent proceedings governed by different legal standards and procedures, relying on *Castaneda-Castillo v. Holder*, 638 F.3d 354, 361 (1st Cir. 2011). The Court rejects the Government's argument and its reliance on *Castaneda-Castillo* for two reasons: (1) the First Circuit in *Castaneda-Castillo* was determining whether the court should stay an asylum proceeding while an extradition proceeding moved forward and cited the Government's own language as dicta, *id.* at 360; and (2) the standard for an asylum proceeding bore no weight on the extradition proceeding[19] while here, the standard in the CAT proceeding is exactly the same as what the Secretary of State must use in the extradition determination. *See* CAT Art. 3, § 1, 22 C.F.R. § 95.1(c). The Court therefore finds no basis to decide that one arm of the Executive Branch can make a determination and another arm of the Executive Branch can ignore that determination when deciding the exact issue.

Third and fourth, whether torture is "more likely than not" was the central issue in the BIA's determination, *see* ECF No. 9-5, and the same one considered and

---

[19] In *Castaneda-Castillo*, the First Circuit rejected the government's argument that the court should hold an asylum appeal in abeyance as not to complicate extradition proceedings and noted that "the argument that adjudicating the asylum claim would somehow 'complicate' the extradition proceedings would have more legs if a decision on the former had legally preclusive effect on the latter." *Id.* at 360. The court also cited the government's own concession that "'the resolution of even a common issue in one proceeding is not binding in the other.'" *Id.*

decided in the immigration litigation as both agencies implement the same obligation under the CAT. *Compare* 8 C.F.R. § 1208.16(c)(4), *with* 22 C.F.R. § 95.2(b).

Lastly, Mr. Aguasvivas and the United States appear as the parties in both cases, so the parties are the same as or in privity with the parties in the immigration proceeding.[20]

With all factors satisfied, the Court holds that res judicata bars reexamination of the BIA's binding resolution that Mr. Aguasvivas is likely to be tortured upon extradition to the Dominican Republic.[21]

## IV.   CONCLUSION

The mandate of the Treaty requiring that the Government produce the document setting forth the charges has not been met, and therefore Mr. Aguasvivas cannot be extradited under the Treaty. Moreover, the BIA's finding that Mr. Aguasvivas is likely to be tortured by the Dominican Republic government if he is returned to that country prohibits his extradition under CAT and its authorizing statutes and regulations.

For the reasons detailed above, it is hereby ORDERED as follows[22]:

---

[20] It may appear that the Dominican Republic is the party in this action and was not represented in the immigration proceeding. The United States Attorney's Manual states that the prosecutor who appears in court "in support of the request for extradition [] is representing the United States in fulfilling its obligations under the extradition treaty." USAM 9-15.700, 1997 WL 1944616 (June 1, 2018).

[21] Because the Court has found that extradition violates the CAT, FARRA, and implementing regulations and that the BIA finding is binding in the extradition proceeding, it need not examine the Due Process and Administrative Procedures Act arguments.

[22] The Court DENIES AS MOOT Mr. Aguasvivas' Motion for Bail. ECF No. 16.

(1) The Extradition Complaint against Cristian Starling Aguasvivas is DENIED AND DISMISSED WITH PREJUDICE under both the (a) Dominican Republic-American Treaty, DR-U.S., art. 7 § 3(c), Jan. 12, 2015, T.I.A.S. No. 06-1215 and (b) United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85;

(2) The United States Department of State is enjoined from surrendering Cristian Starling Aguasvivas to the Dominican Republic or any official of the Dominican Republic; and

(3) The United States Marshals Service is ordered immediately to release Cristian Starling Aguasvivas from custody.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

September 18, 2019

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **CHRISTIAN AGUASVIVAS** ) | |
| ) | |
| **v.** ) | |
| ) | **C.A. NO: 19-123-JJM** |
| **MIKE POMPEO, Secretary of** ) | |
| **State, WILLIAM BARR, Attorney** ) | |
| **General, JOHN GIBBONS, U.S.** ) | |
| **Marshal for the District of** ) | |
| **Massachusetts, WING CHAU, U.S.** ) | |
| **Marshal for the District of Rhode** ) | |
| **Island and DANIEL MARTIN, Warden,** ) | |
| **Wyatt Detention Facility** | |

## JUDGMENT

[   ] Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered it's verdict.

[ X ] Decision by the Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED:**

**Judgment is hereby entered for the Plaintiff against the Defendants, pursuant to the Memorandum and Order dated September 18, 2019 GRANTING the Petition for Habeas Corpus under 28 U.S.C. § 2241.**

Enter:

 /s/ Barbara L. Barletta
**Deputy Clerk**

**DATED:      September 18, 2019**

# United States Court of Appeals
## For the First Circuit

No. 19-1937

CRISTIAN AGUASVIVAS,

Petitioner, Appellee,

v.

MICHAEL POMPEO, U.S. Secretary of State; JEFFREY ROSEN, Acting
U.S. Attorney General;* JOHN GIBBONS, U.S. Marshal for the
District of Massachusetts; WING CHAU, U.S. Marshal for the
District of Rhode Island; DANIEL MARTIN, Warden, Wyatt Detention
Facility,

Respondents, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., Chief U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Amy Barsky, with whom Fick & Marx LLP was on brief, for
appellee.
Lee Gelernt, Cody Wofsy, Roberto Gonzalez, and Lynette
Labinger on brief for the American Civil Liberties Union Foundation
and the ACLU Foundation of Rhode Island, amici curiae.
Christopher J. Smith, Associate Director, Office of
International Affairs, Criminal Division, U.S. Department of

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Acting Attorney General Jeffrey Rosen has been substituted for
former Attorney General William P. Barr.

Justice, with whom <u>Brian A. Benczkowski</u>, Assistant Attorney General, Criminal Division, <u>Bruce C. Swartz</u>, Deputy Assistant Attorney General, Criminal Division, <u>Philip A. Mirrer-Singer</u>, Trial Attorney, Office of International Affairs, Criminal Division, <u>Andrew E. Lelling</u>, United States Attorney, District of Massachusetts, <u>Cynthia A. Young</u>, Chief, Appeals Unit, District of Massachusetts, and <u>Theodore B. Heinrich</u>, Assistant United States Attorney, District of Massachusetts, were on brief, for appellants.

––––––––––––––––

January 7, 2021

––––––––––––––––

**KAYATTA**, **Circuit Judge**.  The Dominican Republic requests Cristian Starling Aguasvivas for extradition.  After a federal magistrate judge certified Aguasvivas as eligible for extradition, Aguasvivas filed a habeas corpus petition in the District of Rhode Island arguing, among other things, that the Dominican Republic had failed to provide the required documentation in its extradition request, and that his extradition would violate the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Dec. 10, 1984, T.I.A.S. No. 94-1120.1 ("CAT"), given that the Board of Immigration Appeals ("BIA") had previously found that he was qualified for CAT relief.  The district court agreed with Aguasvivas on both points, and the United States has now appealed.

For the reasons explained below, we disagree with the district court that the United States is bound by the BIA's prior determination awarding Aguasvivas CAT relief.  We nevertheless affirm the grant of habeas relief because we agree that the United States has failed to file the necessary documents to support an extradition request.

**I.**

On December 6, 2013, Aguasvivas was with his brother, Francis ("Frank"), when three Dominican drug officers, including Lorenzo Ubri, handcuffed and attempted to arrest Aguasvivas.  Shots were fired while the officers were attempting to put Aguasvivas

into their car.  According to the Dominican Republic as represented
by the United States, "Frank distracted the agents by protesting,
and Aguasvivas took advantage of this distraction to disarm Agent
Ubri and shoot him three times at close range, including two
bullets to the chest area."  Ubri died; the two other officers
were shot but not killed.

In  December  2013,  a  Dominican  warrant  issued  for
Aguasvivas's arrest.  Eight months later, Aguasvivas fled to the
United States.  In immigration court, he sought asylum, withholding
of removal, and CAT relief because of his fear of Dominican police.
The immigration judge denied all relief, but in August 2016, the
BIA reversed and granted withholding of removal under the CAT.
The BIA found that it was "more likely than not that [Aguasvivas
would] be tortured at the instigation of or with the consent or
acquiescence of public official[s] in the Dominican Republic" if
he returned.[1]

Just  over  three  years  after  the  warrant  issued,  in
February 2017, the Dominican Republic submitted an extradition
request to the United States.  Extradition is a "two-step procedure
[that] divides responsibility . . . between a judicial officer and
the Secretary of State."  United States v. Kin-Hong, 110 F.3d 103,

---

[1]  At  the  immigration  hearing,  four  victims  testified  that
the Dominican police tortured them for information on Aguasvivas's
location.  The police also killed Aguasvivas's brother, Frank.

109 (1st Cir. 1997). The process is set out in the extradition statutes, 18 U.S.C. § 3181 et seq. First, upon a complaint from the Department of Justice in response to the foreign government's request, the magistrate judge issues a warrant for the arrest of the individual sought. See id. § 3184. The magistrate then conducts a hearing to consider whether the extradition request complies with the relevant treaty's documentation requirements,[2] and whether "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." See id. If those requirements are fulfilled, the magistrate certifies the extradition to the Secretary of State. Id. The Secretary then "determine[s] whether or not the [fugitive] should actually be extradited." Kin-Hong, 110 F.3d at 109 (citing 18 U.S.C. § 3186). "The Secretary has the authority to review the judicial officer's findings of fact and conclusions of law de novo, and to reverse

---

[2] The statute is not perfectly clear on the magistrate's obligation to review whether the documents submitted by the requesting party fulfill the obligations of the pertinent treaty. The language of the statute simply requires that the magistrate certify the extradition "[i]f . . . he deems the evidence sufficient to sustain the charge under the provisions of the property treaty or convention." 18 U.S.C. § 3184. We have previously read that portion of the statute to allow the magistrate (and subsequent habeas court) to consider whether a treaty's warrant requirement was fulfilled. See Kin-Hong, 110 F.3d at 113-14; see also Emami v. U.S. Dist. Ct., 834 F.2d 1444, 1448-49 (9th Cir. 1987); In re Assarsson, 635 F.2d 1237, 1240-43 (7th Cir. 1980). The government does not argue that Aguasvivas's documentation claim in this case was not properly before the magistrate or the district court.

the judicial officer's certification . . . if [he] believes that it was made erroneously." Id. The Secretary can also "decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations." Id. Finally, the Secretary may "attach conditions to the surrender of the relator" or "use diplomatic methods to obtain fair treatment for the relator" -- tools the judiciary does not have.[3] Id. at 110.

Upon receipt and review of the request from the Dominican Republic to extradite Aguasvivas, the United States filed an extradition complaint in the District of Massachusetts. A U.S. warrant issued, and Aguasvivas was arrested in September 2017 in Lawrence, Massachusetts. Following a hearing, a magistrate judge in the District of Massachusetts certified Aguasvivas's extradition in December 2018. The magistrate judge found that the extradition request was supported by the documentation required by the Dominican Republic-United States Extradition Treaty ("Extradition Treaty"), Extradition Treaty, Dom. Rep.-U.S., Jan. 12, 2015, T.I.A.S. No. 16-1215, and that there was probable cause

---

[3] For a critical analysis of how often such diplomatic assurances actually work to prevent torture, see Katherine R. Hawkins, The Promises of Torturers: Diplomatic Assurances and the Legality of "Rendition", 20 Geo. Immigr. L.J. 213 (2006). See also Comm. on Int'l Human Rights, Torture by Proxy: International and Domestic Law Applicable to 'Extraordinary Renditions', 60 Rec. Ass'n B. City N.Y. 13, 138–49 (2005).

to certify Aguasvivas for the extraditable offenses of murder, possession of a firearm, and robbery.

Magistrates' certifications of extraditability are not appealable final orders under 28 U.S.C. § 1291.  In re Mackin, 668 F.2d 122, 127–28 (2d Cir. 1981).  Extraditees therefore sometimes seek habeas relief to challenge their detention pursuant to the certifications.  See id. at 128; see, e.g., In re Extradition of Manzi, 888 F.2d 204, 205 (1st Cir. 1989) (per curiam).  To challenge his detention and avoid extradition, Aguasvivas filed just such a habeas petition in the District of Rhode Island.  The district court granted the petition in September 2019.  It first found that the magistrate judge had evidence sufficient to find probable cause.  But it then found both that the extradition was barred by the BIA's CAT determination and that the extradition request did not satisfy the documentary requirements of the treaty.[4]

With this appeal, the United States challenges both the ruling that the BIA's 2016 CAT determination precludes extradition and the ruling that the request of the Dominican Republic does not

---

[4]  Because it found that release was required on Aguasvivas's CAT and documentation requirements claims, the district court did not reach all the claims in the habeas petition.  Specifically, the habeas petition includes additional claims under procedural due process, substantive due process, and the Administrative Procedure Act.

satisfy the documentary requirements for extradition.  We address each challenge in turn.

## II.

### A.

We begin with the United States' challenge to the district court's ruling that the Convention Against Torture precludes Aguasvivas's extradition.  At issue here, according to Aguasvivas, is the prospect that, if extradited to the Dominican Republic, he will be tortured.  A claim of feared torture warrants attention in the extradition context because of the principle of non-refoulement in international law, reflected in Article 3 of the CAT, and enacted in the United States (as pertinent here) in the "FARR Act."  See Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761, 2681-822; Nasrallah v. Barr, 140 S. Ct. 1683, 1690 (2020) ("[The FARR Act] implements Article 3 of the international Convention Against Torture, known as CAT.").  That Act states in part that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."  FARR Act § 2242(a).  It then "delegates the responsibility for 'prescrib[ing] regulations to implement the obligations of the United States' under the CAT to 'heads of the appropriate

agencies.'"  Saint Fort v. Ashcroft, 329 F.3d 191, 196 (1st Cir.
2003) (quoting FARR Act § 2242(b)).  As relevant to extradition,
the Secretary of State, "[i]n order to implement" the United
States' obligations under the CAT, "considers" whether an
individual sought is "more likely than not" to be tortured before
extraditing him.  22 C.F.R. § 95.2(b).

Aguasvivas, though, does not want to wait to see what
the Secretary decides.  Instead, he launched a preemptive strike,
asking the district court to rule now that the threat of torture
must prevent his extradition, and thus that there is no reason to
detain him.  And the district court agreed, reasoning that, because
the BIA previously found that removal of Aguasvivas by immigration
authorities was barred by the CAT, the Secretary is estopped from
ruling otherwise.  In challenging that ruling, the United States
advances two arguments that command our attention.  First, the
United States contends that the district court exceeded its own
statutory jurisdiction by inquiring into the subject of whether
the CAT precluded Aguasvivas's extradition.  In support of this
argument, the United States relies on the so-called "rule of non-
inquiry," Kin-Hong, 110 F.3d at 110;[5] the Senate's declaration that

---

[5]   See Trinidad y Garcia v. Thomas, 683 F.3d 952, 992 (9th
Cir. 2012) (Berzon, J., concurring in part) ("The Supreme Court
has never used the term 'rule of non-inquiry' . . . .  Instead,
the doctrine developed . . . as lower courts interpreted and
expounded upon Supreme Court extradition precedents.").

Article 3 of the CAT is not self-executing, 136 Cong. Rec. 36198 (1990); the FARR Act § 2242(d); and the REAL ID Act of 2005, Pub. L. No. 109-13, § 106(a)(1)(B), 119 Stat. 231, 310 (codified at 8 U.S.C. § 1252(a)(4)).  Second, the United States argues that, in any event, the CAT's application to this extradition request is not pre-ordained by the BIA ruling and is in fact an issue that is not yet ripe.  Because we find the collateral estoppel issue ripe, and the argument against treating the BIA ruling as controlling to be plain and persuasive, we skip over the more difficult issues of whether we possess statutory jurisdiction.  Cowels v. FBI, 936 F.3d 62, 67 (1st Cir. 2020) ("Where a question of statutory jurisdiction is complex, but the merits of the appeal are 'easily resolved against the party invoking [] jurisdiction,' we can assume jurisdiction for purposes of deciding the appeal." (quoting In re Fin. Oversight & Mgmt. Bd. for P.R., 916 F.3d 98, 114 n.13 (1st Cir. 2019))).[6]

---

[6] We have no reason to believe that any principle of non-inquiry implicates federal court jurisdiction -- much less Article III jurisdiction. In Munaf v. Geren, although the Supreme Court dismissed the petitioners' torture claims based in part on principles of non-inquiry, 553 U.S. 674, 700-03 (2008), the Court held that the district court at least had jurisdiction over the claims as "habeas corpus petitions filed on behalf of American citizens challenging their detention in Iraq" by a multinational force, id. at 680, 685-88.  Similarly, we have previously explained that the principle of non-inquiry cannot be "regarded as an absolute," Kin-Hong, 110 F.3d at 112, quoting the Second Circuit's statement that it could "imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require

1.

A federal court possesses Article III jurisdiction to
hear a case or controversy only if it alleges an injury in fact.
See Susan B. Anthony List v. Driehaus (SBA List), 573 U.S. 149,
157-58 (2014).  An allegation of future injury satisfies that
requirement only "if the threatened injury is 'certainly
impending,' or there is a 'substantial risk' that the harm will
occur."  Id. at 158 (quoting Clapper v. Amnesty Int'l U.S.A., 568
U.S. 398, 414 n.5 (2013)); see also Reddy v. Foster, 845 F.3d 493,
500 (1st Cir. 2017).  We have previously described our ripeness
inquiry as having "roots in both the Article III case or
controversy requirement and in prudential considerations," Reddy,
845 F.3d at 500 (quoting Roman Cath. Bishop of Springfield v. City
of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)), but we
acknowledge that the Supreme Court has moved away from considering

---

reexamination" of the principle, id. (quoting Gallina v. Fraser,
278 F.2d 77, 79 (2d Cir. 1960)); see also Hilton v. Kerry, 754
F.3d 79, 86-87 (1st Cir. 2014) (applying principles of non-inquiry
and declining to apply the "theoretical Gallina exception" but
providing no suggestion of a jurisdictional bar); In re Extradition
of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993) (defining non-
inquiry as "a doctrine which forbids judicial authorities from
investigating the fairness of a requesting nation's justice system
when considering whether to permit extradition to that nation" --
but not as jurisdictional).

The government has not argued that Aguasvivas's CAT claim is
outside the scope of habeas jurisdiction as defined under Fernandez
v. Phillips, 268 U.S. 311, 312 (1925), and discussed further below,
so we need not address that issue here.

prudential standing separate and apart from Article III standing, see Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125-26 (2014) (explaining that to take prudential considerations into account in determining standing would be "in some tension with our recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging'" (quoting Sprint Commc'ns., Inc. v. Jacobs, 571 U.S. 69, 77 (2013))). While it is unclear whether prudential ripeness concerns in particular may still be entertained, see SBA List, 573 U.S. at 167 ("[W]e need not resolve the continuing vitality of the prudential ripeness doctrine in this case . . . ."), Aguasvivas plainly alleges injury either way: He claims that extradition and, thus, the renewal of his detention for extradition are precluded by the fact that a prior ruling renders him nonextraditable under the CAT. See Dep't of Homeland Sec. v. Thuraissigiam, 140 S. Ct. 1959, 1974 (2020) ("[E]xtradition cases . . . illustrate nothing more than the use of habeas to secure release from custody when not in compliance with the extradition statute and relevant treaties."). As a result, the government's argument that Aguasvivas's collateral estoppel claim is not ripe fails.

### 2.

We thus move to the merits of Aguasvivas's collateral estoppel claim, which is that the Secretary is estopped from

determining that Aguasvivas is not likely to face torture if he returns to the Dominican Republic, because the immigration courts have already determined that he is likely to face torture. Even putting to one side the questions of whether and when one agency of the federal government may collaterally bind another arm of the government,[7] collateral estoppel cannot apply here because the issues are not the same. See NLRB v. Donna-Lee Sportswear Co., Inc., 836 F.2d 31, 34 (1st Cir. 1987) ("[T]he issue before the second forum must be the same as the one in the first forum . . . ."). The issue before the BIA was whether it was more likely than not that Aguasvivas would be tortured if he were removed by immigration authorities to the Dominican Republic in 2016. See 8 C.F.R. § 208.16(c)(3). The issue to be addressed by the Secretary would be whether Aguasvivas is more likely than not to be tortured if he is extradited by the Secretary in 2020. See 22 C.F.R. § 95.2(b). The relevant time frames at issue differ by several years. And the Secretary may also be able to use the normal tools of diplomacy to assure certain treatment for Aguasvivas upon surrender, as described above. See Kin-Hong, 110 F.3d at 110. So whether Aguasvivas would be tortured if extradited by the Secretary in 2020 is a materially different question from

---

[7] The government argues that the parties are not identical, and Aguasvivas counters with several theories under which the parties may be at least in privity with each other.

- 13 -

whether he would have been tortured had he been removed by immigration officials without any such assurances in 2016.

      As one amicus brief[8] has pointed out, in theory the Secretary could have sought the same diplomatic assurances from the Dominican Republic during the litigation of Aguasvivas's CAT claim in removal proceedings.  See 8 C.F.R. § 1208.18(c) (setting forth a procedure for the Secretary of State to forward diplomatic assurances to the Attorney General to be relied upon in immigration proceedings).  But we see no reason why the Secretary should be required to seek diplomatic assurances in removal proceedings or else forever hold his or her peace, especially given that removal proceedings might take place before the foreign government even requests extradition in the first place -- as happened here. Presumably, even potentially effective assurances in place at the time of removal proceedings would have to be re-sought or updated if there were an extradition process years later.  The availability of diplomatic assurances in the removal process thus does not convince us that the Secretary must be bound by the results of that process.[9]  As a result, we see no reason to bind the government

---

      [8]  See Br. for the American Civil Liberties Union Foundation and ACLU Foundation of Rhode Island as Amicus Curiae Supporting Appellee and Affirmance at 21.

      [9]  Furthermore, the CAT relief Aguasvivas was awarded in his removal proceeding was not tantamount to permanent legal status. See Andrea Montavon-McKillip, CAT Among Pigeons: The Convention Against Torture, a Precarious Intersection Between International Human Rights Law and U.S. Immigration Law, 44 Ariz. L. Rev. 247,

preemptively by collateral estoppel in these extradition
proceedings, and Aguasvivas's detention would be proper as a matter
of extradition procedure -- at least as to the CAT issue.  See 18
U.S.C. § 3184 (requiring the extradition magistrate to "issue his
warrant for the commitment of the person so charged to the proper
jail" upon certifying extraditability).

**B.**

We turn now to Aguasvivas's claim that the documentary
requirements of the Dominican Republic-United States Extradition
Treaty have not been met, beginning with the question of whether
we have habeas jurisdiction to review the magistrate's
determination on the issue at all and then proceeding to the
merits.

**1.**

In its briefs, the United States makes no claim that we
lack jurisdiction to determine whether the documentary
requirements of the treaty have been satisfied.  Counsel for the
United States explained that the United States has previously and

---

260 (2002) (explaining that CAT relief does not "confer derivative
status to the applicant's family," "provide any permanent
immigration benefits," or automatically provide work
authorization).  In fact, a removal case can be reopened and CAT
withholding terminated if there is a "change in circumstances
relating to the . . . claim."  8 C.F.R. § 208.24(b)(1); see also
Nasrallah, 140 S. Ct. at 1691 ("An order granting CAT relief means
only that, notwithstanding [an] order of removal, the noncitizen
may not be removed to the designated country of removal, at least
until conditions change in that country.").

- 15 -

unsuccessfully contested jurisdiction over this issue in other cases and has intentionally abandoned that argument in this case. See Sacirbey v. Guccione, 589 F.3d 52, 64 n.16 (2d Cir. 2009) (reviewing circuit rulings). Nor do we see, sua sponte, any compelling reason not to exercise jurisdiction under the second prong of Fernandez v. Phillips, 268 U.S. 311 (1925). As the Supreme Court explained in that case: "[H]abeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." Id. at 312. "[W]hether the offense charged is within the treaty" requires an analysis of what the offense charged is -- or whether any offense has been charged at all (not to mention whether a formal charge is necessary). See Noeller v. Wojdylo, 922 F.3d 797, 805 (7th Cir. 2019) (treating a challenge to the warrant at issue "as a challenge within the second category of permissible challenges under [Fernandez], whether the offense charged falls within the treaty, which we have understood as including whether the treaty's documentary requirements have been met"); Sacirbey, 589 F.3d at 63-69 (evaluating whether a formal charge was required and considering it the court's "duty to ensure that the applicable provisions of the treaty and the governing American statutes are complied with" under Fernandez (alteration

- 16 -

omitted) (quoting <u>United States ex rel. Petrushansky</u> v. <u>Marasco</u>, 325 F.2d 562, 565 (2d Cir. 1963))); <u>see also</u> <u>Trinidad y Garcia</u>, 683 F.3d at 1009 (Kozinski, J., dissenting in part) (characterizing the limited scope of review under <u>Fernandez</u> to include "whether the executive branch has the authority to detain the extraditee in the first place and whether the judicial branch has exercised proper jurisdiction over him").

Nor has the United States argued that this set of claims fails to allege an injury in fact. We agree that there is an "immedia[te] and real[]" controversy as to the probable cause and documentation issues that Aguasvivas raises, because he would not be subject to detention but for the magistrate judge's challenged certification that the documentation was proper and that probable cause existed. <u>MedImmune, Inc.</u> v. <u>Genentech, Inc.</u>, 549 U.S. 118, 127 (2007) (quoting <u>Md. Cas. Co.</u> v. <u>Pac. Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941)). And even though these issues could be mooted if the Secretary decides that Aguasvivas should not be extradited, that possibility of eventual relief does not change the fact that the Secretary seeks to have Aguasvivas detained now.

**2.**

So we turn to the merits of Aguasvivas's argument -- accepted by the district court -- that the request for extradition does not comply with the basic documentary requirements of the treaty. That determination turned on an interpretation of the

Extradition Treaty's Article 7, titled "Extradition Procedures and Required Documents."  Paragraph 2 of Article 7 requires, among other things, that "[a]ll extradition requests shall be supported by . . . information describing the facts of the offense or offenses [and] the text of the law or laws describing the offense or offenses for which extradition is requested."  Extradition Treaty art. 7, § 2.  Paragraph 3 then specifies that "[i]n addition to the requirements in paragraph 2 . . . ., a request for extradition of a person who is sought for prosecution shall also be supported by:"

> (a) a copy of the warrant or order of arrest or detention issued by a judge or other competent authority;
> (b) a copy of the document setting forth the charges against the person sought; and
> (c) such information as would provide a reasonable basis to believe that the person sought committed the offense or offenses for which extradition is requested.

Extradition Treaty art. 7, § 3.[10]

Aguasvivas contends that the request for his extradition failed to satisfy these documentary requirements for two reasons: (1) the warrant was not a warrant for his arrest or detention because it did not name him; and (2) the request did not include

---

[10]  We refer only to the official English-language version of the Treaty.  See Extradition Treaty art. 9 (requiring all extradition documents to be translated into the language of the "Requested Party"); cf. 48 U.S.C. § 864 (requiring all proceedings in the District Court of Puerto Rico to be conducted in English).

"the document setting forth the charges" against him.  We address each argument in turn.

### a.

The Dominican Republic submitted a translated copy of the warrant for the arrest of Aguasvivas.  It reads in part:

> "[T]he judge . . . can ordain the arrest of a person when . . . his presence is necessary and there is evidence to reasonably maintain that he is the perpetrator or accomplice of an offense, that he can hide, leave or escape from the place[,]" and "when the person after being summoned to appear . . . does not do that, and his presence is necessary during the investigation or knowledge of an infringement. . . ."
> [This warrant o]rdains the arrest against CRISTIAN STARLING AGUASVIVAS aka MOMON and FRAN AGUASVIVAS aka EL COJO, according to the request filed by the licentiate FELIX SANCHEZ, Deputy Prosecutor of Judicial District of Peravia . . . .

(quoting Dom. Rep. Code Crim. P. arts. 224, 225).

Aguasvivas points out that the warrant botches his name -- entirely omitting his first name ("Cristian") and in its place using only a misspelling of his middle name ("Estarling" instead of "Starling") -- though the version translated to English inexplicably gets it right (and the difference is not a simple matter of translation).  But extradition law discourages reliance on mere technicalities to impede the joint efforts of the treaty parties to extradite.  See Fernandez, 268 U.S. at 312 ("Form is not to be insisted upon beyond the requirements of safety and

- 19 -

justice."); <u>Bingham</u> v. <u>Bradley</u>, 241 U.S. 511, 517 (1916)
(disfavoring defenses "savor[ing] of technicality" in extradition
proceedings). And there is no dispute -- even by Aguasvivas --
that he is the person described in the warrant, which is
accompanied by an affidavit that also describes him and includes
his picture.[11]

The Supreme Court has previously found that an arrest
warrant was invalid when it used an entirely incorrect first name
("James" versus "Vandy M."). <u>See</u> <u>West</u> v. <u>Cabell</u>, 153 U.S. 78, 85
(1894) ("[A] warrant for the arrest of a person charged with crime
must truly name him, or describe him sufficiently to identify
him."). Here, however, the reasonable inference from the warrant's
misspelling is that the police thought Aguasvivas's middle name
was his first name, and then spelled that name wrong. <u>See</u> <u>Gero</u> v.
<u>Henault</u>, 740 F.2d 78, 83 (1st Cir. 1984) (upholding a warrant that
listed the defendant's real name and alias, but in reverse order,
noting that it was clear that the police knew that the defendant
used both names). This is a far cry from an arrest warrant that
mistakes the identity of the party sought. So although we view

---

[11] While Aguasvivas does not argue that he is not the person
intended to be described in the warrant, he does contend that the
use of the wrong name at one point led to the arrest of the wrong
person, Richard Estarlin Aguasvivas. While Aguasvivas submitted
a letter under Rule 28(j) suggesting that Dominican agents were
seeking another person in the lead-up to his attempted arrest, the
letter does not suggest that the warrant submitted in the
extradition case does not identify him.

the mistranslation of the warrant as troubling, it was not error for the magistrate to rely on the warrant despite the misspelling of Aguasvivas's name in the original, Spanish version.[12]

**b.**

The bigger problem arises from the omission in the extradition request of any indictment or the like. To be more precise, such a document was not simply omitted -- it does not exist at all, as the parties agree that the Dominican prosecutor has yet to seek an indictment (called an "acusación" in the Dominican Republic). Nor does any party dispute that the criminal code of the Dominican Republic provides for the initiation of an extradition request when a person against whom an indictment has been presented is in a foreign country. See Dominican Code of Criminal Procedure ("DCCP") Art. 161. Aguasvivas argues that Dominican law actually requires that an indictment precede seeking extradition from any country, but that contention is disputed, and we defer to that extent to the Dominican government's construction of its own law as not requiring any step or document that the

---

[12] Of course, the rule that "federal court proceedings must be conducted in English," United States v. Rivera-Rosario, 300 F.3d 1, 5-6 (1st Cir. 2002); see also Extradition Treaty art. 9 (requiring all extradition documents to be translated into the language of the "Requested Party"); cf. 48 U.S.C. § 864 (requiring all proceedings in the District Court of Puerto Rico to be conducted in English), cannot excuse the government's use of name-altering translations. We simply find that the errors in the Spanish-language warrant here were not sufficient to invalidate it.

treaty does not require.  Cf. Grin v. Shine, 187 U.S. 181, 190-91 (1902) (refusing to consider a challenge to the validity of a foreign arrest warrant).  Similarly, while the Dominican prosecutor's affidavit accompanying the extradition request explains that a prosecutor in the Dominican Republic may in the course of an investigation obtain an arrest warrant before deciding whether or not to bring any charges,[13] nothing in the affidavit states that a prosecutor cannot indict before executing an arrest warrant.  The prosecutor's affidavit also suggests that charges may be lodged in the Dominican Republic by a criminal complaint made out by a victim.  But the affidavit does not claim that any criminal complaint has yet been lodged against Aguasvivas.

---

[13] Under the heading "Criminal Procedure in the Dominican Republic," the prosecutor's affidavit reports that:

> If the accused has escaped, the prosecutor asks the judge for a warrant for his arrest.  As soon as the suspect is arrested, the prosecutor in charge of prosecuting the case, will interview him in the presence of his defense counsel; if the accused can not afford a defense lawyer, the State will provide one.  Within 48 hours, the accused is presented by the prosecutor to the investigating judge, in order that he decides on the measure of coercion that must be applied to the accused.
> The prosecutor decides whether or not to bring charges according to the merits of the evidence available.

For our purposes the salient point is that as best this record shows neither the United States nor the Dominican Republic disputes that Dominican law certainly allows for an indictment or a criminal complaint as a precursor to an extradition request. So here we have an application for extradition that includes no indictment or criminal complaint only because no complaint exists and apparently no indictment has even been sought. In short, this case concerns a request to extradite for arrest and questioning in anticipation of a possible, yet-to-be-determined prosecution.

This all brings us back to the text of the treaty. See United States v. Alvarez-Machain, 504 U.S. 655, 663 (1992) ("In construing a treaty . . . we first look to its terms to determine its meaning."); Restatement (Fourth) of Foreign Relations Law § 306 (Am. Law Inst. 2018) ("A treaty is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in light of its object and purpose."). If the treaty's text is ambiguous and reasonably accommodates the United States' construction, we defer to that construction whether or not it is a construction we would adopt de novo. See Kin-Hong, 110 F.3d at 110 ("[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement . . . ."); Factor v. Laubenheimer, 290 U.S. 276, 293–94 (1933) ("[I]f a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other

- 23 -

enlarging it, the more liberal construction is to be preferred."). Conversely, if the textual meaning is plain and cannot reasonably bear the government's construction, then we must reject that construction. <u>Greci</u> v. <u>Birknes</u>, 527 F.2d 956, 960 (1st Cir. 1976) (declining to accept the State Department's interpretation where the language of the treaty to the contrary was "plain").

The United States' textual argument focuses on the phrase "the document setting forth the charges." Most persons familiar with criminal procedure would read that phrase as referring to either an indictment, a criminal complaint, or in some circumstances in this country, an information. In this case, the United States does not argue that the Dominican extradition request includes any one of these three types of documents. Rather, the United States argues that the warrant can do "double duty," serving as both the warrant and as "the document setting forth the charges." As to why we should regard the warrant as "the document setting forth the charges," the United States offers a single argument:

> The Dominican arrest warrant . . . satisfies the plain terms of Article 7.3(b) of the Treaty. It describes the criminal acts that Aguasvivas is alleged to have committed and lists the Dominican statutes that Aguasvivas is alleged to have violated. It therefore qualifies as "the document setting forth the charges against the person sought."

We see six textual problems with this argument.

– 24 –

First, and most importantly, were the United States correct, then the entirety of paragraph 3(b) (requiring "the document setting forth the charges") would be entirely superfluous. In every case, the warrant would perform the government's version of double duty. The government, after all, makes no argument that Dominican or United States warrants of arrest or detention would ever fail to do what the United States says is necessary to do double duty as the document setting forth the charges. In the United States, for example, arrest warrants must "describe the offense charged." Fed. R. Crim. P. 4(b)(1)(B); see also 1 Federal Practice and Procedure: Criminal §§ 51, 54 (4th ed. 2020) (describing requirements of form for warrants issued pursuant to Rules 4 and 9); 5 Am. Jur. 2d Arrest § 21 (2d ed. 2020) (collecting state and federal cases requiring that arrest warrants describe the offense charged). Indeed, one of the purposes served by an arrest warrant is to give notice of the alleged offense for which probable cause has been found. Jaben v. United States, 381 U.S. 214, 218–19 (1965) ("Notice to a criminal defendant is usually achieved by service upon him of the summons or arrest warrant . . . ."). And the United States makes no claim that arrest warrants in the Dominican Republic differ in this regard.[14]

---

[14] Nor does the United States argue that "order[s] of arrest or detention" can both issue prior to indictment and fail to describe the offenses.

Certainly, the Dominican warrant in this case describes the offenses for which the issuing official has found sufficient cause.

Our dissenting colleague posits that a warrant to search for and seize "a person to be arrested" under Federal Rule of Criminal Procedure 41(c)(4) need not contain such information, but points to no example of an arrest or detention pursuant to such a warrant (rather than a Rule 4 warrant). The United States itself makes no such argument (either in the district court or before us). And even were we to accept the possibility that a warrant silent as to the offense could authorize arrest or detention, the "missing" information required by the United States' "double duty" interpretation would always be supplied by the Paragraph 2 required information.[15] So, whichever way you look at it, either the warrant by itself or certainly the warrant and the paragraph 2 information would in 100 percent of the cases supply everything that the United States claims is necessary, and thus do the requisite double duty, rendering Article 7.3(b) entirely superfluous.

Second, this is a treaty between two countries that both customarily employ warrants to arrest and separate documents to

---

[15] Paragraph 2 requires "[i]n addition to" the documents required by Paragraph 3 "information describing the facts of the offense or offenses . . . [and] the text of the law or laws describing the offense or offenses for which extradition is requested."

charge. When two experienced anglers refer to their "casts," we
don't envision them making movies. Similarly, when these two
countries refer in separately set-off sub-paragraphs to the
warrant and to "the document setting forth the charges," (emphasis
added), we envision something more than a warrant procured by a
prosecutor who has not yet decided to bring charges.

Third, a warrant, unlike an indictment, fails to
indicate that the subject is wanted for prosecution.[16] Under this
treaty, the difference matters. Article 1 of the Extradition
Treaty states that it is intended to provide for extradition of
people "sought by the Requesting Party from the Requested Party
for prosecution" (emphasis added). Article 7.3 itself describes
the required documentation as support for "a request for
extradition of a person who is sought for prosecution." This plain
language expressly describing the role played by "the document
setting forth the charges" reinforces the notion that Article 7 of
the Treaty does not call for the extradition of a person wanted
for questioning regarding a possible but not yet charged
prosecution.

Fourth, we examine the text of this treaty against the
backdrop of judicial interpretations of other treaties. Long

---

[16] The United States does not report that the Dominican
Republic argues otherwise or that the rule of non-inquiry precludes
us from drawing this conclusion.

before this treaty was concluded, two circuit courts had considered whether a treaty required presentation of an indictment or the like in support of an extradition request. See Emami v. U.S. Dist. Ct., 834 F.2d 1444, 1448-49 (9th Cir. 1987); In re Assarsson, 635 F.2d 1237, 1240-43 (7th Cir. 1980). In rejecting the contention that the applicable treaty conditioned extradition on the filing of formal charges, each court pointed out that the treaty's list of required documents contained no reference to any formal document evidencing charges being brought. The lists included, instead, the warrant. Emami, 834 F.2d at 1448 n.3; Assarsson, 635 F.2d at 1243. The Seventh Circuit reasoned that, "[i]f the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided." Assarsson, 635 F.2d at 1243. We readily agree with the holdings and the rationale in both Emami and Assarsson. So we could rule for the government in this case were the language of this treaty materially similar to the language of those treaties.

The treaty in this case, though, adds to the list of required documents a requirement that was missing in those earlier treaties: "the document setting forth the charges." For that reason, our agreement with the holdings in Emami and Assarsson provides no succor for the United States in this case. Indeed, given that the State Department is presumably familiar with the various treaty forms that it has adopted and with circuit law

construing those forms, the contrast between this treaty and the
treaties in those cases strongly suggests that the addition of
§ 3(b) was intended to call for the production of more than just
a warrant.

This reasoning moves even closer to home when we consider
the fifth textual problem with the government's argument, this
Treaty's departure from the language in the pre-existing, 1909
extradition treaty with the Dominican Republic. That treaty, like
the treaties at issue in Assarsson and Emami, also had no
requirement to include the document setting forth the charges.
Extradition Convention art. XI, Dom. Rep.-U.S., June 19, 1909,
36 Stat. 2468 ("If, however, the fugitive is merely charged with
crime, a duly authenticated copy of the warrant of arrest in the
country where the crime was committed, and of the depositions upon
which such warrant may have been issued, shall be
produced . . . ."). When, subsequent to Assarsson and Emami, the
Dominican Republic and the United States added to the list of
required documents "the document setting forth the charges," a
strong inference arose supporting the conclusion that this treaty
requires more than an arrest warrant describing a suspected but
yet-to-be charged crime.

Finally, this inference only grows stronger when we
compare this treaty's supporting document requirements to those
present in other recent treaties. After Assarsson and Emami and

prior to this treaty's conclusion, the State Department demonstrated that it knew how to make the production of a document other than an arrest warrant optional. The extradition treaty between the United States and Austria, for example, provides that "[a] request for extradition of a person who is sought for prosecution shall be supported by" "a copy of the warrant or order of arrest" and "a copy of the charging document, if any." Extradition Treaty, Austria-U.S. art. 10, § 3, Jan. 8, 1998, T.I.A.S. No. 12916 (emphasis added); see also Protocol Amending the Convention between the United States of America and Israel of December 10, 1962, Isr.-U.S., art. 6, July 6, 2005, T.I.A.S. No. 07-110 (amending Article X of the countries' extradition treaty to include the same language). This language plainly recognizes that there is a type of document in addition to the warrant that is known as a charging document. And that language also grants permission to proceed without that other document if it does not exist. The treaty before us preserves that recognition that there is some document that does more than a warrant does, but it eliminates the permission to proceed without such a document. This change would not have been made had the United States been willing to extradite to the Dominican Republic persons (including its citizens) based only on a warrant.

        As best we can tell, no other United States extradition treaty uses the same relevant language as does the treaty with the

Dominican Republic. The treaty that comes closest, the Chile-United States Extradition Treaty, preexisted this treaty and requires a warrant and "a document setting forth the charges." See Extradition Treaty, Chile-U.S., art. 8, § 3(b), June 5, 2013, T.I.A.S. No. 16-1214. The next-closest agreements are those with Belize, Saint Kitts and Nevis, Saint Vincent and the Grenadines, Grenada, and Saint Lucia, all of which also preexist this treaty and none of which requires "the document setting forth the charges." See Extradition Treaty, Belize-U.S., art. 6, § 3(b), Mar. 30, 2000, T.I.A.S. No. 13,089; Extradition Treaty, St. Kitts & Nevis-U.S., art. 6, § 3(b), Sept. 18, 1996, T.I.A.S. No. 12,805; Extradition Treaty, St. Vincent-U.S., art. 6, § 3(b), Aug. 15, 1996, T.I.A.S. No. 99-908; Extradition Treaty, Gren.-U.S., art. 6, § 3(b), May 30, 1996, T.I.A.S. No. 99-914.1; Extradition Treaty, St. Lucia-U.S., art. 6, § 3(b), Apr. 18, 1996, T.I.A.S. No. 00-202. The parties cite no precedent concerning those treaties. Whether the United States' "double duty" theory would work with those treaties without rendering an entire paragraph superfluous, we need not decide. Rather, the arguably pertinent point is that in this treaty alone "a document setting forth the charges" is changed to "the document setting forth the charges."

We have also considered the arguments of our dissenting colleague, which rely heavily on cases construing the interstate extradition statute, or cases construing other treaties. We find

nothing in those cases inconsistent with our holding here. Neither the interstate extradition statute nor the treaties in those cases called for a warrant and "the document setting forth the charges." Instead, in one manner or another they simply required that the person sought for extradition have been "charged," which we agree in that context could be construed "in the broad and practical sense," <u>Pierce</u> v. <u>Creecy</u>, 210 U.S. 387, 402 (1908), as not requiring more than one would find always in an arrest warrant. In none of these cases was the court asked by the government to construe a requirement that "A and B be filed" as meaning that only "A be filed."

Our dissenting colleague also speculates that "an order of detention" refers always and only to something that compels the detention of a person who has <u>not</u> been indicted. Hence, reasons our colleague, there could never be an extradition based on an order of detention if an indictment were required. The United States itself advances no such argument. Nor does it point to any basis for such an unsupported (and unasserted) assumption that orders of detention can never be accompanied by indictments.

In sum, we find that the text of the treaty, even when viewed through a lens of liberal construction favoring extradition, will not accommodate the United States' interpretation. Most notably, that construction would render superfluous a relatively bespoke requirement added to this treaty,

the absence of which requirement in other preexisting treaties was twice noted as significant by circuit courts before this treaty was written.

A final note on the charges: At oral argument, counsel for the United States acknowledged that because of the rule of specialty, any offense not listed in the document satisfying the requirement established in Article 7.3(b) cannot be certified for extradition. See United States v. Tse, 135 F.3d 200, 204 (1st Cir. 1998) ("The doctrine of specialty is grounded in international comity and generally requires that a requesting country not prosecute a defendant for offenses other than those for which extradition was granted."); United States v. Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995) ("The principle of specialty . . . generally requires that an extradited defendant be tried for the crimes on which extradition has been granted, and none other." (internal citations omitted)). Here, the arrest warrant does not list Article 379 of the Dominican Code, which criminalizes a form of robbery. Article 379 is included in the extradition request, however, and the magistrate certified it for extradition. Certification and Committal for Extradition at 3, In re Extradition of Cristian Starling Aguasvivas, No. 17-mj-04218 (D. Mass. Dec. 11, 2018), ECF No. 78. The government avers that the difference between the offense listed in the extradition request and that listed in the arrest warrant (Article 309) amounts to no more than

a typo, and the magistrate judge agreed.  But Article 309 is an
entirely distinct offense under the Dominican Code, so it is
difficult to simply assume that its presence in the arrest warrant
was a typo.  As a result, even if we found the documentation
sufficient to certify on the other charges, we would vacate the
certification of Article 379 specifically.

### C.

Finally, Aguasvivas argues that there is not probable
cause to believe he committed the crimes alleged by the Dominican
Republic.  We address this issue only because it is likely to arise
again if the Dominican prosecutor intends at some point to file
and supply "the document setting forth the charges."  See, e.g.,
Swajian v. Gen. Motors Corp., 916 F.2d 31, 35 (1st Cir. 1990)
(addressing issues "raised by the parties which [were] likely to
recur").  On habeas review of a magistrate's certification of
extraditability, we look only to whether the magistrate's
determination of probable cause was supported by "any evidence."
Kin-Hong, 110 F.3d at 116; Fernandez, 268 U.S. at 312 (authorizing
the habeas court to review "whether there was any evidence
warranting the finding that there was reasonable ground to believe
the accused guilty").  "This circuit has interpreted the 'any
evidence' standard quite literally, conducting a fairly
deferential review of the magistrate's findings."  Kin-Hong, 110

F.3d at 116-17 (citing <u>Koskotas</u> v. <u>Roche</u>, 931 F.2d 169, 176 (1st Cir. 1991); <u>Manzi</u>, 888 F.2d at 205).

Under that standard, the district court's analysis was largely correct: The magistrate certainly had at least some evidence to conclude that Aguasvivas might have been guilty of shooting at the agents who attempted to arrest him. Firstly, Dominican prosecutor Feliz Sanchez Arias reported that the two surviving officers identified a photograph of Aguasvivas as the shooter.[17] And secondly, a video of the shooting on YouTube -- while it does not actually show Aguasvivas shooting anyone -- does not show that he could not have done so. A medical report states that the bullets entered Ubri in the front, while the video plainly

_____

[17] The affidavit is not perfectly clear on the identification, given that it first identifies a photograph as the photograph of Cristian Aguasvivas and then states that the eyewitnesses were qualified to identify Aguasvivas because they saw him shoot Ubri but never explicitly that they identified the person in the photo as the shooter. However, the chain of logic seems to extend to that point: The agents saw the shooting, and believed Aguasvivas -- the man in the photograph -- committed it.

Additionally, evidence at an extradition hearing "may consist of hearsay, even entirely of hearsay." <u>Kin-Hong</u>, 110 F.3d at 120 (citing <u>Collins</u> v. <u>Loisel</u>, 259 U.S. 309, 317 (1922)). Aguasvivas argues that these statements are "not even hearsay" because "there is no declarant." It is true that the affidavit is not clear on whether the officers made the identification directly to Sanchez Arias or whether he learned of the identification through someone else. But the fact that the exact chain of knowledge is not identified does not change the fact that this is competent hearsay evidence admissible at an extradition hearing.

places Aguasvivas immediately in front (and within a foot or so) of Ubri when he was shot.

Of course, there is also a considerable amount of conflicting evidence. The autopsy report seems to assume that someone other than Aguasvivas must have committed the shooting, states that Ubri was killed by a "[d]istant" wound,[18] and suggests that the third shot entered Ubri in the "anterior region" of his left arm. Additionally, the government has admitted that Aguasvivas was handcuffed (albeit with hands in front) while the shots were fired.

As both the district court and Aguasvivas have pointed out, this circuit noted in 1997 that its light-touch approach to the "any evidence" standard may have been out of keeping with the more searching approaches of other circuits, Kin-Hong, 110 F.3d at 117 ("Recently, some other appellate courts, while retaining the traditional formulation, have apparently engaged in a more rigorous review of the evidence presented before the judicial officer, thus raising questions about the actual content of the 'any evidence' standard."), and that the scope of habeas review had broadened somewhat in other ways since the "any evidence" standard was set out in Fernandez, id. ("[H]abeas corpus in other

---

[18] The magistrate judge wrote that the bullets were "fired at short range." We have not been able to locate a source for that contention.

contexts has expanded to become a 'second look' at most substantive and procedural issues."). However, as in <u>Kin-Hong</u>, we need not resolve this issue here. The eyewitness testimony, though presented through hearsay, in combination with the video, makes clear that the magistrate had evidence to conclude that there was a reasonable ground to believe Aguasvivas guilty. Determining whether he is in fact guilty is a task we would leave for the Dominican court system.

### III.

For the foregoing reasons, the decision of the district court is <u>affirmed</u> as to the insufficiency of the documentation to support an extradition request under Article 7 of the treaty and <u>affirmed</u> as to the sufficiency of the probable cause determination, but <u>reversed</u> as to Aguasvivas's collateral estoppel claim. We <u>remand</u> for further proceedings consistent with this decision.

**– Concurring and Dissenting Opinion Follows –**

LYNCH, **Circuit Judge,** **concurring in part and dissenting**

**in part.** I join the holdings in the majority opinion finding

collateral estoppel inapplicable, finding that the warrant was

sufficient as to the naming of Aguasvivas, and upholding the

probable cause determination. I dissent from the affirmance of

the grant of habeas corpus on the basis that the documentation

provided does not meet the requirements of the extradition treaty.

I fear the majority opinion will undermine the purpose and letter

of the treaty and the repercussions of its ruling will extend far

beyond this case.

The extradition treaty at stake states that:

2. All extradition requests shall be supported
by:

>    (a) documents, statements, or other types
>    of information that describe the
>    identity, nationality, and probable
>    location of the person sought;

>    (b) information describing the facts of
>    the offense or offenses and the
>    procedural history of the case;

>    (c) the text of the law or laws
>    describing the offense or offenses for
>    which extradition is requested and the
>    applicable penalty or penalties; . . .

>    (e) the documents, statements, or other
>    types of information specified in either
>    paragraph 3 or paragraph 4 of this
>    Article, as applicable.

3. In addition to the requirements in
paragraph 2 of this Article, a request for
extradition of a person who is sought for
prosecution shall also be supported by:

> (a) a copy of the warrant or order of
> arrest or detention issued by a judge or
> other competent authority;
>
> (b) a copy of the document setting forth
> the charges against the person sought;
> and
>
> (c) such information as would provide a
> reasonable basis to believe that the
> person sought committed the offense or
> offenses for which extradition is
> requested.

Extradition Treaty ("Extradition Treaty"), Dom. Rep.-U.S., art. 7,
§§ 2-3, Jan. 12, 2015, T.I.A.S. No. 16-1215.

    The majority holds that the requirement that the
Dominican Republic provide "the document setting forth the
charges" under Article 7, § 3(b) has not been met.  It makes six
textual arguments -- most of which were not made by Aguasvivas --
to justify rejecting the government's position that a warrant can
be used as "the document setting forth the charges."  In doing so,
the majority concludes that a warrant cannot do "double duty,"
fulfilling the requirements of Article 7, § 3(a) and (b)
simultaneously.

    I disagree with the result the majority reaches, which
is based on incorrect and singular reasoning.  The plain language
of the Extradition Treaty does not require two documents, and the
warrant is sufficient to meet the terms of § 3(b).  The

government's interpretation of the treaty is reasonable, and the documents presented here comply with the treaty.

I would hold that the treaty unambiguously permits a warrant to serve as "the document setting forth the charges" as long as it adequately describes the charges against the accused. And even if the treaty were ambiguous, the canons favoring a "liberal construction" of treaty obligations coupled with the agreement between the United States and the Dominican Republic that the provided documents fulfill the terms of the treaty produce an inescapable conclusion that a warrant alone can satisfy both treaty requirements. I would also hold that the warrant provided in this case adequately stated the charges against Aguasvivas and serves as "the document setting forth the charges" against him under Article 7, § 3(b).

I.

I begin by reviewing the documents provided in support of extradition. Though the majority does not dwell on the particulars of the documents, a review of their text is essential to determining whether the Dominican government has adequately set forth charges against Aguasvivas. Both the Dominican Republic and the United States have provided documents supporting Aguasvivas's extradition.

The Dominican embassy's extradition request states that the Dominican Republic seeks Aguasvivas "to respond to the charges

against him of Association of malefactors, robbery, murder and illegal possession of firearms." The embassy clarifies that Aguasvivas "is charged with the violation of Articles 265, 266, 379, 383, 295 and 304 of the Dominican Criminal Code and Article 39, Paragraph III of Law 36 about Trade and Possession of Firearms." The extradition request also attaches the affidavit of Dominican Prosecutor Feliz Sanchez Arias and a copy of the warrant authorizing Aguasvivas's arrest.

Prosecutor Sanchez Arias's affidavit sets forth the accusations against Aguasvivas and provides background on Dominican criminal procedure. Prosecutor Sanchez Arias states that he is "in charge of the criminal case that accuses . . . Aguasvivas . . . of crimes of association of malefactors, robbery, murder and illegal possession of firearms . . . sanctioned by the articles 265, 266, 379, 383, 295 and 304 of the Dominican Criminal Code and article 39, paragraph III of Law 36 about Trade and Possession of Firearms." He reiterates that Aguasvivas "is accused of" and "must respond for the violation of . . . the Dominican Criminal Code, and . . . Law 36 about Trade and Possession of Firearms." Based on these accusations, an arrest warrant was issued. According to Sanchez Arias, the warrant remains "in force, valid and enforceable." Though he has not sought an indictment, Sanchez Arias explains that in his experience, "[i]f the accused has escaped, the prosecutor asks the judge for a warrant for his

arrest," and that after the accused is apprehended, "the accused is presented by the prosecutor to the investigating judge, in order that he decides on the measure of coercion that must be applied to the accused." Sanchez Arias concludes that "[c]onsidering the evidence that exists on this case, [he] has the conviction that if [Aguasvivas] is extradited to the Dominican Republic, he shall be sentenced in criminal trial by the crimes he is charged."

The arrest warrant, which was issued by a judge of the Dominican Republic authorized to issue such warrants, begins by describing the accusations against Aguasvivas. The warrant specifies that Aguasvivas is sought for arrest because he "disarmed and fired three shots to the agent LORENZO UBRI MONTERO causing his dea[th]," "seriously injured with firearms the agents of the National Directorate for Drug Control," and "disarmed . . . agents of the National Directorate for Drug Control who were participating in the anti-drug operation." As a result of these acts, Aguasvivas is "accused of violation of the articles 265, 266, 295, 304 and 309 of the Dominican Criminal Code and article 39 of Law 36 on Trade and Possession of Firearms." The judge states that based on the evidence presented by the prosecutors, "the accused are the perpetrators of the accusation, and that they can run away, so it is appropriate to grant the authorization for their arrest." The warrant authorizes the detention of Aguasvivas for no more than

twenty-four hours unless the prosecutor requests an additional "coercive measure" from the court.

The United States has provided both a complaint seeking Aguasvivas's extradition and a statement from the Office of the Legal Advisor describing the United States' position on the proper interpretation of the Extradition Treaty.  The complaint filed by the U.S. Attorney both lays out the government's treaty obligations to the Dominican Republic and confirms that "[a]ccording to the information provided by the Government of the Dominican Republic, AGUASVIVAS is charged with murder, aggravated robbery, conspiracy, and illegal firearm possession."  The U.S. Attorney also states that Aguasvivas "would be likely to flee" if faced with a warrant for his arrest.

The Office of the Legal Adviser states that "Article 7.3(b) supplements Article 7.3(a) by ensuring that the Requesting State provide . . . the document that identifies the offenses with which the accused is charged and sought for prosecution." (Emphasis added.)  "There is no requirement in Article 7, or elsewhere in the Treaty, that the requesting country provide separate documents to satisfy the requirements of Article 7.3(a) and (b)."  The United States also explains that it has "reviewed the Arrest Warrant for Cristian Aguasvivas" and concluded that it "satisfies both Article 7.3(a) and Article 7.3(b) of the Treaty."

II.

When interpreting a treaty, we must begin "with the text of the treaty and the context in which the written words are used." E. Airlines, Inc. v. Floyd, 499 U.S. 530, 534 (1991) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988)). If a treaty is unambiguous, it must be applied as written. See id. at 534-35; United States v. Li, 206 F.3d 56, 63 (1st Cir. 2000) (relying on non-textual sources "[t]o the extent that the treaties' terms are ambiguous"). However, "treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." E. Airlines, Inc., 499 U.S. at 535 (quoting Air Fr. v. Saks, 470 U.S. 392, 396 (1985)). When a treaty contains ambiguities, canons of treaty interpretation require us to both give a treaty the "more liberal construction" when more than one is possible and to construe an extradition treaty in favor of enforcement. Factor v. Laubenheimer, 290 U.S. 276, 293-94 (1933). Interpretive canons also require us to reject defenses to extradition that hinge on technicalities. See Fernandez v. Phillips, 268 U.S. 311, 312 (1925). Finally, "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." Sumitomo Shoji Am., Inc. v.

_Avagliano_, 457 U.S. 176, 185 (1982); _see also_ _El Al Isr. Airlines, Ltd._ v. _Tsui Yuan Tseng_, 525 U.S. 155, 167 (1999) ("Because a treaty ratified by the United States is . . . an agreement among sovereign powers, we have traditionally considered as aids to its interpretation . . . the postratification understanding of the contracting parties." (quoting _Zicherman_ v. _Korean Air Lines Co., Ltd._, 516 U.S. 217, 226 (1996))); _GE Energy Power Conversion Fr. SAS, Corp._ v. _Outokumpu Stainless USA, LLC_, 140 S. Ct. 1637, 1645-46 (2020).

### A.

I first consider whether the plain language of Article 7 permits the use of a single document to fulfill the requirements of both Article 7, § 3(a) and (b). The plain text of the treaty does not state that one document cannot meet both requirements. The requirements are listed separately to clarify that both requirements must be met, but that does not mean that two documents are required. As long as the document provided meets the terms of each individual requirement, the treaty terms are satisfied.

The majority's arguments to the contrary are unconvincing. The majority argues that because both the United States and the Dominican Republic use "warrants to arrest and separate documents to charge," Article 7, § 3(b) must refer to something different than an arrest warrant. Again, I disagree. The particulars of how the Dominican Republic brings formal charges

have little bearing on whether an arrest warrant itself can set
forth charges and fulfill both treaty requirements.   If the
drafters of the treaty wished to require something other than a
warrant under § 3(b), they could have done so by requiring
something like a "charging instrument."

        The majority also argues that the United States'
construction of the treaty would render § 3(b) superfluous because
a warrant will always describe the offenses charged.  This argument
is unpersuasive.  Neither government agrees that the United States'
reading of § 3(a) would make § 3(b) superfluous.  There is nothing
in the record to indicate that Dominican warrants <u>always</u> contain
a description of the offenses charged, and it is not our role to
investigate Dominican procedure.  <u>See</u> <u>Grin</u> v. <u>Shine</u>, 187 U.S. 181,
184-85 (1902).  Further, the United States argues that foreign
arrest warrants do not always set forth "any or all of the
charges."  This warrant meets the terms of § 3(b), but not all
warrants necessarily will.

        Looking to Article 7, §§ 2 and 3 together does not change
the analysis.  The majority argues that because § 2 says that an
extradition request must include information describing facts of
the offense and the text of the relevant laws, § 3(b), which
requires a copy of the document setting forth the charges, would
necessarily be rendered surplus if the documents provided here
were adequate under the treaty.  This argument was not made by

Aguasvivas and the government has not had any notice it had to respond to this argument. In any case, the argument is unpersuasive.

The portions of § 2 the majority says would be redundant with § 3 list the <u>information</u> that must be included in an extradition request, without any reference to what specific <u>documents</u> should be included. Extradition Treaty, art. 7, § 2(a)-(c). In contrast, Article 7, § 3 makes clear that the request must include copies of the warrant and the appropriate document setting forth the charges rather than just, for example, a letter from the embassy containing all the information described in § 2(a)-(c). Thus, in cases where there is an indictment setting forth the charges, § 3(b) says that a copy of the indictment should be included in the extradition request. And where the document setting forth the charges is a warrant, a copy of the warrant must be included. There is no surplusage here. And even if there were some redundancy, that would provide "only a clue" to the correct interpretation of a text because "[s]ometimes the better overall reading of the [text] contains some redundancy." Rimini Street, Inc. v. Oracle USA, Inc., 139 S. Ct. 873, 881 (2019).

The majority's reference to Federal Rule of Criminal Procedure 4 is also inapposite. Rule 4 governs the issuance of arrest warrants or summons "on a [c]omplaint," and requires that the warrant "describe the offense charged in the complaint." Fed.

R. Crim. P. 4(b)(1)(B) (emphasis added). But the majority's argument is premised on the fact that the Dominican Republic has not filed a criminal complaint against Aguasvivas. Analogizing from our procedure to make conclusions about Dominican procedure -- especially when Dominican procedure is obviously different here -- is improper. See Emami v. U.S. Dist. Ct., 834 F.2d 1444, 1449 (9th Cir. 1987) (stating that the court should "refrain from interpreting the requirements of German criminal procedure both out of respect for German sovereignty and because [the court] recognize[d] the chance of erroneous interpretation"). And even if we were to analogize to the United States' criminal procedure, the warrant at issue here more closely resembles a Rule 41 warrant, which allows officers to search for and seize a person without filing a complaint when there is probable cause to arrest that person. See Fed. R. Crim. P. 41. Although the warrant here contains a description of the charges against the person sought, a Rule 41 warrant does not have to include such a description.[19] See id.

---

[19]     The majority argues that Rule 41 is not relevant because I have not identified an example of an arrest or detention pursuant to such a warrant. This misunderstands the point. The point is that we cannot extrapolate anything about the Dominican warrant in this case from Rule 4, because a Rule 4 warrant presupposes that the arrestee has already been formally charged with a crime. See Fed. R. Crim. P. 4. In our system, an officer does not need a warrant at all to arrest a person if there is probable cause. Gerstein v. Pugh, 420 U.S. 103, 113 (1975). Thus, Rule 41 warrants, which are meant to aid officers in making arrests even

B.

Next, this dissent evaluates whether Article 7, § 3(b), which requires the requesting country to provide "the document setting forth the charges," mandates that the requesting country provide an indictment, complaint, or other separate charging instrument.[20]

Black's Law Dictionary defines a "charge" as a "formal accusation of an offense as a preliminary step to prosecution." Black's Law Dictionary (11th ed. 2019). This definition contradicts the majority's suggested reading that charges should be brought by means of an "indictment or the like." Instead, any document, including an arrest warrant, which details the crimes and acts the defendant is accused of committing and moves towards a prosecution can set forth charges under § 3(b).

The statute governing interstate extradition and caselaw discussing that statute also indicate that "charges" should be

---

when no Rule 4 warrant has issued and there is no charging instrument, are a better analog whether they are commonly used or not. See Fed. R. Crim. P. 41 advisory committee's note to 1979 amendment (explaining that Rule 41 permits warrants to search for a person subject to arrest "even though no arrest warrant has theretofore issued.").

[20]  The majority refuses to specify what kind of document is needed to fulfill § 3(b). It says that the document setting forth the charges must "indicate that the subject is wanted for prosecution," and must be "more than just a warrant." The majority suggests, but does not hold, that the document should be an "indictment or the like."

interpreted broadly. 18 U.S.C. § 3182 states that "a copy of . .
. an affidavit made before a magistrate" can serve as the document
"charging the person demanded" with a crime for the purposes of
interstate extradition. No formal charging instrument is
required. See In re Strauss, 197 U.S. 324, 331-32 (1905) (holding
that the Constitution and 18 U.S.C. § 3182 allow extradition on an
affidavit even if that affidavit would not serve as a charging
document sufficient to initiate a trial).

Caselaw buttresses the conclusion that a person may be
"charged" with an offense even if no formal charging document has
issued. The Supreme Court has held that the word "charged" in the
Extradition Clause of the Constitution "ought to be understood"
"in the broad and practical sense." Pierce v. Creecy, 210 U.S.
387, 402 (1908); see also id. at 404-05 (explaining that "the word
'charged' was used in its broad signification to cover any
proceeding which a state might see fit to adopt, by which a formal
accusation was made against an alleged criminal" and thus that a
document which "unmistakably describe[d] every element of the
crime" was sufficient to show that "the accused was substantially
charged with [a] crime." (quoting In re Strauss, 197 U.S. at 331));
id. at 403 (noting that for interstate extradition, there is no
requirement of "a good indictment, or even an indictment of any
kind" because extradition "requires nothing more than a charge of
crime"). Specifically, the Supreme Court has held in the context

of interstate extradition that "a party is charged with [a] crime when an affidavit is filed, alleging the commission of the offense, and a warrant is issued for his arrest; and this is true whether a final trial may or may not be had upon such charge." In re Strauss, 197 U.S. at 331; see also id. at 332 ("Why should the state be put to the expense of a grand jury and an indictment before securing possession of the party to be tried?"); Rothgery v. Gillespie County, 554 U.S. 191, 210 (2008) (holding that "an initial appearance following a charge signifies a sufficient commitment to prosecute regardless of a prosecutor's participation, indictment, information, or what the County calls a 'formal' complaint.").

Our sister circuits have similarly construed the term "charged" broadly in extradition treaties. See In re Assarsson, 635 F.2d 1237, 1242 (7th Cir. 1980) (explaining that treaty requirement that individual be "charged" was "used in the generic sense only to indicate 'accused'"); In re Assarsson, 687 F.2d 1157, 1160, 1163 n.13 (8th Cir. 1982) (holding that treaty which applied only to those "charged with or convicted" of an offense did not condition extradition on the existence of formal charges); Sacirbey v. Guccione, 589 F.3d 52, 67 (2d Cir. 2009) ("[W]e interpret these provisions to mean that the proof required under the Treaty to establish that an individual has been 'charged' with a crime is a valid arrest warrant and the evidence submitted in

order to obtain that warrant."); Emami, 834 F.2d at 1448-49 (holding that formal charges were not required to show that defendant had been "charged"). Against this background, the requirement that the requesting party provide a document "setting forth the charges" cannot be transmuted into a requirement that the requesting party provide an "indictment or the like" rather than a warrant setting forth the charges.

The cases relied upon by the majority further support the conclusion that a warrant may serve as a document "setting forth the charges." In Assarsson, a man was sought for extradition by the Swedish government. 635 F.2d at 1239. Under the terms of the treaty, Sweden could seek extradition of those who had been "charged with or convicted of" a list of offenses specified in the treaty. Id. at 1242. Assarsson argued that he had not been "charged with" a crime because no formal charges had been brought against him. See id. As in the instant case, the treaty specified a list of documents required to support an extradition request. Id. at 1243 n.7. The required documents included a "copy of the warrant of arrest or other order of detention issued by the competent authority of the requesting State," "a precise statement of the criminal act with which the person sought is charged," and "an authenticated copy of the texts of the applicable laws of the requesting State." Id. The Seventh Circuit concluded that the warrant was sufficient to show that Assarsson had been "charged"

under the terms of the treaty. Id. at 1242–43. The court explained
that the word "charged" was used in contrast to "convicted," and
thus was "used in the generic sense only to indicate 'accused.'"
Id. at 1242. Furthermore, "[s]ince the parties [to the treaty]
chose not to require production of the charge document, we can
easily infer that they did not require the 'substance' of a charge
either." Id. at 1243. The same reasoning applies here. There is
nothing in the treaty to suggest that the "charges" must be
anything more than accusations levied by the Dominican government.
The treaty does not on its face require a charging instrument, and
it is not appropriate for us to expand the Dominican Republic's
obligations under the treaty. See id. at 1241 n.5 ("[C]ourts
cannot expand the obligations of another nation under a treaty."
(citing Grin, 187 U.S. at 191–92)).

     The majority attempts to distinguish Assarsson by
explaining that the treaty at issue required a warrant and a
statement of the "criminal act . . . charged," while the treaty at
issue here requires a warrant and "the document setting forth the
charges." The majority argues that "[w]hen, subsequent to
Assarsson . . . [the treating parties] added to the list of
required documents 'the document setting forth the charges,' a
strong inference arose supporting the conclusion that this treaty
requires more than an arrest warrant." This argument does not
hold. The majority makes too much of the modest differences in

- 53 -

the treaty language.  As explained in Assarsson, "[i]f the parties
had wished to include the additional requirement that a formal
document called a charge be produced, they could have so provided."
Assarsson, 635 F.2d at 1243.  I agree that the treaty could have
included a requirement for a formal charging document.  But it
does not.  And contrary to the majority's reasoning, a document
"setting forth the charges" is more akin to the statement of the
"criminal act . . . charged" as required by the Assarsson treaty
than to an indictment or other charging instrument.  See id. at
1243 n.7.

The majority also relies on Emami.  In Emami, the German
government sought to extradite Reza Emami for "detention for
investigation."  834 F.2d at 1446.  Formal charges had not been
filed against Emami.  Instead, the German government had issued an
arrest warrant for the purpose of detaining and interrogating
Emami.  Id. at 1447.  Emami first argued that he could not be
extradited before the filing of a formal public charge because the
treaty applied only to persons "who have been charged with an
offense or are wanted by the other Contracting Party for the
enforcement of a judicially pronounced penalty or detention
order."  Id. at 1448 (emphasis added).  Citing Assarsson, the court
rejected this notion, reasoning that the word "charged" was used
to distinguish between those accused and those already convicted
of an offense.  Id.  Further, the word "charged" had been "used as

a verb in the generic sense only to indicate 'accused'" and "could not be transmuted into a requirement that 'charges,' a noun, be filed." Id. (citing Assarsson, 635 F.2d at 1242-43). The court explained that it was appropriate to inquire into whether a defendant had been formally charged only if the treaty required a copy of a formal charging document. Id. As the treaty only required the requesting country to provide "[t]he text of all applicable provisions of law of the Requesting State concerning the definition of the offense," "[a] warrant of arrest," and "[a] summary statement of the facts of the case unless they appear from the warrant of arrest," the court would not inquire into whether a formal charge existed. Id. at 1488 & n.3.

Emami next argued that he was not properly sought "for prosecution" because Germany had not shown an adequate intent to prosecute him. Id. at 1449. He contended that Germany had not shown a commitment to prosecute because it had requested him "for purposes of 'detention for investigation'" and had not filed charges against him. Id. at 1448. The court rejected this argument, explaining that it had "reservations against deciding questions of German criminal procedure" and holding that Germany's statement in its extradition request that Emami was wanted for prosecution was sufficient to show that Emami was wanted for prosecution under the terms of the treaty. Id. at 1449.

The majority's decision conflicts with both holdings. As with Assarsson, the majority attempts to distinguish Emami on the basis that the treaty at issue had different documentary requirements. But the core holding of Emami is that the court should not inquire into whether charges have been brought unless the treaty unequivocally requires a charging document. The extradition treaty at issue in this case does not require a charging document, so we should recognize that any document that sets forth the charges fulfills the requirement of § 3(b).

The majority's decision also flatly contradicts the Emami court's holding that a foreign government's statement of intent to prosecute is sufficient to show that a person is sought "for prosecution." As in Emami, the Extradition Treaty provides for the extradition of people sought "for prosecution" and the Dominican Republic seeks to interrogate the suspect before the filing of formal charges. See id. at 1448. Like in Emami, the Dominican Republic has given clear signals that it intends to prosecute Aguasvivas: the Dominican State Department specified that it wishes to extradite Aguasvivas "to respond to the charges against him," and the prosecutor "in charge of the criminal case that accuses" Aguasvivas has concluded that "[c]onsidering the evidence that exists on this case, [he] has the conviction that if [Aguasvivas] is extradited to the Dominican Republic, he shall be sentenced in criminal trial by the crimes he is charged."

Nevertheless, the majority insists that the requirement that Aguasvivas be sought for prosecution means that more than an arrest warrant is required. This holding both contradicts <u>Emami</u> and undercuts the purpose of the treaty. In light of <u>Emami</u> and <u>Assarsson</u>, the majority's ruling in this case will create a circuit split suitable for Supreme Court review.

      The additional arguments made by the majority do not support its conclusion that the warrant does not adequately set forth the charges against Aguasvivas.

      The majority's fifth argument -- also not made by Aguasvivas -- is that because the Extradition Treaty was drafted after <u>Emami</u> and <u>Assarsson</u>, and the 1909 Extradition Treaty between the Dominican Republic and the United States required only a warrant, the addition of a requirement that the requesting party provide the document setting forth the charges was meant "to call for the production of more than just a warrant." I disagree with this reasoning. First, as explained above, <u>Emami</u> and <u>Assarsson</u> counseled the State Department that if it wanted an extradition treaty to require a formal charging instrument, then it should explicitly add such a requirement to the treaty. When, as here, a later treaty does <u>not</u> contain such a requirement, then we should not read it in. Second, the 2015 treaty replaced the entire text of the 1909 treaty with different text very similar to a significant number of extradition treaties between the United

States and other Caribbean and South American countries. See, e.g., Extradition Treaty, Chile-U.S., art. 8, § 3(b), June 5, 2013, T.I.A.S. No. 16-1214 (requiring "a document setting forth the charges" to support an extradition request); Extradition Treaty, Gren.-U.S., art. 6, § 3(b), Sept. 14, 1999, T.I.A.S. No. 99-914.1 (same); Extradition Treaty, St. Kitts & Nevis-U.S., art. 6, § 3(b), Sept. 18, 1996, T.I.A.S. No. 12,805 (same). Thus, because the text was based on other treaties, rather than an article by article revision of the 1909 treaty, textual differences between the 1909 treaty and the 2015 treaty should not be given undue weight in interpreting the 2015 treaty.

The majority's sixth argument -- also not made by Aguasvivas -- is unconvincing. The majority argues that because the Austrian and Israeli extradition treaties explicitly allow for extradition when there is no "charging document," then we should not read the Dominican extradition treaty to also allow for extradition absent a charging document. This argument ignores critical differences in language between those treaties and the treaty at issue. The Austrian and Israeli treaties specifically require a "charging document" if one exists rather than a more general "document setting forth the charges." Extradition Treaty, Austria-U.S., art. 10, § 3(b), Jan. 8, 1998, T.I.A.S. No. 12,916; Protocol Amending the Convention between the United States of America and Israel of December 10, 1962, Isr.-U.S., art. 6, July

6, 2005, T.I.A.S. No. 07-110. If anything, the fact that other treaties use the phrase "charging document" suggests that "the document setting forth the charges" should not be narrowly interpreted to mean "the charging document."

Finally, in addition to the document setting forth the charges, the treaty requires "a copy of the warrant or order of arrest <u>or detention</u> issued by a judge or other competent authority." Extradition Treaty, art. 7, § 3(a) (emphasis added). While the warrant provided in this case is nominally an arrest warrant, the warrant could also be understood as a warrant of detention. As explained in the warrant, the Dominican Code of Criminal Procedure allows a judge to issue warrants to detain individuals for questioning. The record in this case shows that Prosecutor Sanchez Arias seeks to detain Aguasvivas to interview him before bringing formal charges, as Dominican procedure allows, and the warrant only authorizes the prosecutor to detain Aguasvivas for twenty-four hours for questioning. If the treaty were read to require an indictment or complaint, that sequence would never be permitted, despite the treaty's provision allowing for extradition on a warrant or order of detention.[21]

---

[21]     Contrary to the majority's argument, I do not assume that there could never be an extradition based on an order of detention if a formal charging document were required by the treaty. Rather, as the United States explains, Dominican procedure allows the government to seek pre-indictment warrants and extraditions to detain and question suspects. Thus, when the

In light of the plain text of the treaty and ample
precedent on the meaning of "charges," I would hold that the treaty
unambiguously permits any official document describing both the
criminal acts committed by the defendant and the laws violated by
the defendant to serve as a "document setting forth the charges."
I would also hold that the treaty unambiguously permits one
document to fulfill the requirements of both Article 7, § 3(a) and
Article 7, § 3(b). The majority's contrary holdings put this court
at odds with Supreme Court precedent and the decisions of our
sister circuits.

The arrest warrant for Aguasvivas adequately specifies
the laws Aguasvivas is accused of violating, describes the criminal
acts that Aguasvivas is charged with performing, and lists the
evidence supporting these charges. Thus, it is sufficient to set
forth the charges under the terms of the treaty.

C.

A finding that the treaty is ambiguous would lead me to
the same result. When a treaty is ambiguous, the parties'
reasonable interpretation is essentially binding on the court.
See Sumitomo Shoji Am., Inc., 457 U.S. at 185 ("When the parties
to a treaty both agree as to the meaning of a treaty provision,

---

treaty expressly allows for extradition on an "order of detention"
in addition to an arrest warrant, a strong inference arises that
the Dominican Republic should be permitted to use this pre-
indictment procedure to extradite Aguasvivas.

and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation."). Furthermore, "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." Factor, 290 U.S. at 293-94; see also Grin, 187 U.S. at 184 (stating that extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers.").

The United States and the Dominican Republic agree that the warrant can fulfill the requirements of § 3(b). The State Department opines that "Article 7(3)(b) supplements Article 7(3)(a) by ensuring that the Requesting State provide not only the document that functions as a 'warrant or order of arrest or detention issued by a judge or other competent authority,' but also the document that identifies the offenses with which the accused is charged and sought for prosecution in the Requesting State." However, "[t]here is no requirement . . . that the requesting country provide separate documents." A representative from the Office of the Legal Advisor represented that he had "reviewed the Arrest Warrant for Cristian Aguasvivas submitted by the Dominican Republic in this extradition request," and concluded that it "satisfie[d] both Article 7.3(a) and Article 7.3(b) of the Treaty." The extradition complaint filed in the district court

also explains that Aguasvivas "is <u>charged</u> with murder, aggravated robbery, conspiracy, and illegal firearm possession, in violation of Articles 265, 266, 295, 304, 379, and 383 of the Dominican Criminal Code, and Article 39, Paragraph III, of Dominican Law 36 on Trade and Possession of Firearms." (emphasis added).

       The Dominican Republic has also made clear that they believe Aguasvivas has been charged with several crimes and that they have provided sufficient documentation for his extradition. The communication from the Dominican embassy specifies that it requests Aguasvivas's extradition so that he can "respond to the charges against him of Association of malefactors, robbery, murder, and illegal possession of firearms." Prosecutor Sanchez Arias declares that the "[t]reaty does not state as a requirement for . . . extradition, the prior existence of an indictment against the person required in extradition." He explained that an indictment had not been obtained because "the Prosecutor wants to know the version of the accused of how and why he perpetrated the facts imputed to him . . . prior [to] filing an indictment against him." The warrant also states on its face that Aguasvivas is "accused of violat[ing]" several articles of the Dominican Criminal Code.

       In the face of this agreement, if the treaty is ambiguous, we must defer to the parties and hold that the warrant fulfills the requirements of Article 7, § 3(b).

III.

The majority approach is forbidden by Supreme Court precedent in several respects. First, the Supreme Court has cautioned against expanding the treaty obligations of other countries. See Grin, 187 U.S. at 191 ("The treaty is undoubtedly obligatory upon both powers, and, if Congress should prescribe additional formalities than those required by the treaty, it might become the subject of complaint by the Russian government and of further negotiations."). Instead, extradition treaties should be "faithfully observed, and interpreted with a view to fulfil our just obligations to other powers." Id. at 184. Insisting that the Dominican Republic provide a charging document when the treaty does not explicitly include such a requirement puts an impermissible burden on the Dominican Republic and will stand in the way of the United States' faithful adherence to its treaty obligations, both to the Dominican Republic and the many other countries whose treaties similarly require "document[s] setting forth the charges."

Second, courts should refrain from imposing standards that cause the validity of an extradition request to turn on the technical form of the request. See Glucksman v. Henkel, 221 U.S. 508, 512 (1911) ("[W]hile . . . a man is not to be sent from the country merely upon demand or surmise, . . . if there is presented, even in somewhat untechnical form according to our ideas, such

reasonable ground to suppose him guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender."); <u>Yordi</u> v. <u>Nolte</u>, 215 U.S. 227, 230-31 (1909) (moving away from the "extreme technicality with which [extradition] proceedings were formerly conducted" and holding that extradition complaints "need not be drawn with the formal precision of an indictment"). Where an extradition proceeding "is manifestly taken in good faith, a technical noncompliance with some formality of criminal procedure should not be allowed to stand in the way of a faithful discharge of our obligations." <u>Grin</u>, 187 U.S. at 184-85. Furthermore, courts should not be required to become familiar with foreign criminal procedure in order to resolve extradition requests. <u>Id.</u> at 190 (stating that the court should not be "expected . . . [to] become conversant with the criminal laws of Russia, or with the forms of warrants of arrest used for the apprehension of criminals"); <u>see also</u> <u>Assarsson</u>, 635 F.2d at 1244 ("We are also not expected to become experts in the laws of foreign nations." (citing <u>Grin</u>, 187 U.S. at 181)).

Cases from our sister circuits expand on these notions. In <u>Assarsson</u>, the court explained that courts should "refus[e] to review compliance with foreign criminal procedure . . . based on respect for the sovereignty of other nations." 635 F.2d at 1244. "This respect is embodied in the procedural framework of international extradition, which 'gives to the demanding country

- 64 -

advantages most uncommon to ordinary civil and criminal litigation.'" Id. (quoting First Nat'l City Bank of N.Y. v. Aristeguieta, 287 F.2d 219, 226 (2d Cir. 1960), vacated as moot, 375 U.S. 49 (1963)). Furthermore, courts should avoid inquiries that require them to evaluate and interpret the laws of foreign nations because such inquiries carry a high risk of error. Id. ("[T]he chance of error is much greater when we try to construe the law of a[nother] country . . . ."); see also Emami, 834 F.2d at 1449 (concluding that the court should "refrain from interpreting the requirements of German criminal procedure both out of respect for German sovereignty and because [the court] recognize[d] the chance of erroneous interpretation").

These holdings do not forbid us from inquiring into the sufficiency of the documents provided by the Dominican Republic. But the majority's interpretation of the treaty will unnecessarily require courts to evaluate whether the documents presented include a proper charging document rather than accepting the representations of the Dominican Republic that the defendant has been charged with several crimes.[22] The majority's holding also

---

[22] The dangers of this type of inquiry appear even in this case. While the majority suggests that a criminal complaint by a victim would suffice as a document setting forth the charges, such a complaint does not indicate that a prosecutor will in fact bring charges.

Prosecutor Sanchez Arias's affidavit states that "[t]he aggrieved parties may also file a criminal complaint against the accused and collaborate proactively with prosecutors in the work

hinges on its conclusion that the Dominican Republic will never issue a warrant that does not describe all of the offenses charged against the person sought for extradition.  This type of reasoning goes against the weight of precedent cautioning against inquiries into the criminal procedure of other nations.  We should inquire only whether the documents adequately describe and give notice of the charges against Aguasvivas.

IV.

The majority's decision, in my view, harms the United States in the conduct of foreign affairs and is in conflict with the views of other circuits.  And because the treaty language at issue in this case is nearly identical to the language in a large number of extradition treaties with Caribbean and South American countries, the majority opinion will have repercussions far beyond this case.  Though the Dominican Republic may file an acusación and attempt to extradite Aguasvivas again, in all likelihood Aguasvivas will never be found to permit extradition to face charges in the Dominican Republic.

I respectfully dissent.

---

of investigation" but that "[t]he prosecutor decides whether or not to bring charges" and if the prosecutor does bring charges "the complainant adheres to the accusation."  It is not clear from the majority opinion whether a victim's complaint unsupported by a prosecutor would fulfill the terms of § 3(b).